No. 25-1273

IN THE UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

———————————

J. DOE 1, et al.,

*Plaintiffs-Appellees*,

v.

ELON MUSK, et al.,

*Defendants-Appellants*.

———————————

On Appeal from the United States District Court
for the District of Maryland

———————————

**EMERGENCY MOTION FOR A STAY PENDING APPEAL AND FOR AN
IMMEDIATE ADMINISTRATIVE STAY PENDING DISPOSITION OF
THE STAY MOTION**

———————————

YAAKOV M. ROTH
*Acting Assistant*
*Attorney General*

KELLY O. HAYES
*United States Attorney*

MARK R. FREEMAN
ABBY C. WRIGHT
ADAM C. JED
GRAHAM WHITE
*Attorneys, Appellate Staff*
*Civil Division, Room 7230*
*U.S. Department of Justice*
*950 Pennsylvania Avenue NW*
*Washington, DC 20530*

**TABLE OF CONTENTS**

**Page**

INTRODUCTION ...................................................................................1

STATEMENT ........................................................................................3

    A.   Factual Background ..................................................3

    B.   Prior Proceedings ...................................................5

ARGUMENT ......................................................................................10

I.    At A Minimum, The Preliminary Injunction Should Be Stayed To Permit USAID's Chief Operating Officer To Conduct USAID Business ...........................................10

II.    The Entire Preliminary Injunction Should Be Stayed ..................................13

    A.   Plaintiffs' Appointment Clause claim lacks merit ............................13

    B.   Plaintiff's additional "separation-of-powers" claim lacks merit ........................19

    C.   The balance of equities favor a stay ...................................21

CONCLUSION ....................................................................................23

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

# INTRODUCTION

The government respectfully asks this Court to stay—beginning with an immediate administrative stay—the preliminary injunction issued by the district court on March 18, 2025, which unduly restricts the ability of Executive Branch officials to operate the U.S. Agency for International Development (USAID). In a decision that upends long-established precedent, the district court enjoined a Senior Advisor to the President (Elon Musk) and a component of the Executive Office of the President (the U.S. Department of Government Efficiency Service (USDS)), from providing a range of advice and support to USAID. And, as the district court subsequently clarified, the injunction bars duly-appointed USAID officials—including USAID's effective Chief Operating Officer—from running USAID if they previously worked on a USAID team interacting with those White House officials. This is an extraordinary intrusion on a coordinate branch, and immediate relief is necessary.

The district court based its injunction on two conclusions that were fundamentally flawed. *First*, the court wrongly held that Musk's ability to influence agency policy renders him an "Officer" under the Appointments Clause requiring Senate confirmation. An individual with sizable influence who holds no office and wields no formal authority is not an "Officer."  A contrary rule would undermine every President's ability to work with trusted advisors.  *Second*, the

district court invented a free floating "separation-of-powers" claim that superintends agencies by evaluating which kinds of operations and how many agency decisions cross an undefined constitutional line. A court cannot group together a range of disparate agency actions and declare, without examining the legality of any particular action, that the whole is greater than the sum of its parts and therefore unconstitutional.

The district court's clarification that its injunction bars USAID's Chief Operating Officer, Jeremy Lewin, from running USAID further underscores the error of the court's analysis and effectively prevents the agency from operating. Lewin is not a defendant in this litigation and has never worked for USDS. Rather, he has served as a policymaker at USAID and was recently delegated the duties of Deputy Administrator and Chief Operating Officer. Enjoining Lewin on the ground that he previously interacted with White House advisors cannot be squared with the logic of the court's own ruling that USAID must be run by USAID officials.

Any injunction that prevents the government from carrying out its legally authorized functions imposes an irreparable injury. USAID must take various actions in the very near future, including some that address the concerns that plaintiffs have emphasized. The government therefore respectfully requests an immediate administrative stay and a ruling on this motion by **Tuesday, March 25 at 5pm** to enable the Acting Solicitor General to decide whether to seek Supreme

Cort review if necessary. At the very least, an immediate stay allowing Lewin to perform his legally authorized duties as a USAID official is required to ensure the agency can continue to function. Plaintiffs oppose this motion.

## STATEMENT

### A.     Factual Background

**1.** USAID was initially established by Executive Order as "an agency in the Department of State." *Administration of Foreign Assistance & Related Functions*, Exec. Order No. 10,973, § 102, 26 Fed. Reg. 10,469, 10,469 (Nov. 7, 1961). Congress subsequently recognized USAID as an "independent establishment" but declared the USAID Administrator to be "under the direct authority and foreign policy guidance of the Secretary of State." 22 U.S.C. §§ 6563, 6592. The Department of State and USAID jointly administer various foreign assistance. *See, e.g.*, *id.* §§ 2346(b), 6563.

Upon taking office, President Trump paused foreign development assistance to ensure that the United States' provision of foreign aid is aligned with American interests. *See Reevaluating & Realigning United States Foreign Aid,* Exec. Order No. 14,169, 90 Fed. Reg. 8619 (Jan. 30, 2025). Secretary of State Rubio subsequently directed a "pause[]" on most "new obligations of funding, pending a review, for foreign assistance programs funded by or through the [State] Department and USAID." Doc. 28-2 at 8 (alterations in original) (quotation marks

omitted). President Trump designated Secretary Rubio as USAID's Acting Administrator, who, in turn, designated Peter Marocco, (an official at Department of State) as Deputy Administrator. *Id.* at 7; Doc. 73 at 99. Secretary Rubio then informed Congress that Deputy Administrator Marocco would "begin the process of engaging in a review and potential reorganization of USAID's activities." Doc. 73 at 11 (Op.) (quotation marks omitted). The record explains that Secretary Rubio and Deputy Administrator Marocco authorized numerous actions to restructure USAID and its operations. Doc. 77-2, ¶¶ 2-6.

**2.** On January 20, the President renamed the U.S. Digital Service and established within the Executive Office of the President the United States, the Department of Governmental Efficiency Service (USDS), to report to the White House Chief of Staff. *Establishing & Implementing the President's "Department of Government Efficiency,"* Exec. Order No. 14,158, §§ 1, 3(b), 90 Fed. Reg. 8441 (Jan. 29, 2025) (E.O.). The President further directed that the heads of all Executive Branch agencies "establish within" each agency a "DOGE Team," selected by agency heads. *See id.* §§ 3(c), 4.

The record explains that President Trump designated Amy Gleason as the Acting Administrator of USDS, Op. 35-36, and that Musk does not serve as the USDS Administrator and is not an employee of USDS. Doc. 28-2 at 28. "Mr. Musk is an employee of the White House" and a "Senior Advisor to the President."

4

*Id.* at 28, ¶¶ 3-4. In that capacity, Musk "has no actual or formal authority to make government decisions himself," and "can only advise the President and communicate the President's directives." *Id.* at 29, ¶ 5.

USAID established a USAID DOGE Team led by Jeremy Lewin, who previously served as a Senior Advisor and Director for Strategy and Programs at USAID. Doc. 77-2. The remaining team members were "detailed to USAID from other federal agencies, not USDS." Doc. 28-2 at 17, ¶ 26. USAID DOGE Team members "assisted in recommending and implementing" the personnel and contract actions authorized by Secretary Rubio and Deputy Administrator Marocco. Doc. 77-2, ¶ 7. The record explains that DOGE Team members were "always under the direction and supervision" of USAID leadership. *Id.*

## B.    Prior Proceedings

**1.** Plaintiffs—current and former USAID employees or contractors—brought this action against Elon Musk and USDS. They allege that these defendants are principally responsible for a range of actions at USAID in violation of the Appointments Clause and separation-of-powers principles. Doc. 14 at 36-40.

**2.** On March 18, 2025, the district court granted plaintiffs' motion for a preliminary injunction. The court held that plaintiffs were likely to succeed on both of their claims. First, the court held that Elon Musk is an improperly appointed Officer of the United States. Op. 24-36. Acknowledging that even "[p]laintiffs

5

agree that Musk has no formal legal authority to make the decisions at issue," Op. 31, the court explained "that most of the major actions taken at USAID that could be deemed to be an exercise of significant authority" were "approved by USAID officials," "even if initiated, suggested, or directed by Musk" or USAID's "DOGE Team Members," Op. 26; *see also* Op. 26-27 (detailing specific decisions made by USAID leadership).

But the court focused on the fact that the preliminary injunction record did not contain "specific orders" or other explanations describing the closure of USAID's headquarters and website. Op. 27 (quotation marks omitted). Based on that absence of evidence and the fact that Musk made statements about closing down USAID, the court inferred that "Musk appears to have been involved" in closing the building. Op. 28. Relying on its belief that defendants took other actions regarding other agencies, the court concluded that "Musk made the decisions to shutdown USAID's headquarters and website even though he 'lacked the authority to make that decision,'" Op. 28-29 (emphasis omitted).

The court then held that Musk is an improperly appointed Officer of the United States. Although the court recognized the undisputed fact that "Musk has no formal legal authority to make the decisions at issue," the court nonetheless concluded that some unspecified quanta of significant influence can transform a White House advisor into an Officer who must be Senate confirmed. Op. 31. And

6

because USDS "was established by the DOGE Executive Order," Op. 32, and White House officials have referred to several people other than Musk as being "a leader of DOGE," Op. 33, the court concluded that Musk occupies an office "as the leader of DOGE," Op. 33-36.

Although the district court viewed its Appointments Clause holding as sufficient to establish a likelihood of success on the merits, the court further held that plaintiffs are likely to succeed on their separation-of-powers claim. Op. 37-53. The court did not hold that any particular employment, contract, or grant decision was improper. But the court concluded that in aggregate, the challenged personnel and contract actions amounted to having "eliminated" USAID because the current personnel status means that "USAID appears to be unable to perform its core functions." Op. 39-40 (quotation marks omitted). The court concluded that "actions to dismantle USAID violate the [s]eparation of [p]owers because they contravene congressional authority relating to the establishment of an agency." Op. 51.

The court held that plaintiffs are suffering irreparable injury from (i) the "reputational harm[]" caused by Musk's "statements about USAID and its personnel," (ii) the "potential public disclosure of personal, sensitive, or classified information," and (iii) "security risks" to certain plaintiffs stationed abroad. Op. 56-60. The court stated that the requested injunction "would not be directed at

7

USAID, which is not a party to this case, and thus would not impact its ability to act, including in relation to foreign policy interests." Op. 62.

The district court's injunction requires defendants to "reinstate" plaintiffs' access to various USAID electronic systems and enjoined them from disclosing plaintiffs' personal information. Doc. 75, ¶ 2(a), (b). The court further enjoined defendants from taking various actions related to employee or contract terminations or shutdowns of buildings or computer systems. *Id.* ¶ 2(c). And it enjoined defendants from taking "any other actions relating to USAID without the express authorization of a USAID official with legal authority to take or approve the action." *Id.* ¶ 2(d).

**3.** The next day, the government moved to clarify or modify the injunction to ensure that Jeremy Lewin could carry out his duties and operate the agency. Doc. 77. The motion explained that Secretary Rubio, prior to the issuance of the preliminary injunction, had delegated to Lewin the duties of Deputy Administrator of USAID. *Id.* at 1. The accompanying declaration explained that Lewin has been "serv[ing] as a policymaker at USAID since January 28, 2025" in senior roles and that he is "not" and has "never been, an employee of Elon Musk or USDS." Doc. 77-2, ¶¶ 3, 9. The declaration clarified that in his capacity as a USAID official, he was the "DOGE Team Lead at USAID for a period of time," but he is

8

"no longer the DOGE Team Lead" or "otherwise a member of the DOGE Team." *Id.* ¶ 9.

Because the district court's preliminary injunction defined as "Defendants" any person "who at any time" had served as "a DOGE Team Lead or DOGE Team Member," Doc. 75 at 1, the government asked the court to clarify or, if necessary, modify the injunction to ensure that Mr. Lewin was not enjoined "from engaging in a wide range of work he is otherwise authorized—and tasked—to perform" as Deputy Administrator, Doc. 77 at 2. In particular, the government pointed to the "line" the district court had drawn "between actions taken by Defendants, and those taken (or ratified) by USAID officials." *Id.* The government also explained that "any delay or frustration" of Lewin's "ability to authorize certain activities at USAID may imperil the delivery of USAID's essential aid programming and may potentially place USAID personnel posted overseas in harm's way." *Id.*; *see also* Doc. 77-2, ¶¶ 11-15.

**4.** The district court denied the motion. Doc. 79. The court declared that "[e]xcluding Lewin" from the injunction "would undermine" the purpose of the injunction to bar from agency decisions "all individuals with a past or present affiliation with Defendants or DOGE" who are "the most likely perpetrators of constitutional violations" and to "prevent the circumvention of the injunction." *Id.* at 1. Opining that "USAID functions can be accomplished through other

9

authorized USAID officials in conjunction with the recusal of any enjoined individuals," *id.* at 1-2, the court also claimed to "reserve[] the right to modify the Preliminary Injunction to expand the definition of Defendants should additional personnel actions have the effect of circumventing the Preliminary Injunction," *id.* at 2.

**ARGUMENT**

In considering a request for a stay pending appeal, this Court considers the movant's likelihood of success on the merits and the impact on the parties and the public interest from granting or denying a stay. *See Nken v. Holder*, 556 U.S. 418, 426 (2009). All factors favor a stay.

## I.     At A Minimum, The Preliminary Injunction Should Be Stayed To Permit USAID's Chief Operating Officer To Conduct USAID Business.

The government respectfully requests that this Court at the very least stay the preliminary injunction as it applies to Jeremy Lewin, a USAID official to whom Secretary and Acting Administrator Rubio has delegated the authorities of the Deputy Administrator for Policy and Programming and the Chief Operating Officer for USAID. This Court need not reach the merits of the district court's legal conclusions to recognize that enjoining Lewin has no basis in law and inflicts significant irreparable harm on the government. Even accepting the district court's preliminary injunction on its own terms, the injunction should not reach Lewin.

Lewin and other USAID officials are not defendants in this action. And Lewin is indisputably a USAID official tasked with carrying out USAID's functions by USAID's most senior official, Acting Administrator (and Secretary) Rubio. The district court's core reasoning, as well as its decision not to enjoin a range of past USAID decisions that "USAID either approved or ratified," Op. 65, is focused on ensuring that USAID is run by USAID officials. But the court blocked exactly that from happening. That the court would prefer a different individual to run USAID is not a sufficient basis upon which to proceed.

The district court's conclusion that Lewin should be enjoined as a prophylactic means of shielding USAID from Musk or USDS is similarly unpersuasive. The record shows that Lewin is "not" and has "never been, an employee of Elon Musk or USDS." Doc. 77-2, ¶¶ 3, 9. Agency DOGE Teams are "establish[ed] within" each agency and are not part of USDS, E.O. § 3(c). And Lewin is also "no longer the DOGE Team Lead" or "otherwise a member of the DOGE Team." Doc. 77-2, ¶ 9. The court's decision to enjoin any person "who at any time" had served as "a DOGE Team Lead or DOGE Team Member," Doc. 75 at 1, is prophylaxis built upon prophylaxis that improperly reaches individuals who are not defendants in this action. The fact that the district court is candidly requiring recusal of particular USAID officials selected by the USAID Acting

11

Administrator only underscores the extraordinary intrusiveness of the preliminary injunction.

The irreparable injury inflicted by the preliminary injunction is particularly clear when applied to Lewin. Lewin explained that Secretary Rubio "has authorized" various "steps and actions to be taken in connection with the ongoing restructuring and other matters related to the operation and management of USAID." Doc. 77-2, ¶¶ 11, 12. The declaration further explains that Lewin has important background on USAID's recent restructuring and that other than Secretary Rubio, only Lewin has the "authority" to carry out those responsibilities. *Id.* ¶¶ 3, 6-7, 12, 15. And especially in view of the Secretary of State's other very "significant responsibilities," it is unreasonable "to expect the Agency Head to personally approve every such action or request." *Id.* ¶ 15.

Additionally, some of the functions that Lewin must perform are meant to protect the very equities on which the district court relied when issuing its injunction. Lewin has explained that "[a]ny delay or frustration of [his] ability to authorize" various "actions may imperil the delivery of USAID's essential aid programming and may potentially place USAID personnel posted overseas in harm's way." Doc. 77-2, ¶ 13; *see id.* ¶ 14 (discussing Lewin's responsibilities to "secure the effective delivery" of an "HIV relief program," and "ensure that USAID's critical global health supply chain remains intact"). Lewin has also

explained that he "may need to take certain personnel actions in connection with the orderly administration of the restructuring, or to secure the continued safety of [USAID] personnel and confidentiality of Agency information." *Id.* ¶ 16.

## II.    The Entire Preliminary Injunction Should Be Stayed.

### A.    Plaintiffs' Appointment Clause claim lacks merit.

The Appointments Clause of the Constitution provides the method for appointing "Officers of the United States." U.S. Const. art. II, § 2, cl. 2. Principal officers must be appointed by the President with Senate confirmation, while Congress may vest the appointment of inferior officers in the President alone, the courts of law, or by the heads of Executive departments. *Id.* Individuals are officers, and thus must receive a constitutional appointment, when they occupy a continuing position that is vested with the authority to "exercis[e] significant authority pursuant to the laws of the United States." *Free Enter. Fund v. Public Co. Accounting Oversight Bd.*, 561 U.S. 477, 506 (2010) (alteration in original) (quotation omitted). The district court erred by holding that Elon Musk is likely an officer.

**1.** The record establishes that Musk is not an officer because he does not exercise "significant authority pursuant to the laws of the United States." *Freytag v. Commissioner*, 501 U.S. 868, 881 (1991). The district court acknowledged agreement among the parties that "Musk has no formal legal authority to make the

13

decisions at issue." Op. 31. That should have been the end of the matter. But the court instead relied on what it viewed as Musk's significant influence, believing that "Musk appears to have been involved" in closing the USAID headquarters building and "made the decisions to shutdown USAID's headquarters and website even though he 'lacked the authority to make that decision,'" Op. 28-29 (quoting Doc. 28 at 18).

This kind of purely advisory role falls far short of anything that has been recognized as "significant authority" for officer status. Musk does not, for example, possess statutory or regulatory authority to issue "final decision[s]" that "bind[] the Executive Branch." *United States v. Arthrex, Inc.*, 594 U.S. 1, 23 (2021). Nor can he "make policy" for the Executive Branch by virtue of any statutory or regulatory authority. *See Designation of Acting Director of the Office of Management and Budget*, 27 Op. O.L.C. 121, 123 (2003). Neither plaintiffs nor the district court have identified any such authority granting binding legal effect to any recommendations made by Musk without the further approval and action of other executive officers.

Presidents, moreover, have historically "created advisory groups composed of private citizens … to meet periodically and advise them (hence the phrase 'kitchen cabinets')." *Association of American Physicians & Surgeons, Inc. v. Clinton*, 997 F.2d 898, 908 (D.C. Cir. 1993). And Presidents and other senior

14

Executive Branch officials have long relied on chiefs of staff and a host of other sometimes-powerful advisers. Although the President can direct duly appointed officers of the United States to take particular actions, the President may also choose to rely on a close advisor to identify such actions. Article II gives the President "the flexibility to organize his advisers and seek advice from them as he wishes," *id.* at 909, as well as use those advisors to communicate his decisions. "Agency policymaking is not a 'rarified technocratic process, unaffected by political considerations or the presence of Presidential power.'" *Department of Commerce v. New York*, 588 U.S. 752, 781 (2019).

Presidential advisers can, in practice, be highly influential, communicating high-level decisions and predicting the preferences of their principals. *Cf. Percoco v. United States*, 598 U.S. 319, 330-31 (2023). And because they work closely with and are trusted by principals, their independent judgment may also carry significant sway. Even a cabinet official who disregards a senior White House advisor's urging may do so at his own peril. But powerful advisors are not officers: significant or even decisive influence "does not offend the Appointments Clause so long as [a] duly appointed official has final authority." *Andrade v. Regnery*, 824 F.2d 1253, 1257 (D.C. Cir. 1987). The district court's recognition that "Musk has no formal legal authority to make the decisions at issue," Op. 31, should therefore have been dispositive.

15

The court seems to have recognized as much when it correctly rejected plaintiffs' reliance on a range of challenged actions that "were actually approved by USAID officials." Op. 26. But the district court then erred when it held that Musk is an officer because the court believed that he "made" two "decisions" (closing an office and shutting down a website) "even though he 'lacked the authority'" to do so. Op. 28-29 (emphasis omitted). This reasoning was mistaken twice over.

Most importantly, for the purposes of determining whether someone is an Officer of the United States, "authority" is decisive. The question is whether the individual "exercise[s] significant authority pursuant to the laws of the United States." *Free Enter. Fund*, 561 U.S. at 506; *see also Lucia v. SEC*, 585 U.S. 237, 248-249 (2018). The question is not who "conceive[d of] and even carr[ied] out policies." *Andrade*, 824 F.2d at 1257. Someone who "had complete responsibility for crafting and executing" decisions, *id.*, is still not an officer if he "lacked the authority," Op. 28 (emphasis and quotation marks omitted), to make the formal decision.

Additionally, the district court wrongly shifted the burden of proof from the plaintiffs to the government. *See Speech First, Inc. v. Sands*, 69 F.4th 184, 202 (4th Cir. 2023), *vacated on other grounds*, 144 S. Ct. 675 (2024). The court demanded that the government establish who made each of a wide range of fast-moving

16

decisions. The government presented evidence as to "most of the major actions taken at USAID." Op. 26-27. But in the absence of such evidence, the court effectively assumed plaintiffs' view of the facts. *See* Op. 28.  That is an error.

**2.**  Because plaintiffs failed to establish that Musk exercises significant authority under the laws of the United States, this Court need go no further to conclude plaintiffs cannot succeed on any Appointments Clause challenge. But such a claim fails for the additional reason that Musk does not occupy an office, *i.e.*, "a 'continuing' position established by law." *Lucia*, 585 U.S. at 245. The district court identified nothing with the force of law establishing an office. The Appointments Clause does not apply to the exercise of *de facto* power separate from a legally established office. And, in any event, the concept of an "office" "embraces the ideas of tenure, duration, emolument, and duties." *United States v. Hartwell*, 73 U.S. (6 Wall.) 385, 393 (1867). Musk's position as a "Senior Advisor" does not meet that standard.

To be an office, the position at issue must be continuing, *i.e.*, it must not be "personal to a particular individual." *United States v. Donziger*, 38 F.4th 290, 297 (2d Cir. 2022). Here, there is no indication that Musk's particular role as a "Senior Advisor to the President" will outlast his tenure. *See United States v. Maurice*, 26 F. Cas. 1211, 1214 (Marshall, Circuit Justice, C.C.D. Va. 1823) (explaining that an office has "duties [that] continue, though the person be changed"). Presidents have

17

long selected advisors based on their "identity"—and thus "who cannot simply be replaced" by others—precisely because the President depends on those advisors' personalized advice and judgment. *Donziger*, 38 F.4th at 297.

Moreover, Musk is a "non-career Special Government Employee," Doc. 28-2 at 28, a status that lacks the duration and emoluments characteristic of offices. As defined by statute, "special Government employee[s]" are necessarily time-limited in their service. *See* 18 U.S.C. § 202(a). While some nonpermanent positions can qualify as offices, *see Morrison v. Olson*, 487 U.S. 654, 671 n.12 (1988), the sharply limited duration of Musk's status as a Special Government Employee indicates that his position is not an office. *Cf. Special Government Employee Serving as Paid Consultant to Saudi Company*, 40 Op. O.L.C. 1, 8-9 (2016) (explaining that the special government employee at issue "d[id] not appear to hold the essential features of a federal office—in particular, 'tenure,' 'duration,' and 'continuous duties'").

The district court did not advance its position by denominating Musk "*de facto* USDS Administrator." Op. 35 (quotation marks omitted). The Appointments Clause is concerned with the formal powers vested in an office, not an individual's perceived informal influence. *See Freytag*, 501 U.S. at 881 (looking to the statute for an office's "duties," and noting that court-appointed special masters are not officers in part because their "duties and functions are not delineated in a statute").

18

Far from supporting the district court's conclusion, the suggestion that Musk may exercise influence at two levels of remove—first by influencing the USDS and then by using that role to influence agencies—weighs against, not in favor of, concluding that he occupies an office.

**B.    Plaintiff's additional "separation-of-powers" claim lacks merit.**

The district court similarly erred in perceiving a separation-of-powers violation. Although plaintiffs named no USAID officials as defendants, the district court appeared to take account of decisions made by USAID officials in deciding this claim. Op. 65. It is therefore doubtful that plaintiffs' alleged injuries are "fairly traceable" to the named "defendant[s'] allegedly unlawful conduct," *California v. Texas*, 593 U.S. 659, 680 (2021) (quotation omitted)), or that an order directed to Musk and the other named defendants would redress any such injury. *See also Doe v. Virginia Dep't of State Police*, 713 F.3d 745, 755 (4th Cir. 2013) (citation omitted) (explaining that it is "problematic when third persons not party to the litigation must act in order for an injury to arise or be cured"). If nothing else, serious questions about standing make the likelihood of success on the merits "more unlikely." *Munaf v. Geren*, 553 U.S. 674, 690 (2008) (emphasis omitted).

Plaintiffs' nebulous separation-of-powers claim also lacks merit. Plaintiffs allege that "DOGE itself" has "coercive power over federal agencies," which disrupts the proper "chain of command" and "statutory delegation[s]" in the

19

Executive Branch, and that "[t]he lack of any formal appointment, congressional authorization, or duties that are clearly defined in law" is itself unconstitutional. Doc. 14, ¶¶ 76-81. To the extent that this claim depends on the status of USDS and its authority over USAID, it appears to be largely derivative of the Appointments Clause theory and lacks merit for the same reasons. Indeed, plaintiffs' allegations that a White House component wields "coercive" rather than formal power and operates without formally established duties further underscores that neither Musk nor others at DOGE are Officers of the United States.

In any event, the district court's belief that various actions "eliminated" USAID, Op. 39-40, does not give rise to a freestanding constitutional violation. Agencies have "broad discretion to choose how best to marshal [their] resources and personnel to carry out [their] delegated responsibilities." *Massachusetts v. EPA*, 549 U.S. 497, 527 (2007). This is especially true in the foreign-policy sphere, where the President retains inherent Article II authority. *See, e.g., American Ins. Ass'n v. Garamendi*, 539 U.S. 396, 414 (2003). Individuals who wish to challenge specific USAID actions may do so, subject to the various requirements of Article III and the Administrative Procedure Act (APA). *See, e.g.*, *City of New York v. U.S. Dep't of Def.*, 913 F.3d 423, 431 (4th Cir. 2019) (explaining that the APA authorizes challenges to discrete agency actions and not "broad programmatic attack[s]" (quotation marks omitted)).

20

But plaintiffs' attempt to transform unalleged and unproven statutory violations into a constitutional claim should be rejected. Even proven statutory violations are not also separation-of-powers problems. *See Dalton v. Specter*, 511 U.S. 462, 474 (1994) (stressing the "distinction between claims that an official exceeded his statutory authority … and claims that he acted in violation of the Constitution"). And courts cannot superintend agency operations by declaring the sum of agency actions unconstitutional based on a view of what constitutes an agency's "core functions" and what quantity and sorts of operational challenges amount to having "eliminated" an agency. *See* Op. 39-40. This novel theory has no basis in precedent and no discernible bounds. It is also disconnected from the preliminary injunction in this case, which does not require USAID to resume since-halted operations.

### C.    The balance of equities favor a stay.

The equitable factors strongly favor a stay pending appeal of the entire injunction. The district court's injunction is "an improper intrusion by a federal court into the workings of a coordinate branch of the Government," *INS v. Legalization Assistance Project of the L.A. Cty. Fed'n of Labor*, 510 U.S. 1301, 1305-1306 (1993) (O'Connor, J., in chambers); *see Maryland v. King*, 567 U.S. 1301, 1303 (2012) (Roberts, C.J., in chambers), and causes harm every day it is in effect.

The injunction micromanages agency operations by requiring recusal of particular USAID employees and scrutinizing email access for employees and contractors. *See* Doc. 75 at 1-2. And it bars the President's chosen advisors from taking "any action" or engaging in "any work" "relating to" a host of activities, *see id.* at 2. *See, e.g.*, *Valentine v. Collier*, 978 F.3d 154, 165 (5th Cir. 2020) (finding irreparable harm where injunction taxes agency's "resources" and "hinders" its "flexibility"). Worse still, as the district court's subsequent clarification makes clear, the injunction superintends the Acting Administrator's selection of senior agency officials, by imposing court-established "recusal" rules. Doc. 79 at 1-2. And, as discussed, the effect of the injunction is to prevent the agency from functioning. Indeed, the district court threatened to enlarge the scope of its order by "expand[ing] the definition of Defendants should additional personnel actions have the effect of circumventing the Preliminary Injunction." Doc. 79 at 2.

On the other side of the ledger, plaintiffs have not established irreparable injury warranting extraordinary relief. The district court relied on the allegations of certain plaintiffs stationed abroad who have lost access to USAID's electronic systems. Op. 55. But USAID is already acting to ensure that overseas employees "will retain access to Agency systems and to diplomatic and other resources" until they return to the United States, Op. 56 (quotation marks omitted), and therefore the preliminary injunction is unnecessary to address that harm. Plaintiffs'

22

purported reputational injuries also do not warrant an injunction. Plaintiffs have not identified any actual or likely reputational injury stemming from Musk's statements regarding USAID. *See id.* And even if they did, plaintiffs do not explain how prospective relief will remedy harms from public statements that have already been made.

## CONCLUSION

The government respectfully requests an immediate administrative stay and a ruling on this motion by **Tuesday, March 25 at 5pm.**

Respectfully submitted,

YAAKOV M. ROTH
*Acting Assistant*
*Attorney General*

KELLY O. HAYES
*United States Attorney*

MARK R. FREEMAN
ABBY C. WRIGHT
ADAM C. JED
GRAHAM WHITE
*Attorneys, Appellate Staff*
*Civil Division, Room 7230*
*U.S. Department of Justice*
*950 Pennsylvania Avenue NW*
*Washington, DC 20530*
*(202) 514-4052*

March 2025

**CERTIFICATE OF COMPLIANCE**

I hereby certify that the foregoing response to a motion complies with the type-volume limitation of Federal Rule of Appellate Procedure 27(d)(2)(A) because it contains 5,145 words. It also complies with the typeface and the type style requirements of Federal Rule of Appellate Procedure 27 because this response has been prepared in Word for Microsoft 365 in Times New Roman 14-point font, a proportionally spaced typeface.

*/s/ Graham White*
GRAHAM WHITE

## CERTIFICATE OF SERVICE

I hereby certify that on March 21, 2025, I electronically filed the foregoing

response with the Clerk of the Court for the United States Court of Appeals for the

Fourth Circuit by using the appellate CM/ECF system. Service will be

accomplished by the appellate CM/ECF system.


*/s/ Graham White*
GRAHAM WHITE

**ADDENDUM**

# TABLE OF CONTENTS

**Relevant Record Materials, pursuant to Fed. R. App. P. 8(a)(2)(B)(iii) and Local Rule 8**

Preliminary Injunction Order

(Mar. 18, 2025) (Doc. 75) ......................................................ADD.1

Memorandum Opinion (granting PI and denying stay pending appeal)

(Mar. 18, 2025) (Doc. 73) ......................................................ADD.3

Order Denying Motion for Clarification

(Mar. 20, 2025) (Doc. 79) ....................................................ADD.71

Corrected Complaint

(Feb. 15, 2025) (Doc. 14) ....................................................ADD.73

**Previous Application for Relief, pursuant to Local Rule 8**

Defendants' Opposition to Motion for a Preliminary Injunction (and incorporated request for stay pending appeal)

(Feb. 24, 2025) (Doc. 28) ................................................. ADD.119

## UNITED STATES DISTRICT COURT
## DISTRICT OF MARYLAND

J. DOES 1-26,

      Plaintiffs,

      v.

ELON MUSK,
*in his official capacity*,
UNITED STATES DOGE SERVICE
and
THE DEPARTMENT OF
GOVERNMENT EFFICIENCY,

      Defendants.

Civil Action No. 25-0462-TDC

## PRELIMINARY INJUNCTION

For the reasons set forth in the accompanying Memorandum Opinion, which is incorporated by reference, it is hereby ORDERED that:

1. For purposes of this Order, "Defendants" refers to Elon Musk, in his official capacity; the United States DOGE Service; the Department of Government Efficiency; and their officers, agents, servants, employees, and attorneys. The term shall also include all individuals who at any time from January 20, 2025 through the pendency of this Preliminary Injunction have been designated as, or have served in the role as, a DOGE Team Lead or DOGE Team Member pursuant to Executive Order 14,158 for purposes of any activities relating to the United States Agency for International Development ("USAID"), regardless of the formal personnel status of that individual.

2. Defendants are ENJOINED as follows:

    a. Defendants shall reinstate access to email, payment, security notification, and all other electronic systems, including restoring deleted emails, for all current USAID employees and personal services contractors ("PSCs"), whether in active status or on administrative leave, and shall provide written confirmation to the Court that this requirement has been satisfied within **7 days** of the date of this Order.

b. Defendants shall not disclose outside of USAID any personally identifiable information ("PII"), other personal information, or information contained in an individual's personnel file, security clearance file, or PSC contract file relating to any current or former USAID employee or PSC, including but not limited to the posting of unredacted PII of PSCs on the DOGE website.

c. Defendants shall not take any action, or engage in any work, relating to the shutdown of USAID, defined for present purposes as: placement of employees on administrative leave, reductions-in-force, employee terminations, or contract terminations relating to any USAID employees or PSCs; terminations of USAID contracts or grants; closures of USAID buildings, bureaus, or offices; and permanent shutdowns or terminations of any USAID information technology systems, including but not limited to permanent deletions of the contents of the USAID website or collections of USAID electronic records.

d. Defendants shall not take any other actions relating to USAID without the express authorization of a USAID official with legal authority to take or approve the action.

e. Within **14 days** of the date of this Order, Defendants shall secure and submit to the Court a written agreement among all necessary parties that ensures that USAID will be able to reoccupy USAID headquarters at the Ronald Reagan Building in Washington, D.C. in the event of a final ruling in favor of Plaintiffs. This requirement will be stayed if, within **14 days** of the date of this Order, Defendants secure and submit to the Court a ratification of the decision to permanently close USAID headquarters signed by the Acting Administrator of USAID or another Officer of the United States with the authority to do so on behalf of USAID.

3. Pursuant to Federal Rule of Civil Procedure 65(c), Plaintiffs are required to post with this Court a bond of $100.

4. The Preliminary Injunction shall take effect upon posting of the bond.

Violations of this Preliminary Injunction shall subject Defendants and all other persons

bound by this Order to all applicable penalties, including contempt of court.

Date: March 18, 2025



THEODORE D. CHUANG
United States District Judge

2

## UNITED STATES DISTRICT COURT
## DISTRICT OF MARYLAND

J. DOES 1-26,

     Plaintiffs,

     v.

ELON MUSK,
*in his official capacity*,
UNITED STATES DOGE SERVICE
and
THE DEPARTMENT OF
GOVERNMENT EFFICIENCY,

     Defendants.

Civil Action No. 25-0462-TDC

### MEMORANDUM OPINION

Since it was established by Executive Order on January 20, 2025, the "Department of Government Efficiency," or "DOGE," has sent teams of personnel to numerous federal departments and agencies, taken control of their computer systems, and in many instances, taken the lead in terminating numerous contracts and employees. In the case of the United States Agency for International Development ("USAID"), DOGE and its leader, Elon Musk, have also played a leading role in actions taken to shut down and dismantle the agency, which have included permanently closing its headquarters, taking down its website, and engaging in mass terminations of contracts, grants, and personnel. A group of USAID personnel now challenge DOGE's actions as unconstitutional.

Specifically, Plaintiffs J. Does 1 through 26, who are current or recently terminated employees and contractors of USAID, have filed a civil action against Defendants Elon Musk, in his official capacity, the United States DOGE Service, and the Department of Government

Efficiency, in which they allege violations of the United States Constitution, including of the Appointments Clause, U.S. Const. art. II, § 2, cl. 2, and of the constitutional principle of the Separation of Powers. Plaintiffs have filed a Motion for a Preliminary Injunction, which is fully briefed. The Court held a hearing on the Motion on February 28, 2025. Where the Court finds that Defendants' unilateral actions to shut down USAID likely violated the United States Constitution, the Motion with be GRANTED IN PART and DENIED IN PART.

## BACKGROUND

### I.    DOGE

On November 12, 2024, President-Elect Trump announced that "the Great Elon Musk, working in conjunction with American Patriot Vivek Ramaswamy, will lead the Department of Government Efficiency ("DOGE")." Joint Record ("J.R.") 34–35, ECF Nos. 37, 57-1. Among the purposes of DOGE was "to dismantle Government Bureaucracy, slash excess regulations, cut wasteful expenditures, and restructure Federal Agencies." J.R. 35. On November 20, 2024, Musk and Ramaswamy published an op-ed in the *Wall Street Journal* that detailed their plans for DOGE "to cut the federal government down to size." J.R. 37.

On January 20, 2025, President Trump issued Executive Order 14,158, "Establishing and Implementing the President's 'Department of Government Efficiency'" ("the DOGE Executive Order"). Exec. Order No. 14,158, 90 Fed. Reg. 8441 (Jan. 20, 2025). The DOGE Executive Order renamed the existing United States Digital Service as the "United States DOGE Service" ("USDS" or "DOGE"), located within the Executive Office of the President. It directed the entity to "implement the President's DOGE Agenda, by modernizing Federal technology and software to maximize governmental efficiency and productivity." *Id.* § 1. The DOGE Executive Order also established within DOGE "the U.S. DOGE Service Temporary Organization," which is "dedicated

2

to advancing the President's 18-month DOGE agenda" through July 4, 2026, and is headed by the "USDS Administrator," who reports to the White House Chief of Staff. *Id.* § 3(b). To coordinate and implement this agenda throughout the Executive Branch, the DOGE Executive Order directs every federal agency to establish a "DOGE Team" of at least four employees, selected in consultation with the USDS Administrator, and to ensure that DOGE "has full and prompt access to all unclassified agency records, software systems, and IT systems." *Id.* §§ 3(c), 4(b).

President Trump has issued multiple additional executive orders that expand DOGE's role. In particular, on February 11, 2025, he signed Executive Order 14,210, "Implementing the President's 'Department of Government Efficiency' Workforce Optimization Initiative," which directs agencies to develop data-driven hiring plans to ensure that new hires are in highest-need areas and mandates that they shall not fill vacancies that "the DOGE Team Lead assesses should not be filled" unless the agency head determines otherwise. Exec. Order No. 14,210, 90 Fed. Reg. 9,669 (Feb. 11, 2025). Another executive order directs that agencies shall consult with DOGE Team Leads on contract and grant reviews, approvals, and terminations. Exec. Order No. 14,222, 90 Fed. Reg. 11,095 (Feb. 26, 2025).

## II.    **Elon Musk**

President Trump has identified Musk as the leader of DOGE. On February 11, 2025, President Trump and Musk held a joint press conference in the Oval Office to answer reporters' questions about DOGE. In a February 18, 2025 joint interview on the Sean Hannity Show, President Trump confirmed that Musk was working for DOGE, stated that he is "a leader," and noted that "he's got some very brilliant young people working for him." J.R. 479. On February 19, 2025, President Trump told an audience of investors and company executives at the Future Investment Initiative Institute Priority Summit that "I signed an order creating the Department of

3

Government Efficiency and put a man named Elon Musk in charge." J.R. 568. On February 26, 2025, President Trump had Musk attend the first meeting of the President's Cabinet, stated that "[o]ne of the most important initiatives is DOGE," and told the Cabinet that Musk was there "to give you a summary of what's happening, some of the things they found." Mot. Ex. 68 at 4. On March 4, 2025, during his Presidential Address to Congress, President Trump stated: "I have created the brand new Department of Government Efficiency. DOGE. Perhaps you've heard of it. Which is headed by Elon Musk, who is in the gallery tonight." J.R. 921.

In discussing Musk's role, President Trump stated that after he signs an executive order, it gets "passed on to [Musk] and his group" and "they're all getting done." J.R. 481. He further stated about Musk:

> [H]e would take that executive order that I'd signed, and he would have those people go to whatever agency it was — "When are you doing it? Get it done. Get it done." And some guy that maybe didn't want to do it, all of a sudden, he's signing — he just doesn't want to be bothered.

J.R. 480. On February 7, 2025, President Trump stated that DOGE is acting "at my insistence." J.R. 123. On February 13, 2025, President Trump told reporters that Musk "answers to me." J.R. 259. For his part, Musk has described DOGE as "a support function for the president and for the . . . agencies and departments," Mot. Ex. 68 at 6, and that "one of the biggest functions of the DOGE team is just making sure that the presidential executive orders are actually carried out." J.R. 475.

Musk's public statements and posts on the social media platform X, which is owned by Musk, suggest that he has the ability to cause DOGE to act. On February 2, 2025, Musk promised on X that "D[OGE] will fix it," referencing the National Weather Service internal employee website's description of diversity, equity, and inclusion ("DEI") initiatives, and DOGE later posted that the language was removed. J.R. 91–92. On February 7, 2025, shortly after polling X users

4

on whether a DOGE team member who was fired for racist social media posts should return to the agency, Musk announced that the DOGE member "will be brought back." J.R. 641. As to actions involving agencies, in the afternoon of Friday, February 7, 2025, Musk posted on X, "CFPB RIP." J.R. 205, 215. Then around 10:30 p.m. that evening, a portion of the website of the Consumer Financial Protection Bureau ("CFPB") was shut down, and around 11:00 p.m., CFPB's X account was deleted.

However, in a declaration dated February 17, 2025 ("the Fisher Declaration"), Joshua Fisher, the Director of the White House Office of Administration, asserted that Musk's formal position is as an employee of the White House Office with the title of Senior Advisor to the President, and that he is classified as a "Special Government Employee." J.R. 424. Fisher states that Musk is "not an employee of the U.S. DOGE Service or U.S. DOGE Service Temporary Organization," which are entities in the Executive Office of the President that are separate from the White House Office, and that "Musk is not the U.S. DOGE Service Administrator." J.R. 425. On February 25, 2025, the White House announced that Amy Gleason is the Acting USDS Administrator, but that same day, White House Press Secretary Karoline Leavitt confirmed that "the President tasked Elon Musk to oversee the DOGE effort" while others "are helping run DOGE on a day-to-day basis." J.R. 616. When asked by the Court at the hearing on the Motion, Defendants' counsel was not able to identify who served as Acting USDS Administrator from January 20, 2025 until that date.

## III.   DOGE Activities

On January 20, 2025, after the DOGE Executive Order was signed, DOGE team members, including current and former employees of Musk in the private sector, arrived at the Office of Personnel Management ("OPM") and moved into the area including the office of the OPM

5

Director. DOGE locked senior career civil servants out of OPM computer systems that contain datasets related to the federal workforce. On January 23, 2025, OPM announced that it was testing a new capability to communicate with all federal employees.

On January 24, 2025, DOGE announced on X that in the first 80 hours of its operation, it had canceled "approx. $420M of current/impending contracts" and two federal government leases, with a focus "mainly on DEI contracts and unoccupied buildings." J.R. 115. From January 27 to February 7, 2025, DOGE teams began operating at the United States Departments of Education, Energy, Housing and Urban Development, Health and Human Services ("HHS"), Transportation, and Veterans Affairs; the National Oceanic and Atmospheric Administration; the Federal Emergency Management Agency ("FEMA"); the CFPB; and the Centers for Medicare and Medicaid Services.

DOGE has taken numerous actions without any apparent advanced approval by agency leadership. At the Department of Education, DOGE reportedly made almost all of the decisions about "what grants and contracts to cancel and which employees to put on leave, without seeking or considering input from political appointees." J.R. 581. Political appointees were reportedly "caught off guard" when on February 7, 2025, DOGE executed cuts to billions of dollars of funding from the National Institutes of Health to universities and research organizations. J.R. 582. After DOGE team members reportedly terminated personnel at the Department of Agriculture ("USDA") and the Department of Energy, National Nuclear Security Administration ("NNSA"), USDA and NNSA had to work to rescind the firings of some of its essential personnel involved in combating bird flu and safeguarding nuclear weapons, respectively. Similarly, at the Cabinet meeting, Musk specifically admitted that at USAID, DOGE mistakenly cancelled funding for Ebola prevention. The former Chief Financial Officer of FEMA has submitted a declaration

stating that, based upon her observation of the events on February 10, 2025 relating to a sudden change in FEMA policy to restrict the sending of certain resources to state and local governments, including a contemporaneous announcement of the change by Musk on X, she has concluded that the decision was made not by FEMA leadership, but by Musk or DOGE.

On February 20, 2025, DOGE reportedly put a $1 spending limit on government credit cards used at the General Services Administration ("GSA"), OPM, CFPB, and USAID. This action pre-dated Executive Order 14,222, signed by President Trump on February 26, 2025, which directed that "all credit cards held by agency employees shall be treated as frozen for 30 days from the date of this order." Exec. Order No. 14,222, 90 Fed. Reg. at 11,095.

On February 22, 2025 at 2:46 p.m., Musk posted on X that consistent with President Trump's instructions to "GET MORE AGGRESSIVE," "all federal employees will shortly receive an email requesting to understand what they got done last week," and that the "[f]ailure to respond will be taken as resignation." J.R. 611, 702. Less than three hours later, the email was sent. Subsequently, OPM informed agency leaders that their employees were not required to respond, and certain agency heads directed employees not to respond.

**IV.    USAID**

On January 20, 2025, in addition to establishing DOGE, President Trump also signed Executive Order 14,169, "Reevaluating and Realigning United States Foreign Aid" ("the Foreign Aid Executive Order"), in which he directed a "90-day pause" of "new obligations and disbursements" of "foreign development assistance" funds in order to assess "programmatic efficiencies and consistency with United States foreign policy," subject to waivers by the Secretary of State for specific programs. Exec. Order No. 14,169, 90 Fed. Reg. 8619 (Jan. 20, 2025). On January 24, 2025, Secretary of State Marco Rubio issued a directive ("the Rubio Order") to all

diplomatic and consular posts, consistent with the Foreign Aid Executive Order, that directed a "pause[]" on "all new obligations of funding, pending a review, for foreign assistance programs funded by or through the [State] Department and USAID." J.R. 418. The Rubio Order also identified a limited of number of programs for which the Secretary had granted a waiver from the pause and noted that other waivers could be approved by the Director of Foreign Assistance. That same day, DOGE personnel sought access to U.S. Department of the Treasury payment systems in order to freeze disbursements relating to USAID. Despite warnings from the Acting Secretary of the Treasury that there may not be legal authority "to stop an authorized payment certified by an agency," they eventually gained access. J.R. 145.

On or about Monday, January 27, 2025, DOGE team members ("the DOGE Team" or "the DOGE Team Members") arrived at USAID headquarters at the Ronald Reagan Building in Washington, D.C. to gain access to the agency's financial and personnel systems. That day, 58 senior USAID officials were placed on paid administrative leave for alleged non-compliance with the Rubio Order, "questionable contracting practices," or "managing and administering initiatives no longer deemed to be in the national interest," such as those related to DEI. J.R. 408–09. During that week, the DOGE Team Members were given "root access" to the USAID systems, the highest level of access, and obtained delegate rights to every USAID email account, thus allowing them to see every email and send and delete emails on behalf of every USAID user. J.R. 228.

On Thursday, January 30, 2025, White House officials learned that some USAID grantees overseas had been paid through the HHS payment system. Although the HHS system was apparently the normal channel for those grant payments, the DOGE Team Members reportedly demanded that all USAID senior managers be barred from authorizing payments and that the DOGE Team Members be the exclusive authorizers. That same day, Acting Administrator of

8

USAID Jason Gray was removed from that position, President Trump directed Secretary Rubio to perform the duties and functions of the USAID Administrator, and State Department Director of Foreign Assistance Peter Marocco began performing the duties and functions of the Deputy Administrator of USAID. Marocco has asserted in a declaration ("the Marocco Declaration") that although he consults with the DOGE Team on personnel and other matters, he and Secretary Rubio "have ultimate authority" over decisions relating to personnel and that "the DOGE Team cannot legally direct me to do anything regarding personnel, funding, or the like." J.R. 413.

On Friday, January 31, 2025, plaques with USAID's official seal were removed from the agency's offices. On Saturday, February 1, 2025, the USAID website was shut down. That same day, an additional 57 USAID employees were placed on administrative leave.

On the evening of February 1, 2025, DOGE Team Members sought access to USAID's data security systems, as well as to restricted areas such as sensitive compartmented information facilities ("SCIFs") at USAID headquarters for which they lacked the necessary security clearances. USAID Director for Security John Vorhees and Deputy Director for Security Brian McGill attempted to block the DOGE Team's access to classified material in restricted areas. Musk and a senior DOGE official intervened, and Musk reportedly made multiple calls to USAID leadership and security officers in which he demanded that DOGE Team Members be granted access to private data and restricted areas and that dozens of USAID officials be suspended. In particular, Musk reportedly called a senior USAID official to demand that the DOGE Team Members be granted access to the SCIFs and threatened to call the United States Marshals Service. The DOGE Team Members were granted access to these facilities, and Vorhees and McGill were placed on administrative leave for attempting to block access. Plaintiff J. Doe 2, a USAID cybersecurity employee, reports that on that day, DOGE Team Members without security

clearances used administrative rights to grant themselves access to restricted areas requiring a security clearance. However, Katie Miller, a DOGE official, has posted on X that "[n]o classified material was accessed without proper security clearances." J.R. 65. All classified USAID computer systems have since been dismantled.

By Sunday, February 2, 2025, 2,000 email accounts associated with USAID personnel had been deactivated, including the email accounts of Plaintiffs J. Doe 3, J. Doe 5, and J. Doe 6. That same day, Matt Hopson, who had been recently appointed by President Trump to be the Chief of Staff for USAID, resigned, and the decision was made to terminate the contracts of 800 personal service contractors. In February 2, 2025 posts on X, Musk stated that USAID is "evil," and "USAID is a criminal organization. Time for it to die." J.R. 64, 195. When asked later that evening about the future of USAID, President Trump told reporters that USAID has "been run by a bunch of radical lunatics, and we're getting them out, and then we'll make a decision." J.R. 171.

Shortly after midnight, on Monday, February 3, 2025, Musk hosted a live broadcast on X in which he stated that he checked with President Trump "a few times," went over USAID "in detail," and that "he agreed that we should shut it down." J.R. 65, 171. In explaining the shutdown, Musk stated that USAID was "incredibly politically partisan" in that the agency has been supporting "radically left causes throughout the world including things that are anti-American." J.R. 172. He further stated:

> So to be clear, in shutting down, which we're in the process of doing, shutting down USAID, the reason for that, as opposed to simply trying to do some minor housecleaning, is that, as we dug into USAID, it became apparent that what we have here is not an apple with a worm in it, but we have actually just a ball of worms . . . If you've got an apple that's got a worm in it, but we have actually just a ball of worms, it's hopeless. And USAID is a ball of worms. There is no apple. And when there is no apple, you've just got to basically get rid of the whole thing . . . That is why it's got to go, it's beyond repair.

Compl. ¶ 53 (quoting Department of Government Efficiency (@DOGE), X (Feb. 2, 2025, 12:25

AM), https://x.com/DOGE/status/1886284966855647234). While Musk was hosting the live X

broadcast, DOGE Team Member Gavin Kliger sent an email from a USAID email account to all

USAID staff informing them that the USAID headquarters would be closed on Monday, February

3, 2025. After the live broadcast, at 1:54 a.m., Musk posted on X: "We spent the weekend feeding

USAID to the wood chipper. Could have gone to some great parties. Did that instead." J.R. 197.

Later, on Monday, February 3, 2025, USAID placed an additional 606 employees on paid

administrative leave. Secretary Rubio sent a letter to the chairs and ranking members of the Senate

Foreign Relations Committee, the House Foreign Affairs Committee, and the House and Senate

Appropriations Committees advising them of the Trump Administration's "intent to initiate

consultations with you regarding the manner in which foreign aid is distributed around the world"

and that Secretary Rubio had directed Marocco "to begin the process of engaging in a review and

potential reorganization of USAID's activities to maximize efficiency and align operations with

the national interest." J.R. 421–22. The letter further stated that:

> This review and potential reorganization . . . may include, among other things, the suspension or elimination of programs, projects, or activities; closing or suspending missions or posts; closing, reorganizing, downsizing, or renaming establishments, organizations, bureaus, centers or offices; reducing the size of the workforce at such entities; and contracting out or privatizing functions or activities performed by Federal employees.
>
> The Department of State and other pertinent entities will be consulting with Congress and the appropriate committees to reorganize and absorb certain bureaus, offices, and missions of USAID. Such consultation shall occur on behalf of the heads of such entities, as directed by the President. In consultation with Congress, USAID may move, reorganize, and integrate certain missions, bureaus, and offices into the Department of State, and the remainder of the Agency may be abolished consistent with applicable law.

J.R. 422. The following day, Tuesday February 4, 2025, an additional 1,416 USAID employees

were placed on administrative leave.

On Friday, February 7, 2025, Musk announced on X that the USAID headquarters was now occupied by United States Customs and Border Protection ("CBP"), posted a picture of the USAID headquarters main entrance with the lettering "U.S. Agency for International Development" removed from above the door, and included the descriptive message "Unburdened by what has been." J.R. 383. USAID staff and contractors who worked there were not allowed inside the building to retrieve their personal belongings. By February 7, another 2,104 USAID employees had been identified and slated for placement on administrative leave at 11:59 p.m. that night, which would have resulted in a total of 4,244 of USAID's 4,765 direct hire employees, or close to 90 percent of its workforce, being on administrative leave. That same day, however, in *American Foreign Service Ass'n v. Trump* ("*AFSA*"), a case filed in the United States District Court for the District of Columbia ("D.D.C."), the court issued a temporary restraining order ("TRO") that directed the reinstatement of those USAID employees previously placed on administrative leave and barred USAID from placing additional employees on administrative leave or involuntarily evacuating employees from overseas posts ("the *AFSA* TRO"). *AFSA*, No. 25-cv-0352 (CJN), 2025 WL 435415, at *3 (D.D.C. Feb. 7, 2025). At that time of the TRO, 2,140 direct hire employees had been placed on administrative leave. According to Marocco, 98 percent of these employees were physically located in the United States, and he was unaware of any located in high-risk countries.

On Thursday, February 13, 2025, the *AFSA* TRO was extended until February 21, 2025. *AFSA*, No. 25-cv-0352 (CJN), 2025 WL 485043, at *1 (D.D.C. Feb. 13, 2025). Also on February 13, a separate TRO was granted in two other D.D.C. cases, *AIDS Vaccine Advocacy Coalition v. United States Department of State* and *Global Health Council v. Trump* (collectively, "*AVAC*"), which barred the State Department, USAID, and other agencies from enforcing prior orders or

issuing new ones to suspend or prevent the obligation or disbursement of foreign assistance funds in connection with grants, contracts, and other agreements in existence as of January 19, 2025 ("the *AVAC* TRO"). *AVAC*, Nos. 25-cv-0400 (AHA), 25-cv-0402 (AHA), 2025 WL 485324, at *6-7 (D.D.C. Feb. 13, 2025).

On February 19, 2025, President Trump stated at the Future Investment Initiative Institute Priority Summit that "over the past month, we have effectively eliminated the U.S. Agency for International Development." J.R. 466, No. 1 at 28:15. On Friday, February 21, 2025, the *AFSA* TRO was dissolved, and the court denied a motion for a preliminary injunction because the plaintiffs had not shown a likelihood of irreparable harm, and the court likely lacked jurisdiction because as federal employees, the plaintiffs may be statutorily required to pursue their claims through administrative processes established for such employees. *AFSA*, No. 25-cv-352 (CJN), 2025 WL 573762, at *5–7, *11–12 (D.D.C. Feb. 21, 2025). That same day, in response to a post on X referring to that ruling and stating that "President Trump and DOGE can now DISMANTLE USAID," Musk posted that "the world will be better for this." J.R. 674.

On Sunday, February 23, 2025, DOGE Team Member Kliger created the email account hr_announcements@usaid.gov. Around 3:42 p.m., employees, including Plaintiff J. Doe 21, received a notice from usaid_fo@subscribe.usaid.gov stating that, effective 11:59 p.m. that evening, "all USAID direct hire personnel with the exception of designated personnel responsible for mission-critical functions, core leadership and/or specially designated programs, will be placed on administrative leave globally." J.R. 446. The notice also advised: "Concurrently, USAID is beginning to implement a Reduction-in-Force that will affect approximately 2,000 USAID personnel with duty stations in the United States." J.R. 446. Shortly after receiving the email, J. Doe 21 received a Reduction in Force ("RIF") notice from hr_announcements@usaid.gov

13

consisting of an unsigned memorandum, identified as from "Peter Marocco, Acting Deputy Administrator, USAID," stating that J. Doe 21 was subject to the RIF and would be "separated from the Federal service" effective April 24, 2025. J.R. 440, 448. When J. Doe 21 reached out by email to USAID Employee and Labor Relations as the RIF Notice instructed, J. Doe 21 received a form response stating that the office "only has a skeleton staff at this point and may not be able to respond to everyone individually," and that the office "cannot currently provide information on your individual status." J.R. 453. J. Doe 21 later received an email stating that the office had not sent the RIF notices.

## V.    **Plaintiffs**

Plaintiffs, J. Does 1–26, are current and former employees or personal services contractors ("PSCs") of USAID. PSCs are individuals working for USAID pursuant to their own individual service contracts rather than through a larger contract between USAID and a parent contracting company. Plaintiffs assert that they have been detrimentally impacted by Defendants' actions at or relating to USAID in multiple ways.

Beginning on February 2, 2025, multiple Plaintiffs lost all access to USAID electronic systems and applications, including critical payment and security systems on which some Plaintiffs rely for reimbursements or for basic living needs. Some Plaintiffs later regained access to some USAID electronic systems as a result of the *AFSA* TRO. Since they lost access to USAID's electronic systems, some PSC Plaintiffs have been unable to receive reimbursements for travel and health insurance expenses, in some cases totaling thousands of dollars, that are typically covered by USAID. None have reported that their reimbursements have now been paid.

Other Plaintiffs who are posted abroad temporarily lost access to, and in some instances continue to lack access to, electronic systems upon which they rely for basic living needs. For

14

example, J. Doe 22, a USAID employee stationed in a high-risk area in Central America who has

been placed on administrative leave, has lost the ability to have electricity, cell phone, and internet

bills paid because of the shutdown of USAID's payment system. Though J. Doe 22 asked for and

received one extension from the electric company, the State Department mission in that country

has reported that there is presently no way for the bills to be paid even though they are now due.

If J. Doe 22's electricity, internet, and cell phone are shut down, J. Doe 22 will lack working

security cameras that are necessary in light of the high-risk nature of J. Doe 22's posting and will

lose the use of radios and cell phones that are the only means by which J. Doe 22 can communicate

with the mission's Regional Security Office. Similarly, on February 3, 2025, J. Doe 9, who is a

PSC stationed with family in a high-risk area in the Middle East, lost access to a critical security

application used by United States government personnel to report dangerous situations and to

access emergency assistance. Though access to this application was restored on February 24,

2025, J. Doe 9 continues to experience "an incredible amount of emotional and psychological

distress" out of concern for the safety of J. Doe 9's family should the security application be

disabled again. J.R. 242–43.

        Many Plaintiffs have also been placed on administrative leave, terminated, or had their

contracts terminated as a result of DOGE's actions at USAID. Since DOGE allegedly gained

control of USAID, at least five employee Plaintiffs have been either placed on administrative leave

or terminated, and at least three PSC Plaintiffs have had their contracts terminated. J. Doe 8, a

recently terminated PSC, has not yet been paid the remainder of unused annual leave and is

concerned that it will never be paid because "there is hardly anyone left in the agency to process

these payments." J.R. 436. J. Doe 9 has not been informed of any change in status but has been

warned that terminated PSCs may need to depart the country within 30 days, which has caused

emotional and psychological distress because doing so would require uprooting J. Doe 9's family by, among other things, requiring children to leave school in the middle of the school year. J. Doe 9 is also very concerned about the potential loss of health insurance, which would occur in the event of a termination, because of a medical situation that is serious enough that J. Doe 9 was scheduled to take medical leave in the near future.

Some Plaintiffs have expressed significant concern that, in light of DOGE's all-encompassing access to USAID's data systems, their personally identifiable information ("PII") will be publicly disclosed. Plaintiffs report that their personnel and security clearance files are included in these systems and contain highly sensitive personal information such as social security numbers, passport information, financial records, addresses, and family members' personal information. J. Doe 1's security clearance files include information on foreign contacts and a safety pass phrase. At least one PSC Plaintiff has had PII posted on DOGE's website as part of information about that Plaintiff's contract. Defendants, however, assert that DOGE's website only provides contract information already publicly available on the Federal Procurement Data System.

Finally, certain Plaintiffs are fearful that, in light of their association with USAID, their reputations are being damaged by Musk's disparaging public comments about USAID. For example, J. Doe 12, a PSC, has had family members "receive[] questions from community members inquiring about the 'lack of accountability and liberal corruption' within USAID, based on" Musk's comments, J.R. 249, and J. Doe 9, a PSC located in the Middle East, has stated that Musk's statements about USAID have "been picked up by local media outlets" and "have a direct negative impact on the perception of USAID where I work." J.R. 433.

## DISCUSSION

In the Motion, Plaintiffs seek a preliminary injunction granting "narrow emergency" relief to address the immediate needs of Plaintiffs arising from the alleged constitutional violations and broader relief barring Defendants from engaging in future violations of the Appointments Clause or the principle of Separation of Powers. Mot. at 29–30, ECF No. 25.

To obtain a preliminary injunction, moving parties must establish that (1) they are likely to succeed on the merits; (2) they are likely to suffer irreparable harm in the absence of preliminary relief; (3) the balance of equities tips in their favor; and (4) an injunction is in the public interest. *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008); *see Dewhurst v. Century Aluminum Co.*, 649 F.3d 287, 290 (4th Cir. 2011). A moving party must satisfy each requirement as articulated. *Pashby v. Delia*, 709 F.3d 307, 320 (4th Cir. 2013). Because a preliminary injunction is "an extraordinary remedy," it "may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter*, 555 U.S. at 22.

In addition to arguing that Plaintiffs have failed to establish each of the requirements for a preliminary injunction, Defendants also argue that the Motion should be denied because Plaintiffs lack standing. The Court will first address this threshold issue.

### I.    Standing

Defendants first argue that Plaintiffs lack standing to assert their claims. Because Article III of the United States Constitution limits the jurisdiction of federal courts to "Cases" and "Controversies," plaintiffs in federal civil actions must demonstrate standing to assert their claims. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992). The "irreducible constitutional minimum" requirements of standing consist of three elements: (1) the plaintiff must have suffered an "injury in fact"; (2) the injury must be fairly traceable to the actions of the defendant; and (3) it must be

"likely" that the injury will be "redressed by a favorable decision." *Id.* at 560–61 (citations omitted). Standing must be established for each claim and form of relief sought. *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 352 (2006). When there are multiple plaintiffs, the Court need only determine that there is at least one plaintiff with standing for a particular claim in order to consider the claim. *Town of Chester v. Laroe Ests., Inc.*, 581 U.S. 433, 439 (2017). Here, Defendants argue that Plaintiffs' claimed harm arising from DOGE's access to their sensitive personal information and data does not constitute an injury in fact, and that Plaintiffs cannot demonstrate that their other alleged injuries are traceable to Defendants and redressable through an injunction against Defendants.

## A.    Injury in Fact

To satisfy the requirement of an "injury in fact," Plaintiffs must identify "'an invasion of a legally protected interest' that is 'concrete and particularized' and 'actual or imminent, not conjectural or hypothetical.'" *Spokeo, Inc. v. Robins*, 578 U.S. 330, 339 (2016) (quoting *Lujan*, 504 U.S. at 560). At the hearing, Defendants confirmed that as to this requirement, they contest only whether DOGE's access to Plaintiffs' sensitive personal information and data constitutes an injury in fact. Plaintiffs, however, have alleged other, specific injuries, including that as a result of Defendants' actions: (1) some plaintiffs who are PSCs, including J. Doe 1, J. Doe 8, and J. Doe 20, have had their contracts terminated; (2) at least two plaintiffs, J. Doe 11 and J. Doe 21, have received RIF notices demonstrating that they will be imminently terminated from federal employment in April 2024; (3) Plaintiff J. Doe 22, a USAID employee stationed abroad in a high-risk area who has now been placed on administrative leave, no longer has home electricity, cell phone, and internet bills paid by USAID, as had occurred before Defendants' actions; and (4) at least three plaintiffs, J. Doe 1, J. Doe 3, and J. Doe 6, have work expenses or travel reimbursements

that are owed, but have not been paid, by USAID, in some instances totaling thousands of dollars. Where Defendants do not contest that these harms constitute injuries in fact, Plaintiffs have alleged sufficient facts to satisfy this element.

## B.    Traceability

Next, Plaintiffs must demonstrate that their asserted injuries are fairly traceable to Defendants' actions. *See Lujan*, 504 U.S. at 560. Under this requirement, plaintiffs need not establish that the challenged action is the "proximate cause" of the injury and instead need only show that it is "in part responsible for" the asserted injury. *Libertarian Party of Va. v. Judd*, 718 F.3d 308, 315–16 (4th Cir. 2013) (stating that "the concept of concurrent causation" is "useful in evaluating" this element); *see also Sierra Club v. U.S. Dep't of the Interior*, 899 F.3d 260, 283 (4th Cir. 2018).

Here, Plaintiffs have alleged sufficient facts at this stage to support the conclusion that the personnel and contract actions taken against Plaintiffs, as well as the failures to pay their expenses, occurred at least in part because of Defendants' actions. Musk has specifically expressed his desire to shut down USAID and has taken responsibility for the actions taken to do so. On February 2, 2025, Musk publicly stated that "USAID is a criminal organization" and that it was "Time for it to die," J.R. 195, and shortly thereafter stated in a livestream broadcast that "we're in the process of . . . shutting down USAID" because "it's beyond repair." Compl. ¶ 53. On February 3, 2025, Musk acknowledged that he was personally engaged in doing so when he posted on X that he had "spent the weekend feeding USAID into the wood chipper." J.R. 197. Plaintiff J. Doe 7, a USAID employee, has stated that on the following day, February 4, 2025, J. Doe 7 was placed on administrative leave through an email sent by "one of DOGE's representatives." J.R. 237. The

record therefore supports the inference that Musk either directed or at least participated in the personnel actions against Plaintiffs.

In addition, DOGE Team Members have demanded and gained full access to USAID's offices and computer systems, including its payments systems and classified information systems, and Musk even threatened to call the United States Marshals if they were not provided with such full access. Where DOGE Team Members had complete control over the USAID electronic payment system, it is entirely reasonable to conclude that Defendants are responsible for the failure to pay Plaintiffs' work and travel expenses.

Defendants, however, argue that traceability cannot be satisfied because Plaintiffs' injuries "were caused by independent actions authorized by USAID and its leadership wielding their own power." Opp'n at 11, ECF No. 28. Defendants focus on the Marocco Declaration, in which Marocco asserts that all actions referenced in his declaration were officially taken by either himself, Secretary Rubio in his capacity as Acting Administrator of USAID, or USAID employees at their direction. Although Plaintiffs dispute that claim, even assuming that USAID officials signed off on all of the decisions at issue, traceability can still be established when the causal relationship "between injury and challenged action depends upon the decision of an independent third party." *California v. Texas*, 141 S. Ct. 2104, 2117 (2021) (quoting *Lujan*, 504 U.S. at 562). In such cases, while "plaintiffs attempting to show causation generally cannot rely on speculation about the unfettered choices made by independent actors not before the courts," plaintiffs can satisfy the traceability requirement if they show that "the third parties will likely react in predictable ways" to the challenged action "that in turn will likely injure the plaintiffs." *Food & Drug Admin. v. All. for Hippocratic Med.*, 144 S. Ct. 1540, 1557 (2024) ("*FDA*") (citations omitted).

Here, the record supports the conclusion that the USAID officials were not actually independent actors and that even if they were, they in fact would predictably sign off on the actions directed or taken by Defendants. President Trump publicly acknowledged that Musk and DOGE wield significant influence across federal agencies when he stated in an interview that Musk "take[s] an executive order that I'd signed, and he would have those people go to whatever agency it was" and then "some guy that maybe didn't want to do it, all of a sudden, he's signing." J.R. 480. Notably, USAID officials who refused to comply with Musk's demands to give DOGE Team Members access to USAID secured facilities and computer systems were subsequently placed on administrative leave. DOGE's level of influence, if not control, is further illustrated by a media account reporting that in some instances when Secretary Rubio directed that certain programs should continue to be funded, DOGE Team Members "would veto" the payments, and because they had control over the electronic payments system, the funding was not released. J.R. 572–73. Furthermore, Marocco has effectively confirmed that DOGE played a role in key decisions by acknowledging that he "sometimes consult[s] or coordinate[s] with policymakers and others at [DOGE]" including by consulting with "the DOGE Team on certain matters, including personnel." J.R. 412–13. Finally, the email that contained the RIF notices sent to J. Doe 11 and J. Doe 21 was sent from a USAID email account created by Kliger, a DOGE Team Member, and the relevant metadata shows that Kliger in fact sent out those RIF notices. The record thus supports the conclusion that relevant actions specifically taken by USAID officials were taken as predictable responses to Defendants' directions and actions, and that, at a minimum, Defendants were directly involved in causing those actions through their role in effectuating personnel and contract actions and terminations. *See Dep't of Commerce v. New York*, 139 S. Ct. 2551, 2566 (2019). Under these circumstances, the Court finds that Plaintiffs have satisfied the traceability requirement by

21

ADD.023

showing that Defendants are at least "in part responsible for" their asserted injuries. *Libertarian Party of Va.*, 718 F.3d at 316.

## C.    Redressability

Lastly, Plaintiffs must show that their asserted injury is redressable. To do so, Plaintiffs must demonstrate that "it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Sierra Club*, 899 F.3d at 284 (quoting *Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 181 (2000)). The "second and third standing requirements—causation and redressability—are often 'flip sides of the same coin.'" *FDA*, 144 S. Ct. at 1555 (quoting *Sprint Commc'ns Co. v. APCC Servs., Inc.*, 554 U.S. 269, 288 (2008)). "If a defendant's action causes an injury, enjoining the action or awarding damages for the action will typically redress that injury." *Id.* Further, the "burden imposed by this requirement is not onerous." *Deal v. Mercer Cnty. Bd. of Educ.*, 911 F.3d 183, 189 (4th Cir. 2018). Plaintiffs "need not show that a favorable decision will relieve [their] every injury." *Id.* (alteration in original) (quoting *Sierra Club*, 899 F.3d at 284). "Rather, plaintiffs 'need only show that they personally would benefit in a tangible way from the court's intervention.'" *Id.* (quoting *Sierra Club*, 899 F.3d at 284). "The removal of even one obstacle to the exercise of one's rights, even if other barriers remain, is sufficient to show redressability." *Sierra Club*, 899 F.3d at 285.

Here, the requested relief includes an injunction barring Defendants from "[i]ssuing, implementing, enforcing, or otherwise giving effect to terminations, suspensions, or stop-work orders." Mot. at 29. Such a result would likely address Plaintiffs' injuries, particularly the imminent termination of J. Doe 11 and J. Doe 21, and the recent terminations of the personal services contracts of J. Doe 1, J. Doe 8, and J. Doe 20. In addition, Plaintiffs seek an order that directs Defendants to stop accessing USAID data and electronic systems and to "reinstate access

to email, payment, security notification, and all other systems for all USAID current employees and PSCs." Mot. at 29. Where the injuries relating to unpaid bills and expenses are due in part to the DOGE Team's stoppage of the electronic payment system, such an order would likely address the injuries arising from the unpaid bills and expenses of J. Doe 1, J. Doe 6, and J. Doe 22.

Defendants assert that the proposed relief cannot redress Plaintiffs' injuries because, as they argued with respect to the traceability requirement, Defendants "lack authority to 'legally direct' USAID to do any of" the actions required by the proposed injunction. Opp'n at 12. The issue of who has control over USAID, however, remains in dispute. Plaintiffs have presented evidence that as a practical matter, Musk and DOGE Team Members acting at his direction have had the ability to cause personnel actions against employees and contractors, to stop payments, and to control any action that requires use of USAID's computer systems. The record reflects that Musk has personally taken credit for shutting down USAID, and that he and another DOGE official overrode objections from USAID officials to gain access to the USAID classified computer systems and facilities for DOGE Team Members and then caused dissenting USAID officials to be placed on administrative leave. It also reflects that DOGE Team Members have had complete control over the USAID computer systems and, on at least one occasion, blocked USAID-approved payments from being sent out. Indeed, at the hearing, Defendants effectively acknowledged that DOGE has total control over USAID systems when their counsel stated that thus far they have been unable to identify a USAID official unconnected to DOGE who would have the ability to take actions over the computer system to assist Plaintiffs with their immediate needs.

Where the record demonstrates that Defendants have had, at a minimum, substantial influence over USAID, and that DOGE Team Members have had a direct role in the personnel and contract actions at USAID, *see supra* part I.B, and "complete control" over USAID computer

23

systems, J.R. 429–30, the Court finds that an injunction directed at Defendants would at least contribute to relieving Plaintiffs of some of their injuries. At a minimum, an order directing Defendants to take actions to reinstate the USAID electronic payment system would remove "one obstacle" to curing Plaintiffs' injuries, which "is sufficient to show redressability." *Sierra Club*, 899 F.3d at 285. Accordingly, the Court concludes that Plaintiffs have satisfied all three requirements to establish standing at this stage of the case.

## II.    Likelihood of Success on the Merits

In their Motion, Plaintiffs argue that they are likely to succeed on the merits of both their Appointments Clause claim and their Separation of Powers claim.

### A.    Appointments Clause

Plaintiffs assert that they are likely to succeed on the merits of their claim under the Appointments Clause that Musk has acted as an Officer of the United States without having been duly appointed to such a role. The Appointments Clause provides that the President of the United States:

> [S]hall nominate, and by and with the Advice and Consent of the Senate, shall appoint Ambassadors, other public Ministers and Consuls, Judges of the [S]upreme Court, and all other Officers of the United States, whose Appointments are not herein otherwise provided for, and which shall be established by Law: but the Congress may by Law vest the Appointment of such inferior Officers, as they think proper, in the President alone, in the Courts of Law, or in the Heads of Departments.

U.S. Const. art. II., § 2, cl. 2. "The Appointments Clause of the Constitution lays out the permissible methods of appointing 'Officers of the United States,' a class of government officials distinct from mere employees." *Lucia v. Sec. & Exch. Comm'n*, 585 U.S. 237, 241 (2018) (quoting U.S. Const. art. II., § 2, cl. 2). The Appointments Clause divides Officers of the United States ("Officers") into two categories. "'[P]rincipal' officers" may be appointed only by the President, with the advice and consent of the United States Senate. *United States v. Arthrex, Inc.*, 141 S. Ct.

24
ADD.026

1970, 1979 (2021). "[I]nferior officers," may be appointed in the same manner, or, if Congress so provides, they may be appointed by "the President alone," by a federal court, or by the head of a department. *See id.* at 1979–80 (quoting U.S Const. art. II, § 2, cl.2).

Defendants have not disputed that Musk has not been duly appointed as either a principal or inferior Officer. Plaintiffs characterize Musk as the *de facto* USDS Administrator, a position established by the DOGE Executive Order, while Defendants assert that Musk's official position is Senior Advisor to the President. While both positions are appointed by the President, Musk was not subjected to Senate confirmation, and it is undisputed that Congress did not establish either position as an inferior Officer position subject to appointment by the President only. Accordingly, neither role is that of an Officer.

Plaintiffs argue that the Appointments Clause was violated because Musk carried out the functions of an Officer without being appointed to such a role. To have acted as an Officer, an individual must: (1) "exercise[] significant authority pursuant to the laws of the United States"; and (2) "occupy a 'continuing' position established by law." *Lucia*, 585 U.S. at 245 (citations omitted).

### 1.    Significant Authority

Plaintiffs argue that Musk has "exercis[ed] significant authority pursuant to the laws of the United States." *Buckley v. Valeo*, 424 U.S. 1, 126 (1976) (per curiam). Plaintiffs assert that Musk has done so at USAID in a number of ways, including by unilaterally cancelling government contracts; causing USAID personnel who refused to give DOGE Team Members access to USAID systems to be placed on administrative leave; shutting down the USAID website and blocking USAID employees from accessing computer systems; and directing the closure of USAID headquarters.

25

In response, Defendants primarily argue that Musk did not exercise significant authority because his role is purely advisory, and that while he may have suggested, advised, or even directed certain actions, every alleged exercise of significant authority at USAID was actually approved by a USAID official with authority to do so. Generally, the Appointments Clause is not violated when a duly appointed Officer authorizes or ratifies an exercise of significant authority that was otherwise initiated or first approved by a non-Officer. *See, e.g.*, *Andrade v. Regnery*, 824 F.2d 1253, 1257 (D.C. Cir. 1987) ("[I]t does not offend the Appointments Clause so long as the duly appointed official has final authority over the implementation of the governmental action."); *Jooce v. Food & Drug Admin.*, 981 F.3d 26, 28 (D.C. Cir. 2020) ("This court has repeatedly recognized that ratification can remedy a defect arising from the decision of an improperly appointed official."); *Consumer Fin. Prot. Bureau v. Gordon*, 819 F.3d 1179, 1190–91 (9th Cir. 2016) (finding that ratification by a validly appointed Officer "cures any initial Article II deficiencies").

Defendants have presented evidence that most of the major actions taken at USAID that could be deemed to be an exercise of significant authority, even if initiated, suggested, or directed by Musk or the DOGE Team Members, were actually approved by USAID officials either before or shortly after the action occurred. First, in his declaration, Marocco asserts that either he or Secretary Rubio, or a USAID employee acting at their direction, took all of the actions referenced in his declaration, which include the actions to place personnel on administrative leave or to terminate them and the actions to suspend or terminate grant and contract actions. Moreover, documents in the record, including those submitted in response to the Court's post-hearing request, demonstrate that Marocco or other senior USAID officials approved the decisions to place thousands of USAID employees on administrative leave throughout the first week of February 2025, and that Marocco authorized the RIF notice sent to approximately 2,000 USAID employees

on February 23, 2025. The present record also demonstrates that Secretary Rubio authorized the relevant grant and contract actions, including the January 24, 2025 pause on foreign assistance and the February 2, 2025 decision to terminate approximately 800 USAID PSCs. Although Plaintiffs raise questions about whether Marocco or the other identified USAID officials actually approved these actions, and whether they had the statutory and regulatory authority to take them, Plaintiffs have not provided specific evidence refuting Defendants' documentation. At this early stage of the case, the Court finds that it is, at a minimum, more likely than not that USAID officials either took or ratified the relevant personnel and contract actions.

However, the present record does not support the conclusion that USAID officials made or ratified the decisions to initiate a shutdown of USAID by permanently closing the USAID headquarters and taking down the USAID website beginning the weekend of February 1, 2025. Notably, Marocco did not claim in his declaration, directly or indirectly, that he, Secretary Rubio, or any other USAID official approved those decisions. Further, in response to the Court's post-hearing request in which it directed Defendants to submit the "specific orders or other decision documents, signed by the authorizing government official, that authorized" an enumerated list of relevant decisions, ECF No. 66, Defendants provided such authorizing documents for most of the decisions, but not for these two. Instead, as to the decision to shut down USAID headquarters permanently, Defendants provided only documentation of the separate action on February 7, 2025 by the GSA to formally cancel USAID's occupancy in the building, an action that necessarily followed a decision on behalf of USAID to close and vacate the premises. Indeed, the authority cited by GSA for its action, 41 C.F.R. § 102-85.75, provides that "[c]ustomer agencies can terminate any space assignments" upon written notice, making clear that except in the case of an emergency or forced move by GSA, of which there is no evidence, the decision to terminate the

use of USAID headquarters would have been made by or on behalf of USAID, not by GSA. 41 C.F.R. § 102-85.75(a), (b). Similarly, Defendants have provided only a February 1, 2025 email from a USAID official merely noting that the USAID website was offline, without showing any authorization for this action by a USAID official.

Thus, based on the present record, the only individuals known to be associated with the decisions to initiate a shutdown of USAID by permanently closing USAID headquarters and taking down its website are Musk and DOGE Team Members. On February 2 and 3, Musk specifically stated about USAID on X that it was "Time for it die," J.R. 195, that "we're in the process of . . . shutting down USAID," Compl. ¶ 53, and that he had "spent the weekend feeding USAID to the wood chipper," J.R. 197. On February 3, a DOGE Team Member announced to USAID personnel in an email that headquarters were going to be closed that day. Though the message stated that the action was done "[a]t the direction Agency leadership," J.R. 196, Defendants have failed to provide documentation, or even to claim, that any duly appointed USAID officer actually made this decision.

This record must be considered alongside the fact that Musk appears to have been involved in the shutdown of CFPB headquarters as well, and the evidence that shows or strongly suggests that Musk and DOGE, despite their allegedly advisory roles, have taken other unilateral actions without any apparent authorization from agency officials. Such actions include terminating key employees at USDA and NNSA responsible for work on the bird flu outbreak and nuclear weapons who had to be rehired immediately, announcing and effectuating a sudden change in policy at FEMA that its former Chief Financial Officer has stated was not approved by agency leadership, and sending out an email requiring all federal employees to document their accomplishments for the week. Under these circumstances, the evidence presently favors the conclusion that contrary

to Defendants' sweeping claim that Musk has acted only as an advisor, Musk made the decisions to shutdown USAID's headquarters and website even though he "*lacked the authority* to make that decision." Opp'n at 18.

As for whether such decisions constitute an exercise of significant authority, other than noting that this inquiry "focuse[s] on the extent of power an individual wields in carrying out his assigned functions," the United States Supreme Court has not further defined the significant authority requirement. *Lucia*, 585 U.S. at 245. Although many cases involving the Appointments Clause involve the exercise of adjudicative functions, such as those of an administrative law judge, *see, e.g. id.* at 241, or prosecutorial authority, *see, e.g.*, *United States v. Donziger*, 38 F.4th 290, 296 (2d Cir. 2022), "significant authority" has not been limited to such activities. Indeed, without specifically ruling on whether the action constituted significant authority, courts have considered and decided Appointments Clause challenges in which the authority exerted included authorizing the termination of employees through a reduction-in-force, *see Andrade*, 824 F.2d at 1254–55, and the procurement of government materials and payment of contractors, *see United States v. Maurice*, 26 F. Cas. 1211, 1214 (Marshall, Circuit Justice, C.C.D. Va. 1823) (stating that the duties "of a purchasing quartermaster, commissary, and paymaster" are "important duties" that are "performed by persons who are considered as officers of the United States").

In *Tucker v. Commissioner of Internal Revenue*, 676 F.3d 1129 (D.C. Cir. 2012), the court identified three considerations to be utilized in distinguishing between an inferior Officer and an employee that relate to the type of authority exercised: (1) "the significance of the matters resolved by the officials"; (2) "the discretion they exercise in reaching their decisions"; and (3) "the finality of those decisions." *Id.* at 1133. Here, at least one decision in question—to permanently close an agency's headquarters as part of the shutdown of the agency—is a matter of great significance.

Where Defendants' counsel acknowledged at the hearing that action to shut down a federal agency would constitute the use of significant authority, the decision to take this momentous step toward such a shutdown likewise meets this standard. Notably, the permanent closure of USAID headquarters also resulted in the permanent closure of USAID's classified operations center. For purposes of USAID, the decision at issue was the equivalent of a decision at the Department of Defense to close down the Pentagon and release it for use by another agency. Such an action is at least as significant as, and likely more significant than, the approval of a RIF at issue in *Andrade*. 824 F.2d at 1254–55, 1257.

Where there is no statutory or regulatory requirement to close down a federal agency such as USAID, the exercise of this authority involves substantial discretion. Lastly, where USAID's headquarters was not only closed and vacated, but then turned back to GSA to be transferred to CBP, the decision was plainly final. The Court therefore finds that the action of authorizing the permanent closure of an agency headquarters as part of an overall plan to dismantle the agency is the exercise of significant authority that must be performed by an Officer of the United States.

Defendants' argument that Plaintiffs' Appointment Clause claim fails because Musk is not occupying an office "established by law" that has the legal authority to take the action in question does not alter this conclusion. Since the case referenced by Defendants, *Landry v. FDIC*, 204 F.3d 1125, 1133 (D.C. Cir. 2000), the same court has held that an Appointments Clause claim may proceed even if the office at issue was not formally created by Congress or the Executive Branch. *See Tucker*, 676 F.3d at 1133 & n.1 ("We read *Landry*'s reference to the 'established by Law' question as a 'threshold trigger,' . . . to mean that such an inquiry may but need not be the start of an Appointments Clause analysis." (quoting *Landry*, 204 F.3d at 1133)). Notably, courts have considered Appointments Clause challenges not only when Congress conferred upon the position

held by the decisionmaker the legal authority to take the action in question, but also in situations where a government official did not have such statutory authority but nevertheless exercised that authority without having been appointed in the constitutionally required manner. *See, e.g.*, *Jooce*, 981 F.3d at 27–28 (considering an Appointments Clause challenge to the issuance of rule by a lower level agency official who lacked statutory authority to issue the rule); *Willie v. Raimondo*, No. 22-0689-BAH, 2024 WL 2832599, at \*2, \*5 (D. Md. June 3, 2024) (same).

Plaintiffs agree that Musk has no formal legal authority to make the decisions at issue, but they assert that as a factual matter, Musk has exerted actual authority at USAID that only a properly appointed Officer can exercise. To deny Plaintiffs' Appointments Clause claim solely on the basis that, on paper, Musk has no formal legal authority relating to the decisions at issue, even if he is actually exercising significant authority on governmental matters, would open the door to an end-run around the Appointments Clause. If a President could escape Appointments Clause scrutiny by having advisors go beyond the traditional role of White House advisors who communicate the President's priorities to agency heads and instead exercise significant authority throughout the federal government so as to bypass duly appointed Officers, the Appointments Clause would be reduced to nothing more than a technical formality. *Cf. Lucia*, 585 U.S. at 245 (stating that the significant authority inquiry "focuse[s] on the extent of power an individual wields in carrying out his assigned functions").

## 2. Continuing Position

The Supreme Court first addressed the continuing position requirement in *United States v. Germaine*, 99 U.S. 508 (1878). *See Lucia*, 585 U.S. at 245. In *Germaine*, the Supreme Court held that a surgeon appointed by the Commissioner of Pensions, who was "called on by [the Government] in some special case[s]" to conduct medical examinations on an as-needed basis,

was not an Officer of the United States because his duties were "not continuing and permanent, and they [were] occasional and intermittent." *Germaine*, 99 U.S. at 512. Subsequently, in *Auffmordt v. Hedden*, 137 U.S. 310 (1890), the Supreme Court found that a merchant appraiser who was "selected as an emergency arises, upon the request of [a Government] importer for a reappraisal" was also not an officer where "[h]is position [was] without tenure, duration, continuing emolument, or continuous duties," and where he acted "only occasionally and temporarily." *Id.* at 326–27. More recently, in *Morrison v. Olson*, 487 U.S. 654 (1988), the Supreme Court concluded that an independent counsel in the United States Department of Justice was an Officer rather than a mere employee, even though the position's tenure was temporary, in that the appointment terminated when the counsel "completed or substantially completed any investigations or prosecutions undertaken pursuant to" the statute creating the position. *Id.* at 664, 671 n.12. Beyond these three cases, the Supreme Court has not "explained how to determine what constitutes a sufficiently 'continuing position.'" *Donziger*, 38 F.4th at 296.

In *Donziger*, the United States Court of Appeals for the Second Circuit held that a private attorney appointed as a temporary special prosecutor for a contempt case pursuant to Federal Rule of Criminal Procedure 42(a)(2) was in a "continuing position" for purposes of the Appointments Clause. *Id.* at 297–98. Based on the Supreme Court precedent, the *Donziger* court identified three factors to consider on this issue: "(1) the position is not personal to a particular individual; (2) the position is not transient or fleeting; and (3) the duties of the position are more than incidental." *Id.* at 297.

Here, the position at issue is the USDS Administrator, an office which was established by the DOGE Executive Order. *See* Exec. Order No. 14,158, 90 Fed. Reg. at 8,441. As to whether it is personal to a particular individual, although Defendants assert that Musk's role is unique to

himself, neither the DOGE Executive Order nor any of the other executive orders that relate to DOGE refer to any particular individual and instead purport to create an office and a position. *See, e.g.*, *id.*; Exec. Order No. 14,170, 90 Fed. Reg 8,621 (Jan. 20, 2025); Exec. Order No. 14,222, 90 Fed. Reg. at 11,095. Notably, at various times other individuals, including Vivek Ramaswamy and Amy Gleason, have been referenced by the President or the White House as being a leader of DOGE. The position is therefore not personal to a particular individual.

As for whether the position is "transient or fleeting," the DOGE Executive Order sets an 18-month term for the President's DOGE agenda and the U.S. DOGE Service Temporary Organization, an entity within DOGE, to run until July 2026. *See* Exec. Order No. 14,158, 90 Fed. Reg. at 8,441. However, unlike in *Germaine* and *Auffmordt*, in which the governmental duties of the surgeon and appraiser were to be performed on an as-needed basis when the Government required their services for short, specific, and singular tasks and thus were "occasional and intermittent," *Germaine*, 99 U.S. at 512, or "temporar[y]," *Auffmordt*, 137 U.S. at 327, here, the executive orders contemplate robust, ongoing duties for DOGE during that time period. These functions include "modernizing federal technology and software," Exec. Order No. 14,158, 90 Fed. Reg. at 8441; advising on a "Federal Hiring Plan" and assessing whether new vacancies should be filled, Exec. Order No. 14,170, 90 Fed. Reg. at 8,621; identifying all "sources of Federal funding for illegal aliens," Exec. Order No. 14,218, 90 Fed. Reg. 10,581 (Feb. 19, 2025); and coordinating with agencies on efforts to rescind or promulgate regulations and on contract and grant reviews, approvals, and terminations, *see* Exec. Order No. 14,219, 90 Fed. Reg. 10,583 (Feb. 19, 2025); Exec. Order No. 14,222, 90 Fed. Reg. at 11,095. In practice, in his first month with DOGE, Musk and his DOGE Team Members have been heavily engaged in gaining access to agency computer systems; identifying grants, contracts, and employees to be terminated; using

government-wide emails to monitor employees' weekly activities; and shutting down agency headquarters and websites. Indeed, DOGE's activities reportedly have required around-the-clock work by certain DOGE Team Members.

The head of DOGE is therefore more akin to the independent counsel in *Morrison* or the special prosecutor in *Donziger*, who held temporary but continuous roles that would eventually end when the required assignment, in those cases, the investigation and prosecution of specific individuals pursuant the scope of the appointment, was "completed or substantially completed." *Morrison*, 487 U.S. at 664; *Donziger*, 38 F.4th at 295, 298–99 (finding that a special prosecutor for a single contempt case was in a continuing position). Here, as the head of DOGE, Musk's continuing role over the next 18 months encompasses a set of duties that in many ways are broader than the specific prosecutorial functions in those cases.

Finally, the DOGE duties described in the executive orders and the actual work conducted, which include the carrying out of presidential directives relating to reducing the number of regulations, addressing waste in grants and contracts, and determining the appropriate size of the federal workforce, are not merely "incidental" to the regular operations of government. *Donziger*, 38 F.4th at 297. The Court therefore finds that the USDS Administrator is a "continuing position." *See Lucia*, 138 S. Ct. at 2051.

Defendants, however, assert that Musk is not actually the USDS Administrator. Based on the Fisher Declaration, they assert that Musk is a non-career Special Government Employee who officially holds the title of Senior Advisor to the President, within the White House Office, and who "has no actual or formal authority to make government decisions himself" and thus can "only advise the President and communicate the President's directives." J.R. 424–25. In the declaration, Fisher also asserts that Musk "is not the U.S. DOGE Service Administrator." J.R. 425.

In contrast, Plaintiffs argue that regardless of the formal status of Musk, he "is in fact the '*de facto*'" USDS Administrator and that as the head of DOGE, he exercises actual authority in ways that an advisor to the President does not. Reply at 11, ECF No. 35 (quoting Compl. at 1). As discussed above, President Trump has consistently and repeatedly stated that Musk is in charge of DOGE. *See Texas v. United States*, 809 F.3d 134, 185 (5th Cir. 2015) (relying on presidential statements at the preliminary injunction stage); *aff'd by an evenly divided court*, 136 S. Ct. 2271 (2016) (per curiam); *Cnty. of Santa Clara v. Trump*, 250 F. Supp. 3d 497, 522–23 (N.D. Cal. 2017) (same). Most notably, on February 19, 2025, President Trump publicly stated, "I signed an order creating the Department of Government Efficiency and put a man named Elon Musk in charge." J.R. 568. Musk spoke on behalf of DOGE at a joint press conference with the President on February 11, in a joint interview with the President on February 18, and at the Cabinet meeting on February 26.

Musk's public statements and posts on X, in which he has stated on multiple occasions that DOGE will take action, and such action occurred shortly thereafter, demonstrate that he has firm control over DOGE. For example, on February 2, 2025, shortly after Musk promised on X that "D[OGE] will fix it," referencing the National Weather Service internal employee website's description of DEI initiatives at the agency, DOGE posted that the language was removed. J.R. 91-92. On February 7, 2025, shortly after polling X users on whether a DOGE team member who was fired for racist social media posts should return to the agency, Musk announced that the DOGE member "will be brought back." J.R. 641.

Although the White House announced on February 25, 2025, that Amy Gleason is now the Acting USDS Administrator, that same day, White House Press Secretary Karoline Leavitt maintained that "the president tasked Elon Musk to oversee the DOGE effort" while noting that

35

others "are helping run DOGE on a day-to-day basis." J.R. 616. Notably, at the February 28, 2025 hearing on this Motion, Defendants' counsel could not identify, despite having made an inquiry, who the USDS Administrator was before Gleason. Then on March 4, 2025, in a Presidential Address to Congress, President Trump stated that he had "created the new brand new Department of Government Efficiency. DOGE. . . . Which is headed by Elon Musk." J.R. 921.

At this preliminary stage, the record demonstrates that, at least during the time period relevant to this Motion, Musk was, at a minimum, likely the official performing the duties and functions of the USDS Administrator. Even if viewed from the standpoint of the Senior Advisor position that he occupies on paper, the record of his activities to date establishes that his role has been and will continue to be as the leader of DOGE, with the same duties and degree of continuity as if he was formally in that position. *Cf.* Officers of the United States Within the Meaning of the Appointments Clause, 31 Op. O.L.C. 73, 117 (2007) ("Congress could not evade the Appointments Clause by, for example, the artifice of authorizing a contract for the supervision of the Justice Department, on the ground that no 'office' of Attorney General would be created by law."). The Court therefore finds that Musk has a "continuing position" for purposes of the Appointments Clause.

Where the present record supports the conclusion that Musk, without having been duly appointed as an Officer of the United States, exercised significant authority reserved for an Officer while serving in a continuing governmental position, the Court finds that Plaintiffs have demonstrated a likelihood of success on the merits of the Appointments Clause claim as to the decision to permanently close USAID headquarters. At this stage, the Court need not and does not address whether the remaining decisions and actions referenced by Plaintiffs constituted significant authority exercised by Musk.

###### B.    Separation of Powers

Plaintiffs also argue that Defendants' actions relating to USAID, in the collective, violate the principle of Separation of Powers under the United States Constitution in that they exceed the authorities of the Executive Branch and encroach upon those of the Legislative Branch. Although they identify several potential Separation of Powers violations, the focus of their argument is that Defendants have acted to eliminate USAID, a federal agency created by statute, where only Congress may do so, and in doing so have usurped Congress's authority to create and abolish offices.

###### 1.    The Elimination of USAID

The record demonstrates that Defendants, as well as other government officials, have acted swiftly to shut down, dismantle, and effectively eliminate USAID as an independent agency.

On Sunday, February 2, 2025, Musk specifically announced the dismantling of USAID when he posted on X that "USAID is a criminal organization. Time for it to die." J.R. 174, 195. That same weekend and in the following days, Defendants physically closed USAID headquarters and shut down key functionalities of the agency. As of Friday, January 31, 2025, plaques with the USAID agency seal were removed from USAID offices, and on Monday, February 3, 2025, the USAID headquarters was permanently closed, with employees no longer permitted to enter. Shortly thereafter, the name of the agency was removed from the facade of the building, and as reported by Musk on X on February 7, 2025, CBP took over the USAID office space. That agency is reportedly reconfiguring the space for its own use.

In addition to the physical shutdown of USAID, on February 1, 2025, the USAID website was taken offline, and around that time approximately 2,000 USAID email accounts were deactivated. USAID's classified computer systems have been dismantled or are not available for

use. USAID's Automated Directive System, which contains all internal USAID policies and guidance, has also been taken offline.

In the early hours of Monday, February 3, 2025, as these activities were occurring, Musk specifically stated in a livestream on X that DOGE's actions relating to USAID were not a "minor housecleaning," and that instead DOGE was "shutting down USAID," which he asserted was necessary because USAID was "just a ball of worms" that has "got to go" because "it's beyond repair." Compl. ¶ 53. He stated that he had checked with President Trump "a few times" and confirmed that President Trump "agreed that we should it shut down." J.R. 171. After the livestream ended, Musk took personal credit for the shutdown of USAID by stating on X that he was among those that had spent the weekend "feeding USAID into the wood chipper." J.R. 197.

The dismantling of USAID has included the elimination or sidelining of almost its entire workforce. On January 27, 2025, 58 senior employees were placed on administrative leave, and by February 4, 2025, USAID had placed a total of 2,137 employees on administrative leave. By February 7, 2025, USAID had identified another 2,104 employees who would have been placed on administrative leave that day but were not so placed because of the *AFSA* TRO. Thus, out of USAID's 4,765 direct hire employees, 4,241, or almost 90 percent were on or slated for placement on administrative leave by February 7. On February 23, 2025, after the *AFSA* TRO was lifted, USAID employees were notified that virtually all employees, with limited exceptions, were placed on administrative leave as of that day, and RIF notices were issued to terminate approximately 2,000 employees including J. Doe 11 and J. Doe 21. In the RIF notice, USAID acknowledged that it was eliminating "competitive area[s]," J.R. 448, which generally amounts to the elimination of bureaus or offices. *See* J.R. 912 (stating that competitive area means "bureau" or "office"); 5 C.F.R. § 351.402 (stating that a "competitive area may consist of all or part of an agency" and that

"[t]he minimum competitive area is a subdivision of the agency under separate administration within the local commuting area"). In a declaration, a USAID employee familiar with the agency's staffing data has estimated that over 50 percent of USAID's civil and foreign service employees in Washington, D.C. have received a RIF notice. Further, as stated by Marocco in his February 22, 2025 declaration, nearly 800 PSCs have been terminated, a figure which appears to include J. Doe 1, J. Doe 8, and J. Doe 20 and represents approximately 75 percent of all PSCs employed by USAID. *See* USAID, *Fiscal Year 2024 Agency Financial Report* at 3 (2024) (stating that USAID workforce includes 1,061 U.S. PSCs).

The shutdown activities have also included termination of contracts and grants. Since the initial, across-the-board "pause" on "all new obligations of funding," J.R. 418, DOGE has taken credit, based on its own accounting, for terminating 2,191 contracts worth $26.1 billion and 2,366 grants worth $41.8 billion, for a total of nearly $68 billion. *See* doge.gov/savings (last updated Mar. 10, 2025).

As a result of these and other actions, USAID appears to be unable to perform its core functions and even certain basic functions of a governmental agency. For example, J. Doe 26 has stated in a declaration that "the Agency financial system (Phoenix) has not been accessible or functional," which prevents the processing of payments for employees, contractors, and grantees. J.R. 256. As reported by J. Doe 1, valid payments for completed work are not being made, even for work that is subject to an exemption or waiver from the funding freeze. As reported by J. Doe 2 and J. Doe 7, all of USAID's classified systems, including the USAID classified operations center, have been dismantled and are not operational, meaning that it can no longer engage in certain disaster response operations. As reported by J. Doe 20 and another USAID employee, USAID staffing has been reduced to the point that in some bureaus there are no personnel with

credentials as a timekeeper who can prepare and review documents to have personnel paid, and contracting officers have been placed on administrative leave such that terminated PSCs cannot finalize contract modifications and complete offboarding, including receiving payments owed to them.

Finally, it is likely that USAID is no longer able to perform certain statutorily required activities. J. Doe 2 has stated that as a result of the dismantling of the agency, USAID is not complying with statutory requirements, such as those in the Federal Information Technology Acquisition Reform Act, the Federal Information Security Management Act, the Privacy Act, the E-Government Act of 2002, and the Government Performance and Results Act, among others. The shutdown of the USAID website also likely prevents USAID from fulfilling reporting and transparency obligations as required by Congress. *See* Further Consolidated Appropriations Act, 2024 ("FY24 Appropriations Act"), Pub. L. 118-47, 138 Stat 460, 770, div. F, tit. VII, § 7016(b).

Throughout these activities, Musk has consistently framed them as part of the elimination of USAID. On February 13, 2025, Musk reposted a video on X in which he stated that "We need to delete entire agencies, as opposed to leave part of them behind." J.R. 268. After the *AFSA* TRO was lifted on February 21, Musk agreed with the statement that "DOGE can now DISMANTLE USAID" and declared that "the world will be better for this." J.R. 674. Indeed, on February 19, 2025, President Trump stated at a public event that "we have effectively eliminated the U.S. Agency for International Development." J.R. 466.

Taken together, these facts support the conclusion that USAID has been effectively eliminated.

## 2. Legal Standard

Under *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579 (1952), federal courts may consider claims of a violation of Separation of Powers under the United States Constitution. *Id.* at 587–89 (holding that the President acted beyond his constitutional powers by ordering the seizure of steel mills in order to bolster wartime production); *see, e.g.*, *NLRB v. Noel Canning*, 573 U.S. 513, 525 (2014) (collecting cases); *City & Cnty. of San Francisco v. Trump*, 897 F.3d 1225, 1232 (9th Cir. 2018). To act within its authority, the President or the Executive Branch must act based on authority that "stem[s] either from an act of Congress or from the Constitution itself." *Youngstown*, 343 U.S. at 585. Courts apply a tripartite framework, originally set forth in Justice Robert Jackson's concurrence in *Youngstown*, to assess whether an executive action runs afoul of the Separation of Powers. *Medellín v. Texas*, 552 U.S. 491, 524 (2008). First, "[w]hen the President acts pursuant to an express or implied authorization of Congress, his authority is at its maximum, for it includes all that he possesses in his own right plus all that Congress can delegate." *Youngstown*, 343 U.S. at 635 (Jackson, J., concurring). Second, if Congress is silent and neither grants nor denies authority, the President must rely only on the President's independent powers as established by the Constitution and possibly based on authority existing in "a zone of twilight" in which there may be "concurrent authority" with Congress. *Id.* at 637. Finally, if the President "takes measures incompatible with the express or implied will of Congress," then the President's "power is at its lowest ebb" and the President may "rely only upon his own constitutional powers minus any constitutional powers of Congress over the matter." *Id.*

## 3. Congressional Authorization

The Court first considers whether Congress has expressly or impliedly authorized Defendants' course of conduct in dismantling and eliminating USAID. There is no statute that

authorizes the Executive Branch to shut down USAID. Generally, Congress has reserved to itself the power to create and abolish federal agencies, as well as to authorize restructuring of the Executive Branch. From 1932 to 1984, Congress has at times authorized the President to submit a reorganization plan that could include plans to transfer or abolish all or part of an agency or the functions of an agency, or to consolidate or coordinate part of an agency or its functions with another agency or part of an agency, which would take effect if approved through a special legislative process consisting of resolutions adopted by both the House of Representatives and the Senate. *See* Cong. Rsch. Serv., R42852, *Presidential Reorganization Authority: History, Recent Initiatives, and Options for Congress*, 3 (2012). This statutory grant of authority, however, expired on December 31, 1984, and has not since been reinstated. *See id.*; 5 U.S.C. §§ 903–906.

More specifically, Congress has made clear through statute its express will that USAID be an independent agency, and that it not be abolished or substantially reorganized without congressional approval. USAID was first created by an Executive Order in 1961. Exec. Order No. 10,973, 26 Fed Reg. 10,469, § 102 (Nov. 7, 1961) (directing the Secretary of State to "establish an agency in the Department of State to be known as the Agency for International Development"). In 1998, Congress specifically established USAID in statute through the Foreign Affairs Reform and Restructuring Act of 1998 ("FARRA"), Pub. L. 105-277, Div. G, 112 Stat. 2681–761. Under FARRA, USAID was designated as an independent agency within the Executive Branch, and the position of the USAID Administrator was established as one under the "direct authority and foreign policy guidance of the Secretary of State." 22 U.S.C. §§ 6563, 6592. Specifically, FARRA provided that:

> Unless abolished pursuant to the reorganization plan submitted under section 6601 of this title, and except as provided in section 6562 of this title, there is within the Executive branch of Government the United States Agency for International Development as an entity described in section 104 of Title 5.

*Id.* § 6563(a). As referenced in this provision, Congress required the President to submit to Congress a reorganization plan and report addressing "the consolidation and streamlining" of USAID and "the transfer of certain functions" to the State Department, and in which he could "provide for the abolition" of USAID and "the transfer of all of its functions to the Department of State." *Id.* § 6601(a)(2)–(3), (d)(1). Congress also directed that certain functions of USAID, specifically press and administrative functions, be removed from the agency and reorganized under the State Department. *Id.* § 6581(b). In the report submitted pursuant to § 6601, President Clinton proposed that USAID "continue as an independent establishment in the Executive Branch" and recommended transferring to the State Department only those specific functions proposed for such transfer in FARRA. *See* J.R. 307 (Reorganization Plan and Report §§ 1(d), 2(c) (revised Mar. 1999)); 22 U.S.C. §§ 6601(d)(2)(B)(ii), 6581, 6613(b). This temporary authority to propose the abolition of USAID or transfer of USAID to the State Department expired on December 20, 1998. *See* 22 U.S.C. § 6601(a).

Notably, in FARRA, Congress specifically acted to abolish certain other federal agencies relating to foreign affairs, specifically, the United States Arms Control and Disarmament Agency, the United States Information Agency, and the United States International Development Cooperation Agency, and to transfer their functions to the State Department. *Id.* §§ 6501(2)(A), 6511–6512, 6531–6533, 6561–6562.

Since FARRA, Congress has not granted the President direct statutory authority to reorganize, reconstitute, consolidate, or abolish the agency. Indeed, Congress has rejected efforts to eliminate USAID outright. *See* S. 908, § 1401, 104th Cong. (1995) (introduced June 9, 1995); H.R. 5108, 118th Cong. (2023) (introduced Aug. 1, 2023); *see also Youngstown*, 343 U.S. at 586 (considering the failure to pass legislation introduced in Congress as indicative of congressional

will); *City & Cnty. of San Francisco*, 897 F.3d at 1234 & n.4 (same). Defendants therefore generally lack congressional authorization to dismantle, eliminate, or abolish USAID.

Defendants also likely lack congressional authorization to take even the primary specific steps toward abolition of USAID already conducted. In relation to the most recent appropriation for USAID, Congress placed certain restrictions on any "reorganization, redesign or other plan" relating to USAID, which consists of any actions to "expand, eliminate, consolidate or downsize" the agency or its bureaus and offices, including "the transfer to other agencies of the authorities and responsibilities of" bureaus and offices, and any actions to "expand or reduce the size of the permanent Civil Service [or] Foreign Service . . . from the staffing levels previously justified to the Committees on Appropriations for fiscal year 2024." FY24 Appropriations Act, § 7063 ("Section 7063"). Specifically, this provision states that funds appropriated to USAID "may not be used to implement a reorganization, redesign, or other plan . . . without prior consultation" by the agency head "with the appropriate congressional committees," that "such funds shall be subject to the regular notification procedures of the Committees on Appropriations," and that any such notification must "include a detailed justification for the proposed action." *Id.*

For purposes of this provision, Congress has defined "prior consultation" as a:

[P]re-decisional engagement between a relevant Federal agency and the Committees on Appropriations during which such Committees are given a meaningful opportunity to provide facts and opinions, in advance of any public announcement, to inform: (1) the use of funds; (2) the development, content, or conduct of a program or activity; (3) or a decision to be taken.

118 Cong. Rec. H2087 (Mar. 22, 2024); FY24 Appropriations Act § 4 (stating that this explanatory statement "shall have the same effect . . . as if it were a joint explanatory statement of a committee of conference"). The term "subject to the regular notification procedures of the Committee on Appropriations," FY24 Appropriations Act § 7063, means that "such Committees must be notified

not less than 15 days in advance of the initial obligation of funds." 118 Cong. Rec. H2087 (Mar. 22, 2024); *see also* FY24 Appropriations Act § 7015.

Defendants' primary actions aimed at eliminating USAID, including the closing of USAID headquarters and drastic staffing reductions such as the termination of approximately 50 percent of USAID personnel, qualify as parts of a reorganization of the agency covered by the requirements of this provision, whether as a form of eliminating or downsizing the agency or one of its offices, or as reducing staffing below the previously justified levels. *See* FY24 Appropriations Act § 7063. Secretary Rubio's February 3, 2025 letter to congressional committees stating that Marocco had been tasked with "begin[ning] the process of engaging in a review and potential reorganization of USAID's activities" that could include, among other activities, the "closing, reorganizing, [or] downsizing" of bureaus and offices, "reducing the size of the workforce," and eventually abolishing parts of USAID, J.R. 421–22, while referencing Section 7063, does not render such actions authorized by Congress. First, the actions to shut down USAID headquarters and its website occurred between January 31, 2025 and the morning of February 3, 2025, before or as the letter was sent, and thus involved the unauthorized expenditure of funds before consultation, and without the required advanced notice. *See* FY24 Appropriations Act §§ 7015, 7063. The letter also did not constitute "prior consultation" under the FY24 Appropriations Act because it was not a "pre-decisional engagement" that provided the Appropriations Committees with "a meaningful opportunity to provide facts and opinions, in advance of any public announcement," relating to the use of funds or the decisions to be taken. 118 Cong. Rec. H2087 (Mar. 22, 2024). Rather, Musk's public announcement that USAID was being shut down, and the electronic notification to employees of the closure of USAID headquarters, occurred before the February 3 letter was sent. Further, where USAID's placement of almost all of its workforce on administrative leave,

45

termination of approximately 75 percent of its PSCs, and termination of up to 50 percent of employees all occurred shortly after the letter was sent, and likely would have occurred earlier in the absence of the *AFSA* TRO, there is no evidence that the congressional committees had the opportunity to weigh in before these key actions were taken and publicly announced.

Although the letter provided certain general reasons for initiating consultations, such as inefficient foreign assistance processes and lack of coordination that creates discord in foreign policy, it provided no explanation of any kind, much less the required "detailed justification for the proposed action," for the closure of USAID headquarters or for the mass termination of the employees and PSCs. FY24 Appropriations Act § 7063.

Notably, in the past, when the Executive Branch sought to pursue a USAID reorganization, it first submitted a plan to Congress, engaged in discussions relating to it, and moved forward with the plan only after Congress had communicated its assent. For example, during the first Trump Administration, USAID engaged in a two-year reorganization process, in which USAID Administrator Mark Green undertook nearly 100 consultations with Members of Congress and their staff and submitted nine congressional notifications to the relevant subcommittees, describing proposed structural changes in over 115 pages of detail. Marian L. Lawson, Nick M. Brown, Emily M. Morgenstern, Cong. Rsch. Serv., R45779, *Transformation at the U.S. Agency for International Development (USAID)*, 2 n.4, 8, 9 n.32 (2019). Here, there is no evidence that Defendants provided any such plan or engaged in such consultations and notifications regarding the specific reorganization activities taken as part of the elimination USAID.

Where Congress has consistently reserved for itself the power to create and abolish federal agencies, specifically established USAID as an agency by statute, and has not previously permitted actions taken toward a reorganization or elimination of the agency without first

46

providing a detailed justification to Congress, Defendants' actions taken to abolish or dismantle USAID are "incompatible with the express or implied will of Congress." *Youngstown*, 343 U.S. at 637 (Jackson, J., concurring). Accordingly, the third *Youngstown* category applies, and the President's "power is at its lowest ebb." *Id.*

### 4.    Constitutional Authority

In the absence of congressional authorization, the dismantling of USAID must be supported by the President's "own constitutional powers minus any constitutional powers of Congress in the matter." *Id.* at 637–38. Pursuant to the third category of *Youngstown*, the "President's asserted power must be both 'exclusive' and 'conclusive' on the issue." *Zivotofsky ex rel. Zivotofsky v. Kerry*, 576 U.S. 1, 10 (2015) (quoting *Youngstown*, 343 U.S. at 637–38 (Jackson, J., concurring)). On this issue, courts examine the text and structure of the Constitution as well as relevant precedent and history. *Id.*

In asserting constitutional authority for their actions relating to USAID, Defendants claim that they "fit well within the President's Article II authority." Opp'n at 23. Specifically, Defendants point to the President's foreign affairs powers under Article II of the Constitution. Although Congress has certain authorities in relation to foreign affairs, including through its war and foreign commerce powers, *see Zivotofsky*, 576 U.S. at 21; *Am. Ins. Ass'n v. Garamendi*, 539 U.S. 396, 396 (2003), the President has the "vast share of responsibility for the conduct of our foreign relations" and has "a degree of independent authority to act." *Garamendi*, 539 U.S. at 414. As Defendants acknowledge, however, "[t]he Executive is not free from the ordinary controls and checks of Congress merely because foreign affairs are at issue." *Zivotofsky*, 576 U.S. at 21. Notably, the case law relied upon by Defendants to support the applicability of the President's foreign affairs powers to the present case recognizes the overlap of the political branches' foreign

affairs powers and endorses the supremacy of presidential foreign affairs powers only as they relate to substantive issues of foreign policy or interactions with foreign countries. *See Garamendi*, 539 U.S. at 414–15 (holding that the California Holocaust Victim Insurance Relief Act was preempted because it interfered with the President's authority to conduct foreign policy and to enter into executive agreements with foreign countries to settle claims of American citizens); *Zivotofsky*, 576 U.S. at 7–8, 21 (holding that a statute requiring that passports for American citizens born in Jerusalem record the place of birth as "Israel" violated the Separation of Powers because the President has exclusive authority to grant formal recognition to a foreign sovereign, and the Executive Branch did not recognize any country as having sovereignty over Jerusalem); *United States v. Curtiss-Wright Exp. Corp.*, 299 U.S. 304, 312, 315, 319–20 (1936) (finding that a congressional resolution permitting the president to bar the sale of arms in relation to a particular armed conflict was not an unconstitutional delegation of legislative power to the Executive Branch because of the President's foreign affairs power as "the sole organ of the federal government in the field of international relations").

Here, however, the primary actions at issue—the closure of USAID headquarters, the placement on leave or termination of 90 percent of its workforce, and the termination of large numbers of contracts, including those with personal services contractors—relate largely to the structure of and resources made available to a federal agency, not to the direct conduct of foreign policy or engagement with foreign governments. Plaintiffs do not challenge individual decisions on what particular foreign aid initiatives should be advanced, whether to provide foreign aid to a particular nation, or how USAID personnel should operate in a foreign nation. Rather, they challenge the treatment within the agency of USAID personnel and contractors, the vast majority

48

of whom are located in the United States, and whether their agency should operate independently or be shut down and absorbed into other parts of the federal government.

Although such functions necessarily have some connection to foreign policy because of the nature of USAID's mission, under Defendants' theory, the President would have unilateral control over all aspects of the State Department and could even abolish it as a matter of the foreign policy power. *Youngstown* itself, however, illustrates that the fact that an executive action has some nexus to Article II presidential powers, whether relating to foreign policy or the President's role as Commander-in-Chief, does not necessarily render the action constitutional. *Cf. Youngstown*, 343 U.S. at 587 (holding that the seizure of steel mills "cannot be properly sustained as an exercise of the President's military power as Commander in Chief"). Here, where the actions taken against USAID primarily relate to the internal affairs of government, they cannot be justified based solely on the President's foreign affairs powers.

Defendants' reference at the hearing to the President's purported power "to avoid waste, fraud, and abuse," which the Court construes as an invocation of the President's Article II power to ensure that the laws are faithfully executed, fares no better. Hrg Tr. at 104, ECF No. 53. Where this power allows the President to engage in "the general administrative control of those executing the laws," including the "power of removing those for whom he cannot continue to be responsible," *Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*, 561 U.S. 477, 492–93 (2010) (quoting *Myers v. United States*, 272 U.S. 52, 164 (1926)), it may justify the termination or placement on leave of certain employees. When, however, the Executive Branch takes actions in support of the stated intent to abolish an agency, such as permanently closing the agency headquarters and engaging in mass terminations of personnel and contractors, those actions conflict with Congress's constitutional authority to prescribe if and how an agency shall exist in form and function. *See id.*

at 500 ("Congress has plenary control over the salary, duties, and even existence of executive offices."); *Freytag v. Comm'r of Internal Revenue*, 501 U.S. 868, 883 (1991) (recognizing Congress's "authority to create offices"); *Myers v. United States*, 272 U.S. 52, 128–29 (1926) ("The Legislature creates the office, defines the powers, limits its duration, and annexes a compensation." (quoting 1 Annals of Congress, 581, 582)). Accepted understandings and practice underscore the proposition that even while the President can generally address issues such as waste and fraud, Congress alone holds the constitutional authority to take action to eliminate agencies that it has created. *See Zivotofsky*, 576 U.S. at 23 ("In separation-of-powers cases this Court has often 'put significant weight upon historical practice.'" (quoting *Noel Canning*, 573 U.S. at 524)). Beyond the examples discussed above of Congress statutorily abolishing other foreign policy agencies through FARRA, Congress has repeatedly acted to abolish or significantly reorganize agencies by statute in other contexts. For example, in 1995, Congress abolished the Interstate Commerce Commission and transferred any remaining functions to the Surface Transportation Board within the Department of Transportation. ICC Termination Act of 1995, Pub. L. No. 104-88, 109 Stat. 803, §§ 101, 701–702. In 2002, Congress abolished the Immigration and Naturalization Service by statute and transferred its functions to the United States Department of Homeland Security. Homeland Security Act of 2002, Pub L. No. 107-296, 116 Stat. 2135 §§ 441, 451(b), 471. This history demonstrates that even considering the identified Article II authority, the power to act to eliminate federal agencies resides exclusively with Congress. *See Zivotofsky*, 576 U.S. at 28.

Although examples of unilateral executive actions to eliminate an agency are rare, one instructive case demonstrates that executive action aimed at abolishing a statutorily mandated agency and its programs violates the Separation of Powers even before the agency is entirely

eliminated. In *Local 2677, American Federation of Government Employees v. Phillips*, 358 F. Supp. 60, 72 (D.D.C. 1973), the Court found a Separation of Powers violation pursuant to *Youngstown* when the President sought to terminate the Office of Economic Opportunity ("OEO"), submitted a budget proposal that the OEO receive no funding for the following year for its Community Action Agency ("CAA") program, and stopped providing new funding to CAA grantees and instead required them to phase out their activities. *Id.* at 72, 77–78. The court held that even without the final termination of the program, the steps taken toward its termination violated the Separation of Powers because "it is for the Congress in the responsible exercise of its legislative power to make provisions for termination" of a program, and that "[u]ntil those provisions are made, the function of the Executive is to administer the program in accord with the legislated purposes." *Id.* at 79. The court also found that in seeking to terminate or abolish OEO and its CAA program, the Executive's plan violated the then-existing statutory requirement of 5 U.S.C. § 903(a), that "a reorganization plan be submitted to the Congress before the abolition of that function or the agency itself can take place." *Id.* at 80.

Similarly, Defendants' present actions to dismantle USAID violate the Separation of Powers because they contravene congressional authority relating to the establishment of an agency. To find that the President's Article II powers permit such action would mean that "no barrier would remain to the executive ignoring any and all Congressional authorizations if he deemed them, no matter how conscientiously, to be contrary to the needs of the nation." *Id.* at 77; *see also City & Cnty. of San Francisco*, 897 F.3d at 1232 ("[T]he President may not decline to follow a statutory mandate or prohibition simply because of policy objections." (quoting *In re Aiken Cnty.*, 725 F.3d 255, 259 (D.C. Cir. 2013)). Where Congress has prescribed the existence of USAID in statute pursuant to its legislative powers under Article I, the President's Article II power to take care that

the laws are faithfully executed does not provide authority for the unilateral, drastic actions taken to dismantle the agency.

Defendants' remaining argument does not alter this conclusion. In opposing Plaintiffs' Separation of Powers claim, Defendants do not advance any factual claim that Defendants' actions do not effectively constitute the elimination of USAID as an agency. Rather, they argue that, based on *Dalton v. Specter*, 511 U.S. 462 (1994), this claim cannot succeed because it amounts only to a claim that the Executive Branch exceeded its statutory authority. In *Dalton*, the plaintiffs sought to enjoin the closure of a naval base pursuant to President George H.W. Bush's acceptance of the recommendation of a commission that was established by, and followed a process set forth in, the Defense Base Closure and Realignment Act of 1990. *Id.* at 466. After finding that the Administrative Procedure Act ("APA") did not apply to decisions by the President, the Court held that while his actions could "still be reviewed for constitutionality," such a constitutional claim failed because "an action taken by the President in excess of his statutory authority" does not necessarily violate the Constitution, and the plaintiffs' claim amounted only to one asserting a statutory violation. *Id.* at 473–74.

Here, however, Plaintiffs' Separation of Powers claim is not based only on alleged statutory violations but instead further asserts that the elimination of USAID exceeds the President's Article II powers. Under *Youngstown*, courts may permissibly consider whether Congress has authorized the President to act through a statute, as relevant to, but not dispositive of, a Separation of Powers claim. *Youngstown*, 343 U.S. at 635 (Jackson, J., concurring). Such consideration of the impact of statutes on a Separation of Powers claim is common. *See, e.g.*, *id.* at 585–86; *Dames & Moore v. Regan*, 453 U.S. 654, 670–74 (1981). Where, as discussed above, Defendants' actions exceed the President's constitutional powers based in part on, but not because of, statutory provisions that

52

relate to the creation and potential reorganization and abolition of USAID, the Court finds that the Separation of Powers claim is not an APA claim or another claim based only on a violation of statutory authority.

Accordingly, for the reasons discussed above, the Court finds that it is likely that Plaintiffs will succeed on their Separation of Powers claim relating to the dismantling of USAID. Based on this finding, the Court need not and will not address Plaintiffs' assertion that Defendants also violated the Separation of Powers through "the unlawful obstruction of congressionally appropriated funds." Mot. at 14. While Plaintiffs identify a valid theory of a Separation of Powers violation that may well apply in this case, where Plaintiffs merely referenced this argument without providing specific analysis, the Court will not consider it at this stage but may do so if it is more fully developed at later stages of this case. *See City & Cnty. of San Francisco*, 897 F.3d at 1233–35; *see also AVAC*, Nos. 25-0400 (AHA), 25-0402 (AHA), 2025 WL 752378, at *14 (D.D.C. Mar. 10, 2025).

## III.    Irreparable Harm

The second requirement for a preliminary injunction is that the plaintiff will likely suffer irreparable harm in the absence of preliminary relief. *See Winter*, 555 U.S. at 20. "Where the harm suffered by the moving party may be compensated by an award of money damages at judgment, courts generally have refused to find that harm irreparable." *Hughes Network Sys., Inc. v. InterDigital Commc'ns Corp.*, 17 F.3d 691, 694 (4th Cir. 1994). Moreover, to establish irreparable harm, a plaintiff "must make a 'clear showing' that the plaintiff will suffer harm that is 'neither remote nor speculative, but actual and imminent.'" *Mountain Valley Pipeline, LLC v. 6.56 Acres of Land*, 915 F.3d 197, 216 (4th Cir. 2019) (quoting *Direx Israel, Ltd. v. Breakthrough Med. Corp.*, 952 F.3d 802, 812 (4th Cir. 1991)).

53

At the outset, the Court addresses Plaintiffs' argument that a finding of liability on either

of their constitutional claims would necessarily establish irreparable harm. Though Plaintiffs are

correct that, "the denial of a constitutional right . . . constitutes irreparable harm for purposes of

equitable jurisdiction," *Ross v. Meese*, 818 F.2d 1132, 1135 (4th Cir. 1987), courts have limited

the application of that principle "to cases involving individual rights, not the allocation of powers

among the branches of government." *Aposhian v. Barr*, 958 F.3d 969, 990 (10th Cir. 2020),

*abrogated on other grounds*, *Garland v. Cargill*, 144 S. Ct. 1613, 1619 & n.2 (2024); *cf. Roman

Cath. Diocese of Brooklyn v. Cuomo*, 141 S. Ct. 63, 67 (2020) (per curiam) (finding that an

infringement of a First Amendment right results in irreparable harm); *Ross*, 818 F.2d at 1134–35

(finding that an infringement of a Fourth Amendment right results in irreparable harm). Indeed,

two United States Courts of Appeals have considered whether Appointments Clause or Separation

of Powers violations necessarily establish irreparable harm and have concluded that they do not.

*See Alpine Sec. Corp. v. Fin. Indus. Regul. Auth.*, 121 F.4th 1314, 1333–34 (D.C. Cir. 2024);

*Leacho, Inc. v. Consumer Prod. Safety Comm'n*, 103 F.4th 748, 753 (10th Cir. 2024) (holding that

"while violations of certain individual constitutional rights, without more, can constitute

irreparable harm, violations of the Constitution's separation of powers provisions do not").

*Axon Enterprise, Inc. v. Federal Trade Commission*, 143 S. Ct. 890 (2023), cited by

Plaintiffs, is not to the contrary. In *Axon*, the Supreme Court held that that a plaintiff need not

exhaust administrative remedies consisting of a proceeding before an administrative law judge

("ALJ") before pursuing a claim in federal court that the ALJ had been installed in violation of the

Appointments Clause, in part because the injury of being subjected to an "illegitimate proceeding"

before the ALJ "is impossible to remedy" once that proceeding is completed. *Id.* at 903. As the

*Alpine* court correctly concluded in analyzing *Axon*, this determination was grounded in the

54

requirements of the statutory scheme establishing the administrative process and neither addressed the issue of whether, nor leads to the conclusion that, an Appointments Clause or Separation of Powers violation necessarily causes irreparable harm for purposes of a preliminary injunction. *See Axon*, 143 S. Ct. at 903–04; *Alpine*, 121 F.4th at 1336. Recognizing the distinction between constitutional rights held by individuals and those relating to the authorities of the branches of government, this Court will not rely on a broad principle that the constitutional violations asserted here necessarily establish likely irreparable harm and will therefore consider whether Plaintiffs have otherwise met this requirement.

Plaintiffs' additional arguments on this issue include that they are facing or will likely face irreparable harm based on the physical security risk that some Plaintiffs stationed abroad are experiencing; the reputational injury that they are suffering from Musk's disparaging public comments about USAID; and the disclosure of sensitive personal and potentially classified information to DOGE Team Members. As to physical security, Plaintiff J. Doe 22 is facing an ongoing physical security risk as a result of DOGE's control and dismantling of USAID. J. Doe 22 is a USAID employee stationed in a high-risk area in Central America who was placed on administrative leave on February 23, 2025, and because of DOGE's shutdown of the USAID payment system, there is no way to pay J. Doe 22's electricity, cell phone, and internet bills. J. Doe 22 reports that this situation remains despite the alleged waiver in place for payments to provide USAID personnel abroad with access to basic resources, and J. Doe 22's Mission leadership has informed J. Doe 22 that it still has "no way to pay" even though the cell phone and internet bills were due at the end of February 2025. J.R. 457. Though J. Doe 22 has not lost service yet, a loss of electricity and cell phone service would create serious security risks because "[o]nce the electricity goes out," J. Doe 22 will "lose access to . . . security cameras and radios,"

and the radio and cell phone are J. Doe 22's only means of contacting the Mission's Regional Security Office to address security threats. J.R. 457.

Thus, while USAID generally represented in its administrative leave announcement of February 23, 2025 that overseas employees "will retain access to Agency systems and to diplomatic and other resources" until they return to the United States, J.R. 446, J. Doe 22's account, which post-dates that announcement, illustrates that USAID cannot be deemed to have fully addressed all security risks facing overseas personnel on administrative leave. Notably, the February 22, 2025 Marocco Declaration, the only declaration relating to USAID personnel submitted by Defendants in this case, discussed personnel in high-risk locations only in relation to the February 7 placement of USAID personnel on administrative leave and did not attest to the safety of personnel in high-risk areas who were placed on administrative leave on February 23, such as J. Doe 22. Thus, unlike in other cases with different factual records, *see AFSA*, 2025 WL 573762, at *5–7; Defs. Notice of Supp. Authority Ex. A at 7-11, ECF No. 60-1, J. Doe 22's specific account of circumstances creating a physical security risk in a high-risk location arising from Defendants' control of USAID systems demonstrates a likelihood of irreparable harm. *Cf. Bollat Vasquez v. Mayorkas*, 520 F. Supp. 3d 94, 111–12 (D. Mass. 2021) (concluding that plaintiffs faced likely irreparable harm when a governmental policy required them to remain in a dangerous part of a foreign country in which plaintiffs faced "daily peril").

While the security risk to J. Doe 22 is sufficient to demonstrate a likelihood of irreparable harm, Plaintiffs have identified an additional form of likely irreparable harm consisting of reputational harms stemming from Musk's disparaging public statements about USAID. Generally, a claim that an employee's "reputation would be damaged as a result of" an adverse employment action does not establish irreparable harm as required for a preliminary injunction.

56

*Sampson v. Murray*, 415 U.S. 61, 91–92 (1974). In *Sampson*, in which a federal employee sought a "temporary injunction" barring her dismissal pending an administrative appeal, the alleged reputational harm stemmed from the general "humiliation and damage to . . . reputation" and "embarrassment of being wrongfully discharged" that would ensue from a termination. *Id.* at 63, 66, 91. The Supreme Court specifically recognized, however, that "cases may arise in which the circumstances surrounding an employee's discharge, together with the resultant effect on the employee, may so far depart from the normal situation that irreparable injury might be found." *Id.* at 92 n.68. Courts have invoked this exception in such abnormal and compelling circumstances. *See Roe v. Dep't of Defense*, 947 F.3d 207, 212, 229–30 (4th Cir. 2020) (affirming a determination that the discharge of two HIV-positive Air Force servicemembers based on the Air Force's determination that this status made them unfit for service would likely lead to irreparable harm in part because their injury was compounded by "the stigma facing those living with HIV" and the likelihood that the discharges would force them to "address questions from others" that would effectively force them to reveal their HIV-positive status); *Heineke v. Santa Clara Univ.*, 736 F. App'x 622, 624 (9th Cir. 2018) (finding that *Sampson* did not "foreclose the possibility that reputational damage and emotional distress" from an adverse employment action "may represent irreparable harm" and remanding for a determination on whether a plaintiff suspended from his faculty position based an investigation into a student's sexual harassment complaint had established likely irreparable harm on these bases).

Here, if the stated reasons for the shutdown of USAID and the related personnel actions were limited to, as asserted by Marocco, the need to assess "USAID's operations and align its functions to the President's and the Secretary [of State's] priorities," J.R. 407, the termination of Plaintiffs and other USAID personnel would result in the typical reputational harm that stems from

57

a termination, which would not support a finding of irreparable harm. *See Sampson*, 415 U.S. at 91–92. However, Defendants' public statements regarding the reasons for the actions relating to USAID go far beyond the ordinary. On February 2, 2025, as USAID headquarters was being shut down, Musk stated on X that USAID is "evil" and in another post that has been viewed at least 33.2 million times, that "USAID is a criminal organization." J.R. 64, J.R. 195. The next day, Musk also publicly stated in a lengthy discussion on X that USAID was not "an apple with a worm in it" but was instead "just a ball of worms" that is "hopeless" and "beyond repair" to the point that "you've got to basically get rid of the whole thing." Compl. ¶ 53; J.R. 172.. He also stated that USAID had been engaged in "anti-American" activity. J.R. 172. Where such a prominent member of the Executive Branch has publicly described Plaintiffs' place of employment in these ways on such a large media platform, and in a way that effectively characterizes it not as an agency in which certain individuals have engaged in misconduct but as a criminal enterprise from top to bottom, the likely harm to the reputation of personnel who worked there is of a different order of magnitude, because these statements naturally cast doubt on the integrity of those who worked there. At a minimum, they likely diminish the value of the experience of working at USAID in the eyes of future employers, with lasting impact because such personnel necessarily must rely upon and discuss their prior work experience at USAID when they search for new employment upon any final termination from USAID, as well as in future employment searches.

Such reputational injury does not appear to be merely speculative, as at least one Plaintiff has already begun to experience it. J. Doe 12, a USAID PSC, has reported personally hearing "remarks that explicitly and implicitly accused USAID workers of being 'corrupt' and 'stealing from the American people'" and has had family members state "that they have received questions from community members inquiring about the 'lack of accountability and liberal corruption'

within USAID, based on" Musk's statements about USAID and its personnel. J.R. 248–49. Relatedly, J. Doe 9, who is posted in the Middle East, has reported that Musk's derogatory statements about USAID are available on media outlets in that region and "have a direct negative impact on the perception of USAID where I work." J.R. 433. Under these highly unusual and extraordinary circumstances, the reputational injury faced by Plaintiffs "so far depart[s] from the normal situation" that the Court finds that it constitutes an additional form of likely irreparable harm for purposes of a preliminary injunction. *See Sampson*, 415 U.S. at 92 n.68; *cf. Roe*, 947 F.3d at 229–30.

Finally, Plaintiffs have argued that the disclosure of sensitive personal information available to the DOGE Team will likely result in irreparable harm. Because the DOGE Team Members demanded and received root access to USAID's systems, they can view, extract, and export the sensitive personal data of all current and former USAID employees. Generally, the public disclosure or the likely disclosure of PII or other sensitive personal information can cause irreparable harm. *See, e.g.*, *United States v. Miami Univ.*, 294 F.3d 797, 818–19 (6th Cir. 2002) ("Once personally identifiable information has been made public, the harm cannot be undone."); *Senior Execs. Ass'n v. United States*, 891 F. Supp. 2d 745, 755 (D. Md. 2012) ("[G]enerally speaking, the public disclosure of confidential information is irreparable."). Outside of the preliminary injunction context, courts have concluded that the disclosure of classified information to individuals without authorization to view it irreparably harms the government. *See, e.g.*, *Snepp v. United States*, 444 U.S 507, 513 (1980); *United States v. Hashmi*, 621 F. Supp. 2d 76, 82–83 (S.D.N.Y. 2008) (finding that requiring defense counsel to obtain a security clearance was justified given the Government's "strong interest in preventing the irreparable harm of disclosing classified information"); *United States v. Al-Arian*, 267 F. Supp. 2d 1258, 1266–67 (M.D. Fla. 2003) (same).

By extension, where classified information relates to a particular individual, that person could be irreparably harmed by its disclosure to someone who lacks a security clearance.

Here, there are specific reasons to be concerned about the potential public disclosure of personal, sensitive, or classified information. First, as described above, the DOGE Team Members took extreme measures to gain access to classified information, including in SCIFs, when there was no identified need to do so and, as confirmed by J. Doe 11, at least some of them lacked security clearances. These measures included threatening to call the U.S. Marshals and then placing security personnel on administrative leave for attempting to enforce restrictions relating to classified material. Relatedly, J. Doe 2, a USAID employee on administrative leave with responsibilities relating to cybersecurity and privacy, has reported that DOGE Team Members without security clearances used their root access to USAID's systems to "grant themselves access to restricted areas requiring security clearance." J.R. 228.

Unlike in some cases in which assurances were provided that DOGE Team Members have complied and will comply with protocols for protecting sensitive information, *see Univ. of Cal. Student Ass'n v. Carter*, No. 25-354 (RDM), 2025 WL 542586, at *5–6 (D.D.C. Feb. 17, 2025), no such assurances have been provided here. Rather, on at least one occasion, Defendants have publicly disclosed personal information relating to one of the PSC Plaintiffs by posting information about that individual's personal services contract on a DOGE website. Although Defendants correctly note that the same information appears to already be publicly available on the Federal Procurement Data System website, with the likely greater exposure of the DOGE website as a means to inform the general public about DOGE's progress in saving taxpayer dollars, they should have redacted such PII from a personal services contract listing before posting it on DOGE's website. Furthermore, disclosure of personal information is of greater concern where some

Plaintiffs, such as J. Doe 1, are or have previously been posted overseas in high-risk areas, and have expressed concern about "highly sensitive personal information" such as "foreign contacts" and "a safety pass phrase" being released from personnel and security clearance files. J.R. 224.

Under the circumstances in the present record, where the DOGE Team Members have displayed an extremely troubling lack of respect for security clearance requirements and agency rules relating to access to sensitive data, where they did not redact PII being posted on their public website, and where certain Plaintiffs whose personal information could be disclosed remain vulnerable in high-risk areas around the world, the Court finds that the potential disclosure of sensitive personal information presents another form of likely irreparable harm. *See Oak Grove Techs., LLC v. Attwa*, No. 23-cv-334-BO-RN, 2024 WL 84703, at *2 (E.D.N.C. Jan. 8, 2024) (finding that "the risk that the security of" employees' personally identifiable information "could be breached" while that data was in defendant's possession established likely irreparable harm); *Am. Fed'n of Teachers v. Bessent*, No. DLB-25-0430, 2025 WL 582063, at *13–14 (D. Md. Feb. 24, 2025).

For these reasons, Plaintiffs have satisfied the requirement of likely irreparable harm, and the Court need not address their remaining arguments on this issue.

## IV.    Balance of the Equities and the Public Interest

The remaining requirements for a preliminary injunction are that the balance of equities tips in the plaintiffs' favor, and that an injunction is in the public interest. *See Winter*, 555 U.S. at 20. When one party is the Government, these two factors merge and are properly considered together. *Nken v. Holder*, 556 U.S. 418, 435 (2009). In general, the Government and the public interest are not harmed by a preliminary injunction that temporarily enjoins activity that is likely to be unconstitutional under the present circumstances. *See Giovani Carandola, Ltd. v. Bason*,

USCA4 Appeal: 25-1273    Doc: 6    Filed: 03/21/2025    Pg: 93 of 186
Case 8:25-cv-00462-TDC    Document 73    Filed 03/18/25    Page 62 of 68

303 F.3d. 507, 521 (4th Cir. 2002); *Centro Tepeyac v. Montgomery Cnty.*, 722 F.3d 184, 191 (4th Cir. 2013). Where the Court has concluded that Defendants actions have likely violated both the Appointments Clause and Separation of Powers, these factors weigh in Plaintiffs' favor. In this instance, the public interest is specifically harmed by Defendants' actions, which have usurped the authority of the public's elected representatives in Congress to make decisions on whether, when, and how to eliminate a federal government agency, and of Officers of the United States duly appointed under the Constitution to exercise the authority entrusted to them.

Beyond this broad interest, the record further demonstrate that these factors favor an injunction. Where Plaintiffs located overseas have identified serious concerns about security and safety, and the actions that likely violate the constitutional provisions at issue here have already placed them in economic jeopardy, an injunction addressing these issues would benefit them. As for Defendants' interests, as discussed below, a preliminary injunction would not be directed at USAID, which is not a party to this case, and thus would not impact its ability to act, including in relation to foreign policy interests. Rather, the restrictions would be placed only on Defendants and would be unlikely to impede their ability to conduct assigned work pursuant to the various executive orders that complies with the Constitution and federal law. The Court therefore finds that the balance of the equities and the public interest weigh in Plaintiffs' favor.

## V. Remedy

Where all four required elements have been established, the Court will grant a preliminary injunction. Specifically, Plaintiffs request a preliminary injunction providing certain "narrow emergency relief" to Plaintiffs, consisting of barring Defendants from accessing, utilizing, and disclosing Plaintiffs' sensitive personal information outside of USAID, barring them from destroying their personal property left in offices to which they have lost access, and requiring them

62

ADD.064

to "reinstate access to email, payment, security notification, and other systems for all USAID

current employees and PSCs," including restoring emails deleted when access was removed. Mot.

at 29–30. More broadly, Plaintiffs seek a preliminary injunction:

> Enjoining Defendants from "[i]ssuing, implementing, enforcing, or otherwise
> giving effect to terminations, suspensions, or stop-work orders" in connection with
> any contracts, grants, . . . or other foreign assistance awards in existence as of
> January 19, 2025," similar to the relief granted in [the *AVAC* TRO] and clarifying
> that the relief extends to USAID PSCs.

\*\*\*

> Setting aside as unlawful any actions undertaken or directed by Defendants in
> connection with USAID.

> Enjoining Defendants from undertaking or directing any further action in
> connection with USAID unless and until Defendant Musk is properly appointed
> pursuant to the Appointments Clause and provided that such action conforms with
> the Constitutional Separation of Powers and federal statutes, including the Foreign
> Affairs Reform and Restructuring Act of 1998 and the Further Consolidated
> Appropriations Act of 2024.

> Enjoining Defendants from undertaking or directing any further action in
> connection with USAID that exceeds DOGE's stated mission of "modernizing
> Federal technology and software," pursuant to Executive Order 14158, unless and
> until Defendant Musk is properly appointed pursuant to the Appointments Clause
> and provided that such action conforms with the Constitutional Separation of
> Powers and applicable federal statutes.

*Id.*

   As to the terms of the injunction, "the traditional function of a preliminary injunction" is

to "maintain the status quo until after a trial and final judgment." *Pierce v. N.C. State Bd. of

Elections*, 97 F.4th 194, 209 (4th Cir. 2024). "Crafting a preliminary injunction is an exercise of

discretion and judgment, often dependent as much on the equities of a given case as the substance

of the legal issues it presents." *Roe*, 947 F.3d at 231 (quoting *Trump v. Int'l Refugee Assistance

Project*, 582 U.S. 571, 579 (2017)). In considering the equities, a court should consider the

"concrete burdens that would fall on the party seeking the injunction" while ensuring that the

injunction is "no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs." *Id.* (citations omitted). A court should also "mold its decree to meet the exigencies of the particular case" and "pay particular regard for the public consequences." *Id.*

With these principles in mind, the Court will grant some but not all of the relief requested. The Court will grant most of the "narrow emergency relief" requested by Plaintiffs. Specifically, to address the ongoing security and privacy concerns, and to mitigate the short-term impact on Plaintiffs who have been adversely impacted by the likely unconstitutional shutdown activities of Defendants, it will require DOGE Team Members, who have total control of the USAID computer systems, to reinstate access to email, payments, security notifications, and other electronic systems, including restoring deleted emails, for current USAID employees and PSCs. Where DOGE Team Members are government employees and it is unclear to what extent they need access to particular information for specific agency needs, the Court will not enjoin Defendants from accessing any particular personal or sensitive information of Plaintiffs or others, but it will enjoin Defendants from any disclosure outside the agency of PII or other personal information of USAID employees or PSCs, including but not limited to the posting of unredacted PII of PSCs on the DOGE website. Any legally required disclosures of such information outside the agency may be executed by USAID personnel unaffiliated with Defendants. At this time, where USAID personnel were permitted to reenter USAID headquarters to retrieve personal belongings, the request relating to that issue appears to be moot.

Although Defendants assert that the preliminary injunction should apply only to Plaintiffs, where the parties have been unable to identify a means by which individualized relief could be provided without jeopardizing Plaintiffs' anonymity, and the record already contains multiple examples of USAID personnel who were placed on administrative leave or otherwise sanctioned

for objecting to Defendants' actions, the Court finds that applying these requirements to all current USAID employees and PSCs, including those on administrative leave, is necessary to provide full relief to Plaintiffs. While these steps impose some limited burdens on Defendants, they are warranted in light of the benefit to Plaintiffs.

As for the broader requested relief, the Court finds Plaintiffs' proposed terms overbroad and too general and non-specific to provide adequate notice of what conduct is enjoined. The Court will address the issues identified in those requests through narrower, more specific provisions. Although the mass personnel and contract terminations are part of the ongoing dismantling of USAID that likely violates the constitutional principle of Separation of Powers, the Court will not categorically enjoin them because while Defendants may have participated in them, the record presently supports the conclusion that USAID either approved or ratified those decisions, so such relief would effectively enjoin USAID. Such an injunction is not warranted where USAID is not a party to this case and thus was not on notice of the need to contest such an injunction, Plaintiffs have effectively taken the position that USAID is not acting in concert with Defendants but instead has frequently been at odds with Defendants, and Plaintiffs have not even requested injunctive relief against USAID.

However, in relation to the Separation of Powers claim, the Court will enjoin Defendants from taking any actions in relation to additional terminations or placements on administrative leave of USAID personnel; terminations of USAID contracts or grants; closures or shutdowns of USAID buildings, bureaus, offices; or permanent shutdowns or terminations of USAID information technology systems, including permanent deletions of the contents of the USAID website or collections of USAID electronic records. Such restrictions are warranted in that where Defendants appear to have been primarily responsible for the rush to shut down USAID, the restrictions will

assist in maintaining the status quo so as to delay a premature, final shutdown of USAID, which would adversely impact Plaintiffs by resulting in final terminations that would be particularly damaging in light of the reputational harms discussed above. The impact on Defendants would be limited because the restrictions do not bar DOGE Team Members from engaging in USAID activities that are separate and distinct from these activities. The impact on the public interest is also limited because the injunction does not prevent USAID from engaging in lawful activities in these categories directly, including those necessary to effectuate foreign policy interests, and there is no reason to believe that it cannot do so without the assistance of Defendants.

In relation to the likely Appointments Clause violation, to maintain the status quo and prevent additional potential violations during the pendency of the case, the Court will enjoin Defendants from engaging in any actions relating to USAID without the express authorization of a USAID official with legal authority to take or approve the action. While this provision may cover activity not specifically subject to the Appointments Clause, its breadth is necessary to provide an objective standard that can be fairly understood and applied, and it creates no undue burden on Defendants in light of their steadfast position that their role is purely advisory.

As for the specific likely violation, the typical remedy after a final determination on the merits is to void the decision made by the unauthorized official, which in this instance would result in the reopening of USAID headquarters. *See Lucia*, 585 U.S. at 251. Where the likely unauthorized closure has materially advanced the unauthorized elimination of USAID that will have detrimental impacts on both Plaintiffs and the public interest, and where additional delay will likely prevent the Court from granting full relief after a final resolution on the merits, the Court will require Defendants, within 14 days, to secure and submit a written agreement among all necessary parties that ensures that USAID will be able to reoccupy USAID headquarters at its

original location in the event of a final ruling in favor of Plaintiffs. In light of Defendants' demonstrated ability to act rapidly across the Executive Branch, the Court finds that the burden of this requirement on Defendants is reasonable. However, recognizing that an Appointments Clause violation may be cured by a ratification of the decision by a duly appointed Officer, the Court will stay this requirement if Defendants secure and submit, within 14 days, a signed ratification of the decision to permanently close USAID headquarters from the Acting Administrator of USAID or another Officer of the United States with authority to do so on behalf of USAID. *See Jooce*, 981 F.3d at 28.

As to Defendants' specific requests in the event of a preliminary injunction, the Court will not consolidate the preliminary injunction motion with a final determination on the merits because factual disputes remain that will require discovery before a final decision on the merits can be made. Based on the Court's findings of Plaintiffs' likelihood of success on the merits, the likely irreparable harm to Plaintiffs, and the public interest, and where the Court does not find Defendants' will be unduly burdened by the terms of the injunction to be issued, the Court will not stay the injunction pending appeal or the filing of a notice of appeal. *See Nken*, 556 U.S. at 434. Pursuant to Federal Rule of Civil Procedure 65(c), the Court will require the posting of only a limited bond where there has been no showing that Defendants will necessarily have to expend materially significant resources in order to comply with the injunction.

## CONCLUSION

For the foregoing reasons, the Court finds that Defendants' actions taken to shut down USAID on an accelerated basis, including its apparent decision to permanently close USAID headquarters without the approval of a duly appointed USAID Officer, likely violated the United States Constitution in multiple ways, and that these actions harmed not only Plaintiffs, but also the public interest, because they deprived the public's elected representatives in Congress of their constitutional authority to decide whether, when, and how to close down an agency created by Congress.

Accordingly, the Motion for a Preliminary Injunction will be GRANTED IN PART and DENIED IN PART. The Motion will be granted in that the Court will issue the accompanying Preliminary Injunction. The Motion will be otherwise denied. A separate Order shall issue.

Date:   March 18, 2025

THEODORE D. CHUANG
United States District Judge

**UNITED STATES DISTRICT COURT**
**DISTRICT OF MARYLAND**

J. DOES 1-26,

     Plaintiffs,

     v.

ELON MUSK,
*in his official capacity*,
UNITED STATES DOGE SERVICE
and
THE DEPARTMENT OF
GOVERNMENT EFFICIENCY,

     Defendants.

Civil Action No. 25-0462-TDC

**ORDER**

Upon consideration of Defendants' Motion for Clarification or Modification, ECF No. 77, the Court informs the parties that based on the information provided with the Motion and pursuant to the plain language of paragraph 1 of the Preliminary Injunction, Jeremy Lewin is bound by the Preliminary Injunction as someone who served as a DOGE Team Lead or DOGE Team Member in relation to USAID from January 20, 2025 forward.

The definition of the class of individuals bound by the injunction was carefully crafted to not include all individuals who could potentially be bound, *see* Fed. R. Civ. P. 65(d)(2), in that it arguably could have included all or most of the personnel at USAID, but it specifically includes all individuals with a past or present affiliation with Defendants or DOGE to address the most likely perpetrators of constitutional violations and to prevent the circumvention of the injunction, whether intentional or not, through the movement of such individuals to other roles. Excluding Lewin from this class would undermine these purposes. Any necessary USAID functions can be

accomplished through other authorized USAID officials in conjunction with the recusal of any enjoined individuals.

Accordingly, it is hereby ORDERED that:

1. Defendants' Motion for Clarification or Modification, ECF No. 77, is DENIED, in that the Court confirms that Jeremy Lewin is bound by the Preliminary Injunction and therefore declines to clarify or modify the Preliminary Injunction so as to exclude him from its coverage.

2. The Court reserves the right to modify the Preliminary Injunction to expand the definition of Defendants should additional personnel actions have the effect of circumventing the Preliminary Injunction.

Date: March **20**, 2025

THEODORE D. CHUANG
United States District Judge

2

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| J. DOE 1-26,<br><br>*Plaintiffs*<br><br>v.<br><br>ELON MUSK, in his official capacity, UNITED STATES DOGE SERVICE, *and* the DEPARTMENT OF GOVERNMENT EFFICIENCY,<br><br>*Defendants* | **Case No. 25 8:25-cv-00462-TDC** |

## COMPLAINT FOR
## DECLARATORY AND INJUNCTIVE RELIEF

Plaintiffs, J. Doe 1-26,[1] by and through their attorneys, hereby bring this Complaint against Elon Musk, in his official capacity, as well as the United States DOGE Service and the Department of Government Efficiency (collectively "DOGE"). In support thereof, upon personal knowledge as well as information and belief, Plaintiffs allege the following:

### NATURE OF THE ACTION

Defendant Elon Musk has an office in the White House, no supervising official, and a team of individuals with wide-ranging government access whom he directs. Defendant Musk was the driving force behind the creation of DOGE and acts as the *de facto* DOGE Administrator, despite the lack of any formal announcement by President Donald J. Trump or any public process affiliated with the selection of that position.

---

[1] Plaintiffs are filing a motion to waive the requirement under Local Rule 102.2(a) to provide their addresses and to permit Plaintiffs to proceed under pseudonyms.

In his government role, Defendant Musk exercises an extraordinary amount of power. Indeed, the scope and reach of his executive authority appears unprecedented in U.S. history. His power includes, at least, the authority to cease the payment of congressionally approved funds, access sensitive and confidential data across government agencies, cut off systems access to federal employees and contractors at will, and take over and dismantle entire independent federal agencies.

Recent weeks demonstrate that Defendant Musk follows a predictable and reckless slash-and-burn pattern:

1. Identify a federal program target, often relying on information posted on his privately owned social media platform, X, to pick them.

2. Attempt to install his DOGE team—which largely consists of former employees from across a variety of Defendant Musk's businesses—within the agency or agencies that administer those programs.

3. Attempt to gain access to the agency's core operating systems—often demanding access that is forbidden by privacy and security laws for individuals who have no clearance to access that information.

4. If resistance is met by the duly appointed officers or regular staff, threaten and/or ensure that any personnel roadblocks are placed on leave or otherwise removed. Perhaps amplify threats against staff on X, heightening the risk of third-party harassment.

5. Install DOGE members within the target agency and gain access to the agency's internal systems.

6. Use the agency's internal technology and information systems—again, without proper legal authorization—to identify personnel for termination and contracts for freezing.

7. Begin dismantling the agency from within by severely disrupting or crippling

2

operations.

8. Post about his actions either on his personal X account or the official DOGE X account, or both.

In the case of USAID in particular, Defendant Musk's actions were far ahead of other members of the Trump Administration including (in that case) duly confirmed cabinet members like Secretary of State Marco Rubio.

It is clear, however, that the duties Defendant Musk and the DOGE team he directs have performed thus far—and the new duties he is now undertaking, such as starting to dismantle the Department of Education—represent "the performance of [] significant governmental dut[ies]" that may be "exercised only by persons who are 'Officers of the United States,'" and duly appointed pursuant to the U.S. Constitution's Appointments Clause. *Buckley v. Valeo*, 424 U.S. 1, 141 (1976).

But Defendant Musk has not been nominated by President Trump and confirmed by the U.S. Senate, as Article II of the United States Constitution requires. Moreover, even if Defendant Musk qualified only as an inferior officer (a dubious proposition, given his sweeping powers), Congress has not vested "by Law" the authority to appoint him in the President alone, without the advice and consent of the Senate. Finally, even if Defendant Musk could somehow be considered a mere "employee" rather than an "officer" of the United States, his exercise of "significant," seemingly unfettered authority constitutes a grave violation of the separation of powers.

Questions regarding Defendants Musk's and DOGE's roles, scope of authority, and

3

proper appointment processes are not merely academic. Plaintiffs—among countless other American individuals and entities—have had their lives upended as a result of the actions undertaken by Defendants Musk and DOGE. Not only have Defendants pulled the rug out from under Plaintiffs professionally and financially, but they have repeatedly publicly besmirched the good names of these dedicated, and loyal civil servants to justify their unconstitutional power grab—causing reputational injury to Plaintiffs that will threaten their ability to obtain future employment. Upon information and belief, Defendants still have full access to the digital infrastructure of Plaintiffs' agency, causing continued disruptions and maintaining access to Plaintiffs' (sometimes highly sensitive) personnel files. More broadly, the reckless disregard with which Defendants have exercised their unconstitutional authority has unlawfully disrupted contracts of the United States—some of which are signed by individual Plaintiffs—undermined national security, and put American lives at risk abroad.

For all of these reasons, Plaintiffs respectfully request permanent and preliminary injunctive relief from this Court, enjoining Defendant Musk and his DOGE subordinates from performing their significant and wide-ranging duties unless.

## JURISDICTION AND VENUE

1. This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 2201.

2. Venue is appropriate in this judicial district under 28 U.S.C. § 1391(b) and (e) because at least one of the Plaintiffs resides in this district.

## PARTIES

3. Plaintiffs J. Does 1-26 are current and former employees or contractors of the U.S.

Agency for International Development ("USAID").

4. J. Doe 1 is a personal services contractor ("PSC") who has been with USAID since 2017. Their role is to coordinate humanitarian assistance. Their main duties include managing a portfolio of partners and providing guidance to junior staff. Through work with USAID, they have deployed into dangerous areas around the world, including Pakistan. Under their contract, to end the contract in the middle of the contractual period, the government is required to provide a 15 day notice. As a result of Defendants' unlawful actions, J. Doe 1 was cut off from access to their work email without any advanced notice. As of February 12, 2025, J. Doe 1 has been given access to their USAID email but not to other critical USAID systems. Upon information and belief, DOGE staff have been given full access to USAID systems, which includes personnel information. As a result of the dangerous nature of J. Doe 1's job, specifically their deployment into conflict zones, their personnel and security clearance files contains highly sensitive personal information—social security number, passport information, personal references, foreign contacts, previous addresses, financial records, tattoo descriptions, a safety pass phrase, and their family members' information. J. Doe 1 is worried that Defendants do not have the security clearance or training needed to handle this type of  extremely confidential information, and will use it to J. Doe 1's detriment.

5. J. Doe 2 is a USAID employee and has been with the agency for over 10 years. Their main duties include technological responsibilities related to cybersecurity and privacy. On January 30, 2025, J. Doe 2 was working from the USAID office when they were told to provide access to individuals from DOGE. J. Doe 2 conducted research and

5

determined that the people who were trying to get access to these crucial systems were "hackers." J. Doe 2 was alarmed and raised this issue with their supervisors, indicating that the DOGE personnel should not obtain access. However, J. Doe 2 thereafter discovered that the DOGE personnel had already been given access. Furthermore, they were given *root access* to these systems, the highest level of access one can obtain and which allows a person to take over a system. This includes the ability to modify, add, delete data, and create user accounts. On Feb 1, 2025, DOGE personnel who did not have a security clearance, used their administrative rights to grant themselves access to restricted areas requiring security clearance. It is unclear what the DOGE personnel did with that access. DOGE personnel have also taken over delegate rights to every USAID mailbox. With this they have the ability to see every email, delete, and send email on behalf of every user within USAID.  J. Doe 2 is also aware that there is rapid preparation to tear down the USAID network to create a condition where USAID employees will not have access to any facilities nor computing environment.

On February 4, 2025, J. Doe 2 was put on administrative leave and lost all access to USAID systems. On February 10, 2025, J. Doe 2 was allowed back into the USAID system, apparently pursuant to a temporary restraining order in a separate lawsuit between different parties.

J. Doe 2 understands that the DOGE personnel had administrative privileges into all the USAID systems and tools and that DOGE personnel took information out of the agency and sent it elsewhere. DOGE's actions have caused J. Doe 2 emotional injury, as J. Doe 2 is aware of the extent of confidential information that has been breached and the privacy

6

laws broken.

J. Doe 2 also understands the USAID buildings have been given to other agencies for other purposes, including allowing the breaking down of offices and cubicles. USAID staff and contractors who worked in the USAID buildings are not allowed inside, even to obtain personal belongings.

6.  J. Doe 3 is a PSC who has been with USAID, in the Bureau of Humanitarian Assistance (BHA), since 2017. They are a part of the Support Relief Group (SRG), a group of staff who fill regular staffing shortages in DC and the field, as well as surge to support BHA disaster responses worldwide. They are a former Army officer and an engineer with a high level security clearance. They have filled roles in grant programming and operations, both in DC and in the field.  They have also worked on more than a dozen response teams.

As a result of Defendants' unlawful actions, J. Doe 3 has been locked out of their email account and other systems (including time cards, vouchers, etc.) since February 2, 2025. J. Doe 3 has received no communication about the status of their contract or employment. J. Doe 3 has over $15,000 worth of travel vouchers that should be paid by the agency but have not been paid thus far.

J. Doe 3 has spent 20 years working in the humanitarian field. J. Doe 3 does not know what they will do if they lose this job and there is no prospect of getting comparable employment, especially if the entire humanitarian aid sector collapses due to the huge cuts in U.S. funding. Further, J. Doe 3 is worried about what will happen if there is a

7

humanitarian emergency that J. Doe 3's bureau (and USAID more broadly) would typically respond to and they will not be there to provide support; this concern is shared by other USG agencies that support USAID personnel during responses.

7. J. Doe 4 has dedicated over 10 years of their life in service at USAID. On February 4, 2025, as a result of Defendant's illegal conduct, J. Doe 4 was cut off from accessing USAID email and other systems. J. Doe 4 has witnessed the negative impacts of USAID's stop-work order on the partners and beneficiaries of USAID, some of the most vulnerable people on the planet, whom they have worked with directly in implementing USAID programs. Additionally, J. Doe 4 experienced the harm of seeing years of their efforts and U.S. taxpayer dollars wasted, as current USAID leadership unlawfully discards investments to design and implement effective USAID programs without a fair assessment of their merit or impact. J. Doe 4 has also witnessed the harm of colleagues around them, including a fellow whom J. Doe 4 had arranged to join the agency; the fellow was *en route* to their first day when notified the position was eliminated. Finally, J. Doe 4 experienced direct personal harm, as the President of the United States and Defendant Musk label civil servants "lunatics" and threaten to end their employment at a whim, even though J. Doe 4's work has been supported by bipartisan appropriations bills and is based on systematic analysis.

8. J. Doe 5 is a PSC who has been with USAID for almost 3 years. They support the agency's efforts to combat human trafficking. For instance, at the end of February, they were scheduled to travel to Southeast Asia to help design new activities that would have worked to strengthen the U.S. government's ability to respond to trafficking rings in Asia

8

that impact U.S. security interests. They lost access to their email Sunday, February 2, without explanation. When that shut down, they also lost the ability to finalize a report on USAID's counter-trafficking efforts, as required by 22 U.S.C. § 7103(d)(7). The loss of email access also prohibited them from being able to respond to an active GAO audit, titled "Combating Human Trafficking During Armed Conflicts." When they regained email access on February 9, there were no emails in their inbox from the previous week, even though they had repeatedly copied their work email address when trying to communicate with their contracting officer about their employment status between February 2 and February 9.  They remain confused and anxious about the status of their employment—to date no one at the agency has provided guidance on whether or not they were on administrative leave but, pursuant to their employment contract, only their contracting officer has authority to end the contract. There has also been no guidance on if or how they should finalize the report, audit and other activities they were working on for the agency.

9. J. Doe 6 is a PSC who has been with USAID for several years and has worked for over 25 years in this field. They are a subject matter expert whose main duties include working on supporting independent media, advocating for digital rights, and promoting information integrity, including working on countering authoritarianism and foreign malign influence which undermines U.S. national security. Under their contract, in order to end the contract in the middle of the contractual period, the government is required to provide a 15 day notice. J. Doe 6 was in Africa for work with USAID when the stop work order came out. They traveled back home to the United States and have thousands of

9

dollars of travel costs reimbursement that is supposed to be covered by USAID. As a result of Defendants' unlawful actions, J. Doe 6 lost access to their work email and USAID systems on February 2. J. Doe 6 has received no formal communication about their situation. J. Doe 6's insurance is covered to a large degree by USAID and they do not know if the insurance will be covered.  As of February 12, 2025, J. Doe 6's access has not been restored. J. Doe 6's livelihood is severely jeopardized by Defendants' illegal activity.

10. J. Doe 7 is a Civil Service Excepted ("CSE") employee who has been with USAID for over 10 years. They work in a department focused on disaster response.  On Sunday, February 2, 2025, USAID personnel were cut off from accessing USAID systems in droves. On Monday, February 3, 2025, more USAID personnel were cut off from accessing systems. That morning, J. Doe 7 spoke with the information technology ("IT") personnel in their building. The IT person shared that representatives from DOGE had access to all systems. The IT personnel knew this because they were required to help the DOGE representatives obtain access. On the morning of February 3, 2025, J. Doe 7 was contacted by USAID personnel overseas who were stranded without access to government phone, laptop, and systems, including AtHoc and Scry, the apps used to disseminate emergency safety and security information/direction to colleagues. The systems to help the USAID people overseas were shut down and so J. Doe 7 could not assist them.

On Tuesday, February 4, 2025, J. Doe 7 went into the office and was eventually informed by colleagues that they and other personnel had to leave the building. J. Doe 7 then went

ADD.082

home to keep working. That evening, as a result of Defendants' unlawful actions, J. Doe 7 was told they were put on administrative leave via an email from the USAID press email address, sent from one of DOGE's representatives. Shortly after receiving this notice, J. Doe 7 lost access to USAID systems. On Sunday, February 9, 2025, apparently in response to a temporary restraining order issued in another lawsuit, J. Doe 7 was given access to USAID systems.

J. Doe 7 understands that the DOGE representatives have access to their personnel, medical, and security clearance files. These files have extremely sensitive information about J. Doe 7 and their family members, including information that could subject them to harassment by DOGE members and/or by third parties. J. Doe 7 is extremely worried about this prospect. Some of J. Doe 7's colleagues have been doxxed and so this concern is especially heightened.

11. J. Doe 8 is a PSC who has worked for the federal government for almost 16 years. They are part of a team that provides emergency aid during humanitarian disasters and crises. They have worked as an emergency responder across the globe, including back-to-back deployments in Armenia, Gaza, and Ukraine, as well as other crisis areas as a part of their work for USAID. As a result of Defendants' unlawful actions, on February 3, 2025, J. Doe 8 was locked out of USAID systems, including their email access. They received no communication about why access was stopped. On Monday, February 10, 2025, J. Doe 8 was able to access their USAID email. There has still been no communication from USAID about why access was cut off in the first place. About half of J. Doe 8's

11

immediate team colleagues still do not have access.

12. J. Doe 9 is a PSC offshore, in a high-risk area in the Middle East. On Monday, February
3, 2025, J. Doe 9 tried to login to their USAID email account but was locked out. J. Doe
9 received no warning or notification in advance from being shut out of USAID's
systems. Their supervisor and head of mission were not informed in advance of the
cutoff. All of the contacts and the safety and security applications from J. Doe 9's USAID
work phone were removed remotely. The safety and security application is the
mechanism by which federal government staff overseas in dangerous areas indicate that
they are in a dangerous situation and access help. J. Doe 9 lives with their family in the
foreign country in which they are stationed and is concerned for their safety. If there is an
emergency, J. Doe 9 hopes they will be able to get out and be taken care of by USAID,
but there is no guarantee as over the last few weeks, nothing done within USAID by
Defendants has been according to protocol or implemented in a methodical, safe manner.
J. Doe 9 has no idea what their status is each day. They continue to come into the office
in order to execute their duties to the best of their ability despite not having access to any
of the tools and resources required to do so. As of February 12, 2025, they are still locked
out of all USAID systems, including email. They have tried numerous times to reach out
to different helpdesk lines in Washington, DC. The only response J. Doe 9 has received is
a message that the helpdesk confirms J. Doe 9's account is disabled but that they cannot
provide further information.

13. J. Does 10, 12, 14, 16, 17, 19, 20, 23, and 25 are PSCs or other contractors who, as a

12

result of Defendant's unlawful actions, have all lost access to USAID systems with only some of them obtaining access on or about February 10, 2025, and remain in limbo as to whether the terms of their employment contracts will be honored. J. Does 11, 13, 15, 18, 21, 22, 24, and 26 are employees who, as a result of Defendant's unlawful actions, have all lost access to USAID systems; some of the employees have regained access to USAID systems apparently in response to a temporary restraining order granted in another case.

14. Defendant Musk is, according to White House spokespeople, an unpaid "special government employee" pursuant to 18 U.S.C. § 202. Upon information and belief, Defendant Musk acts as the *de facto* DOGE Administrator. *See* Executive Order 14158, "Establishing and Implementing the President's 'Department of Governmental Efficiency,'" 90 FR 8441 (2025) ("There shall be a USDS Administrator established in the Executive Office of the President who shall report to the White House Chief of Staff."). In his role, Defendant Musk oversees a DOGE team, including a "DOGE Team Lead" embedded within each federal agency. *See id*. at Sec. 3(c).

15. Defendant United States DOGE Service was established on January 20, 2025 by Executive Order 14158. DOGE's stated purpose is to "implement the President's DOGE Agenda, by modernizing Federal technology and software to maximize governmental efficiency and productivity." *Id*. at Sec. 1. "DOGE…shall terminate on July 4, 2026" but that termination "shall not be interpreted to imply the termination, attenuation, or amendment of any other authority or provision of this order." *Id*. at Sec. 3(b).

16. On information and belief, Defendant United States DOGE Service is in a transitional state and not fully formed, but there is a web of employees working at the direction of

13

Defendant Musk which is referred to as the Department of Government Efficiency, or DOGE. Defendant United States DOGE Service, as well as the network of personnel working at the direction of Defendant Musk, are referred to collectively herein as "DOGE."

## FACTS

### Before January 20, 2025: DOGE's Origin and Defendant Musk's Role

17. In addition to his government role, Defendant Musk serves as the Chief Executive Officer of automaker Tesla and of rocket manufacturer Space X. He also owns the social media company X, formerly known as Twitter. Additionally, he co-founded Neurolink, a neurotechnology startup, and founded xAI, an artificial intelligence company. Defendant Musk's estimated wealth is $379 billion dollars,[2] and he was the largest contributor of the 2024 election cycle, contributing $288 million to support President Trump and other Republican candidates.[3]

18. In August 2024, Defendant Musk proposed the idea of a "government efficiency commission" in a podcast interview with Lex Fridman. As recounted by *Forbes Magazine*, "When Fridman said he wished Musk 'could go into Washington for a week and be the head of the committee for making government smaller,' the billionaire said he has 'discussed with Trump the idea of a government efficiency commission, and I would

---

[2] *Bloomberg Billionaires Index*, BLOOMBERG (Feb. 11, 2025), https://www.bloomberg.com/billionaires/profiles/elon-r-musk.
[3] Trisha Thanadi et al., *Elon Musk Donated $288 Million in 2024 Election, Final Tally Shows*, WASH. POST (Jan. 31, 2025), https://www.washingtonpost.com/politics/2025/01/31/elon-musk-trump-donor-2024-election.

14

be willing to be part of that commission.'"[4]

19. After that, on August 12, 2024, Defendant Musk interviewed then former President Trump on X. Defendant Musk proposed the creation of a "government efficiency commission" that would ensure "taxpayers money . . . is spent in a good way." Former President Trump expressed support for the idea and indicated that he would consider appointing Defendant Musk to lead such a commission if re-elected.[5]

20. On September 5, 2024, in a speech to the Economic Club of New York, former President Trump announced his plans to establish a "government efficiency commission" that would be "tasked with conducting a complete financial and performance audit of the entire federal government, and making recommendations for drastic reforms." Former President Trump also stated that Defendant Musk had agreed to lead this commission.[6]

21.  At the time of the 2024 election, Defendant Musk's companies had more than $15 billion in contracts with the United States government with nine cabinet departments and three federal agencies. His companies were the subject of at least 20 recent investigations or reviews by five cabinet departments and six independent agencies.[7]

---

[4] Siladitya Ray, *Trump Backs Idea Of Musk Joining 'Government Efficiency Commission' If He Wins Second Term*, FORBES (Aug. 13, 2024), https://www.forbes.com/sites/siladityaray/2024/08/13/trump-backs-idea-of-musk-joining-government-efficiency-commission-if-he-wins-second-term.

[5] Siladitya Ray, *Trump Backs Idea Of Musk Joining 'Government Efficiency Commission' If He Wins Second Term*, FORBES (Aug. 13, 2024), https://www.forbes.com/sites/siladityaray/2024/08/13/trump-backs-idea-of-musk-joining-government-efficiency-commission-if-he-wins-second-term.

[6] Nick Robins-Early, *Trump Announces Plan for Elon Musk-Led 'Government Efficiency Commission,'* THE GUARDIAN (Sep. 5, 2024), https://www.theguardian.com/us-news/article/2024/sep/05/trump-musk-efficiency-commission.

[7] Eric Lipton et al., *U.S. Agencies Fund, and Fight With, Elon Musk. A Trump Presidency Could Give Him Power Over Them*, N.Y. TIMES (Oct. 21, 2024), https://www.nytimes.com/2024/10/20/us/politics/elon-musk-federal-agencies-contracts.html.

15

22. On November 12, 2024, President-elect Trump announced that "the Great Elon Musk, working in conjunction with American Patriot Vivek Ramaswamy will lead the Department of Government Efficiency ('DOGE')." The announcement further stated that: "Together, these two wonderful Americans will pave the way for my Administration to dismantle Governmental Bureaucracy, slash excess regulations, cut waste expenditures, and restructure Federal Agencies—Essential to the 'Save America' Movement." "This will send shockwaves through the system, and anyone involved with Government waste, which is a lot of people!" stated Defendant Musk.[8] Defendant Musk posted this same statement to X and then reposted it as the first X post from the Department of Government Efficiency.[9]

23. Defendant Musk and Mr. Ramaswamy made similar points on November 20, 2024 in a *Wall Street Journal* opinion editorial, emphasizing that DOGE would "cut the federal government down to size," through three types of reform: "regulatory rescissions, administrative reductions and cost savings." They criticized "rules and regulations" issued by "millions of unelected, unappointed civil servants (from) within government agencies who view themselves as immune from firing thanks to civil service protections." They said that DOGE will identify the minimum number of employees required at agencies to perform their "constitutionally permissible and statutorily mandated functions" and then reduce agency staff in proportion to the number of regulations that are cut. Defendant Musk and Mr. Ramaswamy claimed that they would

---

[8] Donald J. Trump (@realDonaldTrump), TRUTH SOCIAL (Nov 12, 2024, 7:46 PM), https://truthsocial.com/@realDonaldTrump/posts/113472884874740859.
[9] Department of Government Efficiency (@DOGE), X, https://web.archive.org/web/20241115012406/https://x.com/doge (last accessed Feb. 12, 2025).

ADD.088

co-lead DOGE as "outside volunteers" and stressed the importance of public support and transparency.[10]

24. On December 4, 2024, President-elect Trump announced that the "team of incredible pioneers at DOGE" would "rebuild a U.S. Government that truly serves the People."[11]

25. On January 8, 2024, Defendant Musk stated that DOGE would seek to cut $2 trillion in government spending with $1 trillion as a realistic goal, and that reducing spending within the federal government would provide a "target rich environment."[12]

*After January 20, 2025: The Creation, Mission, and Staffing of DOGE*

26. President Trump created the United States DOGE Service in the Executive Office of the President on January 20, 2025, in one of his first acts as President. Executive Order 14158, "Establishing and Implementing the President's 'Department of Governmental Efficiency'" 90 FR 8441 (2025). In pursuit of the stated mission "to implement the President's DOGE Agenda," the order:

> Creates DOGE teams within each federal agency, including an embedded "DOGE Team member" who can only be hired by the agency "in consultation with" the DOGE Administrator, *id*. at Sec. 3(c);

---

[10] Elon Musk & Vivek Ramaswamy, *Elon Musk and Vivek Ramaswamy: The DOGE Plan to Reform Government*, WALL ST. J. (Nov. 20, 2024),
https://www.wsj.com/opinion/musk-and-ramaswamy-the-doge-plan-to-reform-government-supreme-court-guidance-end-executive-power-grab-fa51c020.
[11] Statement by President-elect Donald J. Trump Announcing the Appointment of David A. Warrington as Assistant to the President and Counsel to the President (Dec. 04, 2024),
https://www.presidency.ucsb.edu/documents/statement-president-elect-donald-j-trump-announcing-the-appointment-david-warrington.
[12] Live (@Live), Interview by Mark Penn with Elon Musk, X (Jan 8, 2025, 10:46 PM),
https://x.com/Live/status/1877200335443304685.

17

Orders the DOGE Administrator to commence "a Software Modernization Initiative to improve the quality and efficiency of government-wide software, network infrastructure, and information technology (IT) systems. Among other things, the USDS Administrator shall work with Agency Heads to promote interoperability between agency networks and systems, ensure data integrity, and facilitate responsible data collection and synchronization," *id*. at Sec. 4(a).;

Directs agency leaders to "take all necessary steps, in coordination with the [DOGE] Administrator and to the maximum extent consistent with law, to ensure [DOGE] has full and prompt access to all unclassified agency records, software systems, and IT systems," *id*. at Sec. 4(b).

27. According to the *New York Times*, "In November, Mr. Trump initially said the group would provide outside advice as it worked closely with White House budget officials. The president's order, however, brings the group inside the federal government. The order also follows a major shake-up in leadership. Elon Musk will be its sole leader after Vivek Ramaswamy bowed out of the project."[13]

28. The details of Defendant Musk's employment, including whether he has been formally named as the DOGE administrator, have not been shared with the public. However, a White House official has stated that Defendant Musk was classified as a "special

---

[13] Madeleine Ngo & Theodore Schleifer, *How Trump's Department of Government Efficiency Will Work*, N.Y. TIMES (Jan. 21, 2025), https://www.nytimes.com/2025/01/21/us/politics/doge-government-efficiency-trump-musk.html.

18

governmental employee," has a governmental email, and an office at the White House.[14]

29. Upon information and belief, Defendant Musk reports directly to President Trump, and often acts unilaterally in directing DOGE operations. The *New York Times* has stated that "Senior White House staff members have at times also found themselves in the dark, according to two officials, who spoke on the condition of anonymity to describe sensitive discussions. One Trump official, who was not authorized to speak publicly, said (Defendant) Musk was widely seen as operating with a level of autonomy that almost no one can control."[15] President Trump has repeatedly praised Defendant Musk and indicated that President Trump supervises Defendant Musk himself. For instance, President Trump recently stated, referring to Defendant Musk, "He's a very talented guy from the standpoint of management and costs, and we put him in charge of seeing what he can do with certain groups and certain numbers."[16] And also that, "I told him, do that and then I'm going to tell him very soon—like, maybe in 24 hours—to go check the Department of Education."[17]

30. Public reporting has filled in some of the gaps in official announcements from the White House. *Pro Publica* tracked DOGE-affiliated individuals working within DOGE as well

---

[14] Ty Roush, *White House Says Elon Musk Trusted To Claim His Own Conflicts Of Interest As 'Special Government Employee'—Here's What That Means*, FORBES (Feb. 5, 2025), https://www.forbes.com/sites/tylerroush/2025/02/05/white-house-says-elon-musk-trusted-to-claim-his-own-conflicts-of-interest-as-special-government-employee-heres-what-that-means/; Kaitlan Collins & Tierney Sneed, *Elon Musk Is Serving As A 'Special Government Employee,' White House Says,* CNN (Feb. 3, 2025), https://www.cnn.com/2025/02/03/politics/musk-government-employee/index.html.

[15] Jonathan Swan et al., *Inside Musk's Aggressive Incursion Into the Federal Government*, N.Y. TIMES (Feb. 4, 2025), https://www.nytimes.com/2025/02/03/us/politics/musk-federal-government.html.

[16] Justin Elliott et al., *The Elite Lawyers Working for Elon Musk's DOGE Include Former Supreme Court Clerks*, PROPUBLICA (Feb. 7, 2025), https://www.propublica.org/article/elon-musk-doge-lawyers-supreme-court.

[17] Bret Baier (@BretBaier), Interview with Donald Trump, X (Feb. 9, 2025, 9:16 AM), https://x.com/BretBaier/status/1888592903666029042.

19

as within other agencies. It shows some DOGE members within DOGE itself (seemingly as employees of the Executive Office of the President), as well as embedded within numerous agencies, including the Office of Personnel Management ("OPM"), General Services Administration, Treasury Department, Department of Health and Human Services, Environmental Protection Agency, FBI, Social Security Administration, and USAID. Most of the individuals affiliated with DOGE have had prior professional relationships with Defendant Musk, including previously working at one or more of his companies.[18]

31. For instance, on January 23, 2025, OPM announced it was testing a new capability to communicate with all civilian federal employees. From on or about January 23 through January 26, 2025, OPM sent numerous requests to various federal agencies to collect information on government employees and about diversity, equity and inclusion initiatives that are now barred. Amanda Scales was listed as the contact for questions. Until recently, Ms. Scales worked in human resources at xAI, the private artificial intelligence corporation of which Defendant Musk is the founder. *Pro Publica* reports that she is now Chief of Staff at OPM, although it is unclear whether she held that role at the time she was collecting such sensitive information, or whether she was still at xAI.[19]

32. The *Washington Post* reports that "[i]n federal directories, DOGE staffers are sometimes listed at multiple different agencies, making the full nature of their roles within the government unclear." One young team member—Edward Coristine, a 19-year-old recent

---

[18] Avi Asher-Schapiro et al., *Elon Musk's Demolition Crew*, PROPUBLICA (Feb. 11, 2025), https://projects.propublica.org/elon-musk-doge-tracker.
[19] *Id.*; Complaint–Class Action at 15-23, Jane Does 1-2 v. Off. Personnel Mgmt., No. 1:25-cv-00234 (D.D.C. Jan 27, 2025).

ADD.092

college graduate and former Neuralink intern —is reported to have positions at DOGE, OPM, USAID and at the State Department. "The unusual appointment reflects how Musk's DOGE has deployed some of its personnel to multiple agencies at once, giving young and relatively inexperienced — and largely unvetted — individuals unprecedented visibility into the workings of government."[20]

***After January 20, 2025: Defendant Musk's and DOGE's Unlawful Actions across Agencies***

33. Upon information and belief, the structure of DOGE, including specifically creating and embedding DOGE teams within each administrative agency, has allowed Defendant Musk to amass an unprecedented amount of power. He has access to sensitive information across agencies, and control over the computer systems and digital data of numerous agencies. He authorizes and oversees terminating employees and contractors, canceling government grants and contracts, terminating leases, and removing the name from the front of USAID's building.[21]

34. DOGE routinely posts on its X account about the trans-agency activities it undertakes. For example, on February 3 and 4, DOGE posted that it had terminated "36 contracts . . . for a total savings of ~$165mm across 6 agencies," and canceled 12 leases.[22]

35. Defendant Musk often uses his personal X account to identify changes that he wishes to implement across various agencies, and then promptly executes those changes through his role leading DOGE. For example, on February 2, 2025—the day he and his DOGE

---

[20] Faiz Siddiqui et al., *19-Year-Old Musk Surrogate Takes On Roles at State Department and DHS*, WASH. POST (Feb 10, 2025), https://www.washingtonpost.com/business/2025/02/10/musk-doge-state-department-surrogate.
[21] *See, e.g.*, Department of Governmental Efficiency (@DOGE), X, https://x.com/DOGE/.
[22] *Id.* at https://x.com/DOGE/status/1886982858369020330.

21

team gained access to the Bureau of Fiscal Service's payment systems—Defendant Musk responded to an X post about certain federal program grants awarded by the Department of Health and Human Services by stating: "The @DOGE team is rapidly shutting down these illegal payments."[23]

36. Similarly, on February 5, 2025, Defendant Musk responded to a post from X user @libsoftiktok that identified a government website containing diversity, equity, inclusion, and accessibility ("DEIA") language, to which Defendant Musk responded that "Doge will fix it."[24] Shortly after Defendant Musk's promise that "Doge will fix it," the "DOGE Commerce team" searched the agency website and executed changes to it.[25]

37. On February 3, Defendant Musk posted on X that President Trump would succeed in dismantling the Education Department.

38. Since then, numerous DOGE staffers have been installed at the Department of Education. According to *NBC News*, by February 7, DOGE members Akash Bobba and Ethan Shaotran had obtained administrator-level status in the Department of Education's computer systems with potential access to sensitive information. Shaotran had accessed the back end of the ed.gov website that day. DOGE staff sent a directive to Department staff instructing them to not include "extraneous information, including gender identifying pronouns, motivational quotes, and GIFs" in their email signature blocks.[26]

39. On February 10, 2025, DOGE announced that it had cut $881 million in Department of

---

[23] Elon Musk (@elonmusk), X (Feb. 2, 2025, 3:14 AM), https://x.com/elonmusk/status/1885964969335808217.
[24] Elon Musk (@elonmusk), X (Feb. 2, 2025, 3:47 AM), https://x.com/elonmusk/status/1885973321595928862.
[25] Department of Governmental Efficiency (@DOGE), X (Feb 5, 2025, 11:12 PM), https://x.com/DOGE/status/1887353683970535877.
[26] Tyler Kingkade & Natasha Korecki, *Inside DOGE's Takeover of the Education Department*, NBC NEWS (Feb 8, 2025), https://www.nbcnews.com/news/us-news/elon-musk-doge-team-education-department-rcna191244.

ADD.094

Education contracts, including 170 contracts for the Department's Institute of Education Sciences.[27]

40. On or around February 5, 2025, members of DOGE were on site at Centers for Medicare and Medicaid Services ("CMS") and had gained access to key payment and contracting systems.[28] The representatives were looking at the systems' technology, spending, organizational design, and staffing. In response to reporting on DOGE's access to CMS, Defendant Musk posted on X, "Yeah, this is where the big money fraud is happening."[29]

41. As reported in the *New York Times*, "Mr. Musk's aides have been conducting 15-minute video interviews with federal workers. Some of their questions have been pointed, such as querying employees about whom they would choose to fire from their teams if they had to pick one person."[30]

***After January 20, 2025: United States Department of Treasury***

42. DOGE has trained a particular focus on the Treasury Department, apparently because federal payments are made through the Treasury Department's electronic system. David Lebryk, a decades-long non-political employee of the Department, was named Acting Secretary by President Trump and served in that role until Scott Bessent was confirmed

---

[27] Rebecca Carballo & Juan Perez Jr., *DOGE Announces $881 Million in Cuts for Education Department Contracts*, POLITICO (Feb. 10, 2025),
https://www.politico.com/news/2025/02/10/education-department-pauses-research-contracts-00203494.
[28] Molly Bohannon & Derek Saul, *Trump Signs Executive Order Instructing Government To Work With Musk's DOGE—Here's What To Know*, FORBES (Feb. 11, 2025),
https://www.forbes.com/sites/mollybohannon/2025/02/08/heres-what-to-know-about-elon-musks-doge-judge-blocks-doges-treasury-access.
[29] Elon Musk (@elonmusk), X (Feb. 5, 2025, 12:01 PM), https://x.com/elonmusk/status/1887184902543577590.
[30] Theodore Schleifer et al., *Young Aides Emerge as Enforcers in Musk's Broadside Against Government*, N.Y. TIMES (Feb. 7, 2025), https://www.nytimes.com/2025/02/07/us/politics/musk-doge-aides.html.

23

as Treasury Secretary on January 27. On or around January 25, Defendant Musk's allies began asking Mr. Lebryk about source code information related to the nation's payment system on behalf of DOGE. Mr. Lebryk denied those requests, and was put on administrative leave shortly thereafter.[31]

43. In seeking access to Treasury systems, Defendants Musk and DOGE initially stated that their goal was merely to undertake a general review of the system and observe its operations without interfering with disbursements. However, a January 24, 2025 email exchange revealed that the DOGE push for access to the Treasury payment system was actually intended to "receive access to the closely held payment system so that the Treasury could freeze disbursements to [USAID]."[32]

44. On or around January 31, 2025, Treasury Secretary Scott Bessent gave DOGE members full access to the U.S. Treasury's federal payment system that manages the finances of the United States Government, which in fiscal year 2024 involved nearly $5 trillion in receipts and $6.7 trillion in outlays.[33]

45. At least initially, DOGE members gained administrator-level privileges, including the ability to write code to the Treasury's secure payment system. On information and belief, a DOGE member named Marko Elez made changes to the code base for the payment

---

[31] Andrew Duehren et al., *Treasury Official Quits After Resisting Musk's Requests on Payments*, N.Y. TIMES (Jan. 31, 2025), https://www.nytimes.com/2025/01/31/us/politics/david-lebryk-treasury-resigns-musk.html.

[32] Andrew Duehren et al., *Treasury Sought to Freeze Foreign Aid Payments, Emails Show*, N.Y. TIMES (Feb. 6, 2025), https://www.nytimes.com/2025/02/06/us/politics/trump-musk-usaid.html; Fatima Hussein, *DOGE Was Tasked With Stopping Treasury Payments To USAID*, AP sources say, ASSOCIATED PRESS (Feb. 6, 2025), https://apnews.com/article/treasury-doge-musk-read-only-access-489231c6db1a9f07fc68f9f08803f815.

[33] Andrew Duehren et al., *Elon Musk's Team Now Has Access to Treasury's Payments System*, N.Y. TIMES (Feb. 1, 2025), https://www.nytimes.com/2025/02/01/us/politics/elon-musk-doge-federal-payments-system.html.

ADD.096

systems related to blocking payments and making the blocked payments less visible.[34] Mr. Elez's post-college work experience prior to DOGE was at two companies owned by Defendant Musk, SpaceX and X. Mr. Elez had been given administrator-level access to the Payment Automation Manager and Secure Payment System at the Treasury's Department's Bureau of the Fiscal Service. "Housed on a secure mainframe, these systems control, on a granular level, government payments that in their totality amount to more than a fifth of the US economy."[35]

46. On February 6, Mr. Elez resigned after the *Wall Street Journal* published a story about his racist and pro-eugenic posts on social media. On February 7, Defendant Musk initiated a poll on X asking users whether Mr. Elez should be reinstated. Later that day, Defendant Musk rehired Mr. Elez, illustrating that Defendant Musk holds and exercises control over the DOGE members embedded in agencies.[36]

### After January 20, 2025: USAID

47. Upon information and belief, between roughly January 30 and February 3, Defendant Musk directed DOGE to take control of USAID employee email accounts and all digital infrastructure and to shut down the same; he also directed DOGE to shut down USAID's

---

[34] Matt Shuham, *DOGE Aide Has Full Access to The Top Government Payment System: Reports*, HUFFPOST (Feb. 4, 2025), https://www.huffpost.com/entry/elon-musk-doge-aide-treasury-payments-administrative-privileges_n_67a25541e4b042f60737bd47.

[35] Vittoria Elliott et al., *A 25-Year-Old With Elon Musk Ties Has Direct Access to the Federal Payment System*, WIRED (Feb. 4, 2025), https://www.wired.com/story/elon-musk-associate-bfs-federal-payment-system.

[36] Jason Abbruzzese, *Elon Musk Says DOGE Staffer Who Resigned for Racist X Posts Will Be Brought Back*, NBC NEWS (Feb. 7, 2025), https://www.nbcnews.com/politics/jd-vance/bring-back-vance-says-supports-rehiring-doge-staffer-resigned-racist-s-rcna191224.

ADD.097

offices and force employees to work remotely. Indeed, Defendant Musk recounted on the morning of February 3 that "With regards to the USAID stuff, I went over it with (the president) in detail and he agreed that we should shut it down."[37]

48. Upon information and belief, on or around January 30, Defendants began instructing USAID employees to give them access to USAID technology systems. Employees raised concerns with their supervisors because the DOGE staff was attempting to access critical systems that contained sensitive information which Defendants were not legally authorized to access.

49. Continuing into February 1, Defendants demanded access to classified USAID systems without the required security clearances. This included Defendant Musk making direct calls to USAID's leadership and security officials in which he demanded that DOGE team members receive access to private data and restricted areas. Defendant Musk threatened to call the U.S. Marshals service to gain access.[38] USAID Director for Security John Vorhees and Deputy Director for Security Brian McGill attempted to block the DOGE team's access and in turn were placed on administrative leave.

50. On or around February 1, DOGE personnel gained access to the USAID computer systems. They obtained root access to these systems, the highest level of access one can obtain, which allows complete control over a system. DOGE began blocking USAID employees from accessing their systems. Immediately thereafter, hundreds of USAID

---

[37] Jennifer Hansler et al., *Elon Musk Said Donald Trump Agreed USAID Needs to Be 'Shut Down'*, CNN (Feb. 3, 2025), https://www.cnn.com/2025/02/02/politics/usaid-officials-leave-musk-doge/index.html.
[38] Andrew Roth, *DOGE v USAID: How Elon Musk Helped His Acolytes Infiltrate World's Biggest Aid Agency*, THE GUARDIAN (Feb. 5, 2025), https://www.theguardian.com/us-news/2025/feb/05/musk-doge-takeover-usaid; Margaret Brennan, *Two Top Security Officials at USAID Placed on Leave, Sources Say*, CBS NEWS (Feb. 3, 2025), https://www.cbsnews.com/news/usaid-dramatic-changes-security-officials-on-leave.

civil servants lost access to their emails without prior notification.[39]

51. That same day, USAID.gov went offline, showing an error message that read "server IP address could not be found."[40]

52. The next morning, in response to an X post describing Mr. Vorhees and Mr. McGill's placement on leave, Defendant Musk posted "USAID is a criminal organization. Time for it to die."[41]

53. Later on February 2, in the "First DOGE 𝕏 Spaces Conversation," Defendant Musk said, "So to be clear, in shutting down, which we're in the process of doing, shutting down USAID, the reason for that, as opposed to simply trying to do some minor housecleaning, is that, as we dug into USAID, it became apparent that what we have here is not an apple with a worm in it, but we have actually just a ball of worms . . . If you've got an apple that's got a worm in it, maybe you can take the worm out, but if you've got actually just a ball of worms, it's hopeless. And USAID is a ball of worms. There is no apple. And when there is no apple, you've just got to basically get rid of the whole thing . . . That is why it's got to go, it's beyond repair." [42]

54. At 12:42 AM on February 3, Gavin Kliger, a DOGE team member, sent an email to all USAID staff telling them to work remotely that Monday, as USAID headquarters would be closed. The email purported to be from "USAID Press" and stated that the directive

---

[39] Rebecca Heilweil, *USAID Website Goes Dark, Staff Emails Deactivated Amid DOGE Takeover, Source Says*, FedScoop (Feb. 2, 2025),
https://fedscoop.com/usaid-website-goes-dark-staff-emails-deactivated-amid-doge-takeover-source-says.
[40] Edward Helmore, *USAID Website Offline as Trump Moves to Put Agency under State Department*, The Guardian (Feb. 1, 2025), https://www.theguardian.com/us-news/2025/feb/01/usaid-website-offline-trump.
[41] Elon Musk (@elonmusk), X (Feb 2, 2025, 12:20 PM), https://x.com/elonmusk/status/1886102414194835755.
[42] Department of Governmental Efficiency (@DOGE), X (Feb 2, 2025, 12:25 AM),
https://x.com/DOGE/status/1886284966855647234.

ADD.099

was "At the direction of Agency leadership" but listed Mr. Kliger on reply. On information and belief, Mr. Kliger gained access to the USAID computer systems as part of the infiltration of digital assets described above and issued to himself an agency email address, gkilger@usaid.gov.[43]

55. Immediately after Mr. Kliger sent that email, Defendant Musk posted on X at 12:54AM that "We spent the weekend feeding USAID into the wood chipper."[44]

56. On information and belief, Defendant Musk, assisted by his subordinates on DOGE staff, has exercised and continues to exercise control over USAID systems—including restricted systems and locations that house sensitive data which the DOGE staff does not have clearance to legally access—and systematically blocked access to all systems by USAID personnel.

57. The impact of this unauthorized dismantling of USAID has had disastrous consequences for the American and global public, effectively paralyzing operations that delivered life-saving aid across more than 100 countries. Critical humanitarian programs—such as HIV treatment initiatives, malaria prevention efforts, clinical trials, and infectious disease strategies that prevent the transnational spread of disease—were shut off from the U.S. Government with no warning and no explanation, as Plaintiffs and other USAID staff suddenly lost access to their USAID systems. Vulnerable communities were left in the lurch, without essential medical care or other necessities, exposing them to preventable harm, including death. Moreover, billions of dollars in development projects—ranging

---

[43] Sam Stein (@samstein), X (Feb 3, 2025, 7:37 AM), https://x.com/samstein/status/1886393465870676475.
[44] Elon Musk (@elonmusk), X (Feb 3, 2025, 1:54 AM), https://x.com/elonmusk/status/1886307316804263979.

ADD.100

from significant support for Ukrainian security infrastructure to programs aimed at supporting education for girls in repressive regimes—are at risk of collapse, a disruption that not only undermines decades of progress in global health and economic stability but also diminishes U.S. power and strategic influence abroad.

58. In a joint press conference with President Trump on February 11, 2025, Defendant Musk made clear that he and his DOGE team directly control the levers of funding at USAID. A journalist asked Defendant Musk: "USAID has been one of your main targets. Are you concerned at all that some of the cuts, or shutting an agency altogether, may lead to disease or other bigger problems starting in other countries that then come to the United States?" In his response, Defendant Musk, referring to DOGE, stated, "we have turned on funding for Ebola prevention and for HIV/PR prevention. And yes, we are moving fast. We will make mistakes, but we'll fix them very quickly."[45]

59. Also at the February 11 joint press conference, Defendant Musk said, "there are quite a few people in bureaucracy who have ostensibly a salary of a few hundred thousand dollars but have somehow manage[d] to accrue tens of millions of dollars of net worth, uh, while in that position, which is what happened at USAID . . . ."[46] On information and belief, Defendants Musk and DOGE have unprecedented and illegal access to thousands of federal government employee records, including security clearance files *which contain the net worth of those employees*. On information and belief, Defendant Musk has used

---

[45] Chris Megerian, *WATCH: Trump Makes Appearance With Musk, Signs Executive Order Downsizing Federal Workforce*, PBS NEWS (Feb. 11, 2025), https://www.pbs.org/newshour/politics/watch-trump-makes-appearance-with-musk-signs-executive-order-downsizing-federal-workforce.
[46] *Id.*

29

his illegal access to personnel and security clearance files to the detriment of those individuals by disclosing the contents of those files.

***After January 20, 2025: Consumer Financial Protection Bureau***

60. Defendant Musk's and DOGE's latest target has been the Consumer Financial Protection Bureau ("CFPB"). Upon information and belief, Defendant Musk, as the *de facto* DOGE Administrator, is intimately and actively involved in the efforts targeting each agency, including CFPB. As a result of his involvement in CFPB, Defendant Musk will have easy access to non-public information to business competitors.

61. On or around Thursday, February 6, "four young staffers working under Musk" at DOGE—Gavin Kliger, Luke Farritor, Nikhil Rajpal and Jordan Wick—arrived at the CFPB's offices. As *Bloomberg News* reports, "the DOGE staffers were granted access to all of CFPB's data systems, including sensitive bank examination and enforcement records, according to five people familiar with the matter and emails seen by *Bloomberg News*. The people asked not to be identified, citing concerns over potential retribution. By Sunday, the agency was a skeleton, with its funding limited and activities suspended." [47]Reporting by *Wired* confirms the same—"On Friday, [February 7], staff for Elon Musk's Department of Government Efficiency shut down a portion of the agency's homepage after a day of struggling to obtain access to the CMS and other systems. . . [T]hree DOGE staffers, including Gavin Kliger and Nikhil Rajpal were given access to

---

[47] Jason Leopold, et al., *DOGE-BACKED HALT at CFPB Comes Amid Musk's Plans for 'X' Digital Wallet*, Bloomberg (Feb. 10. 2025), https://www.bloomberg.com/news/features/2025-02-10/doge-backed-halt-at-cfpb-comes-amid-musk-s-plans-for-x-digital-wallet?embedded-checkout=true

CFPB's HR, procurement, and financial infrastructure."[48]

62. On Monday, February 10, OMB issued a memo for all CFPB employees to "Stand down from performing any work task," while DOGE's investigation of internal agency records continued.[49]

63. On Tuesday, February 11, many workers at CFPB were "informed that they had been fired with a frenetic email" some of which were not addressed to the individual employee but rather were "addressed as [EmployeeFirstName][EmployeeLastName], [Job Title], [Division]."[50]

64. Defendant Musk has a direct business connection to CFPB. "Just nine days before his DOGE team visited CFPB, Musk's X—the former Twitter—announced that it had struck a deal with Visa to process peer-to-peer payments. Musk has publicly mused about expanding into payment-services since he first took control of X in 2022. Entering that business could bring CFPB oversight under rules the agency finalized in November. The records DOGE can now access would include sensitive and potentially competitive information."[51]

[48] Makena Kelly et al., *Dozens of CFPB Workers Fired in After-Hours Blitz*, Wired (Feb 11. 2025),https://www.wired.com/story/dozens-of-cfpb-workers-terminated-in-after-hours-firing-blitz/.

[49] Tim Dickinson & Andrew Perez, *Inside Trump and Musk's War on the Consumer Financial Protection Bureau*, Rolling Stone (Feb. 10, 2025), https://www.rollingstone.com/politics/politics-features/trump-musk-cfpb-consumer-financial-protection-bureau-1235262743/.

[50] Makena Kelly, Dhruv Mehrotra, *Dozens of CFPB Workers Fired in After-Hours Blitz*, Wired (Feb. 11, 2025), https://www.wired.com/story/dozens-of-cfpb-workers-terminated-in-after-hours-firing-blitz/.

[51] Jason Leopold & Evan Weinberger, *DOGE-Backed Halt at CFPB Comes Amid Musk's Plans for 'X' Digital Wallet*, Bloomberg (Feb. 10, 2025), https://www.bloomberg.com/news/features/2025-02-10/doge-backed-halt-at-cfpb-comes-amid-musk-s-plans-for-x-digital-wallet.

65. On February 5, 2025, in the wake of questions regarding Defendant Musk's possible conflicts of interest due to his extensive business interests, White House Press Secretary Katherine Leavitt stated that Defendant Musk will determine for himself whether he has any conflicts that would preclude him from engaging on any particular matter.

*Plaintiffs' injuries*

66. Plaintiffs have suffered and continued to suffer myriad injuries as a result of Defendant Musk and DOGE's unconstitutional actions. These include but are not limited to:

    a. **Financial injuries as a direct result of losing access to their personal email accounts and other digital records.** Plaintiffs lost access to timesheets, reimbursement records, and health benefits, seriously threatening their ability to recoup those resources. J. Doe 3, for instance, unexpectedly and suddenly lost access to over $15,000 worth of travel vouchers. J. Doe 6 has hundreds of dollars in travel costs to be reimbursed and has still not been able to access the relevant system.

    b. **Uncertain employment status as a direct result of losing access to their personal email accounts and other digital records and Defendants' other actions.**

        i. Plaintiff PSCs, after suddenly losing access to email and other communication devices, have no way to confirm the status of their contracted employment with the agency. Many were prevented, as a practical matter, from discussing their status with their contracting officer

32

during the black-out period. If USAID provided them with the 15-day notice prior to termination during that time period—as required by every PSC contract—they have no way to know. J. Doe 5 noticed, upon regaining access to their email, a complete lack of emails in their inbox, even though they had copied their work email address while sending multiple emails to their contracting officer from their personal email address.

ii.    Moreover, if the various legal actions pausing USAID's demise are not successful, and Plaintiffs are terminated, they face bleak employment prospects because the dismantling of USAID has had disastrous consequences for the humanitarian infrastructure around the world, leading to widespread layoffs and organizational closures.

c.    **Potential legal liability as a direct result of losing access to their specific USAID email accounts, other digital records, and inability to comply with legally required reporting requirements.** Some Plaintiffs are authorized to sign grant awards and other contracts on behalf of USAID and, by signing their name, pledge to perform ongoing diligence and other acts. They have been prevented from performing their contractual obligations. A multi-day period where professional emails were blocked and seemingly wiped out, without any error message or other indication to the other party, raises serious questions about what lost work product, contacts, and other professionally critical assets Plaintiffs may have lost during that period. Additionally, because USAID is an organization

33

provided for by law, some USAID personnel, such as J. Doe 5, have various reporting responsibilities laid out in statute and are unable to comply with those requirements due to Defendants' actions.

d.  **Reputational injuries resulting from Defendant Musk leveraging the vast power of his unconstitutional position to disparage USAID and Plaintiffs.** For instance, on February 2, 2025 Defendant Musk, through his social media platform, X, accused Plaintiffs of belonging to "a criminal organization" and described them as "a ball of worms." In response, his X followers responded with strings of vitriol aimed at USAID and its employees, including accusing USAID employees of "funneling money into the hands of Hamas terrorists."[52] In a February 11 press conference joint press conference by Defendant Musk and President Trump, Defendant Musk accused USAID employees of "getting wealthy at taxpayer expense." President Trump added "But USAID is really corrupt. I'll tell you, it's corrupt, it's incompetent." As a group, Plaintiffs are deeply concerned that their professional experience at USAID is forever publicly tarnished. Due to the resulting online threats and harassment following such heated language from Defendant Musk and President Trump, Plaintiffs also fear for their personal safety.

e.  **Severe emotional distress due Defendant Musk and DOGE having access to extremely sensitive personal information.** For instance, as a result of the

---

[52] The Conservative Alternative (@OldeWorldOrder), X (Feb. 2, 2025, 12:23 PM), https://x.com/OldeWorldOrder/status/1886103036889559417.

dangerous nature of J. Doe 1's job, specifically their deployment into conflict zones, their personnel and security clearance files contain highly sensitive personal information —including, social security number, passport information, personal references, foreign contacts, previous addresses, financial records, descriptions of their tattoos, a safety pass phrase, and intimate information about their extended family members. J. Doe 1 is extremely concerned that Defendants do not have the security clearance or training needed to handle this type of extremely confidential, and will use it to the detriment of J. Doe 1 and/or their loved ones. Defendant Musk provided evidence of the abuse of his and DOGE's illegal access to personnel and security clearance files this week when he indicated Defendants are examining the net worth of federal employees, including those at USAID.

f. **Severe emotional distress stemming from the first-hand knowledge of what the sudden disruption of grants and USAID services means for vulnerable populations globally.** After 10 years of USAID service, J. Doe 4 has been devastated to witness the negative impacts of USAID's stop-work order and sudden disengagement with partners and beneficiaries of USAID, some of the most vulnerable people on the planet, whom they have worked with directly in implementing USAID programs. J. Doe 10 is a nutrition advisor for clinics in Africa, including Somalia. When they suddenly lost the ability to contact these partners, they suffered extreme distress in being suddenly prevented from communicating with their overseas partners who depend on J. Doe 10 and USAID

35

to fund programs that keep children from starving. J. Doe 10 is a parent and knows clinics are in danger of shutting down, leaving malnourished children in grave danger.

**COUNT ONE:**
**VIOLATION OF THE APPOINTMENTS CLAUSE**
**OF THE UNITED STATES CONSTITUTION**

67. Plaintiffs hereby reallege and incorporate all allegations in the above paragraphs as if fully set forth herein.

68. The Appointments Clause of the U.S. Constitution states, in relevant part, that the President of the United States "shall nominate, and by and with the Advice and Consent of the Senate, shall appoint Ambassadors, other public Ministers and Consuls, Judges of the supreme Court, and all other Officers of the United States, whose Appointments are not herein otherwise provided for, and which shall be established by Law: but the Congress may by Law vest the Appointment of such inferior Officers, as they think proper, in the President alone, in the Courts of Law, or in the Heads of Departments."

69. There are two important aspects of the Appointments Clause implicated by Defendants' attempted government takeover. *First*, it establishes that Congress is the sole body with constitutional authority to create Officers of the United States. *See, e.g.*, *Trump v. United States*, 603 U.S. 593, 645 (2024) (Thomas, J. concurring) ("Although the Constitution contemplates that there will be 'other Officers of the United States, whose Appointments are not herein otherwise provided for,' it clearly requires that those offices "shall be established by Law."); Office of Legal Counsel, *The Test for Determining "Officer"*

36

*Status Under the Appointments Clause*, 49 Op. O.L.C. __ (Jan. 16, 2025) ("The Appointments Clause [provides] that offices not recognized by the Constitution itself 'shall be established by Law,' thus lodging in Congress ultimate authority over the creation of most offices.") (citing U.S. Const. art. II, § 2, cl. 2; *United States v. Maurice*, 26 F. Cas. 1211, 1213-14 (C.C.D. Va. 1823); Office of Legal Counsel, *Limitations on Presidential Power to Create a New Executive Branch Entity to Receive and Administer Funds Under Foreign Aid Legislation*, 9 Op. O.L.C. 76, 77–78 (1985)).

70. *Second*, it lays out the framework for how officers must be appointed to office. Based on the Appointments Clause, there is a tripartite classification of federal government workers. They are either (1) principal officers; (2) inferior officers; or (3) lesser functionaries ("mere employees"). *Lucia v. Sec. & Exch. Comm'n*, 585 U.S. 237, 241, 245, n.3 (2018).

71. Principal officers must always be appointed "by and with the Advice and Consent of the Senate." U.S. Const. art. II, § 2, cl. 2.

72. Inferior officers may be appointed directly by the President, but only when Congress has "by Law vest[ed] the Appointment of such inferior Officers" in the President. *Id*.

73. As the facts alleged above demonstrate, Defendant Musk and his DOGE team are exercising an unprecedented level of control over the federal government—one which spans agencies and seems to know no bounds absent federal court orders restricting it. Moreover, upon information and belief, Defendant Musk reports directly to President Trump. Such authority can only be considered that of a principal officer.

74. Defendants have not been appointed with the advice and consent of the Senate. Even if

37

Defendants were to be considered inferior officers (which is highly doubtful given their unfettered control over multiple agencies), Congress has not "by Law" vested the authority to appoint these new-fangled inferior officers "in the President alone." Nor can the President evade the requirements of the Constitution by vesting the powers of an officer in a mere employee; this is all the more true when those powers are unbounded and include control over every possible aspect of every federal agency. *See Maurice*, 26 F. Cas. at 1214 (an office must be "established by law" and "exist with ascertained duties."). As detailed above, Defendants have exercised executive power far beyond the scope of any legally authorized appointment, engaging in personnel decisions, directing agency operations, and overriding executive branch officials.

## COUNT TWO:
## VIOLATION OF SEPARATION OF POWERS

75. Plaintiffs hereby reallege and incorporate all allegations in the above paragraphs as if fully set forth herein.

76. In addition to violating the Appointments Clause of the Constitution, Defendants have violated and stand to continue to violate fundamental Separation of Powers principles by repeatedly subverting the Congress.

77. The United States Constitution establishes a system of separated powers, ensuring that legislative power is vested in Congress (Article I), executive power is vested in the President (Article II), and judicial power is vested in the courts (Article III).

78. This constitutional structure is designed to prevent any single individual or entity from amassing unchecked governmental authority and to preserve the fundamental principle

38

that each branch of government operates within its designated sphere.

79. DOGE itself, as structured and implemented, operates beyond the bounds of any proper executive power. Despite purporting to be an information technology efficiency initiative, DOGE wields coercive power over federal agencies, including the ability to mandate staffing changes, conduct unauthorized audits, override agency decision-making, implement new policies with regulatory effect, and, importantly, freeze congressionally appropriated funds.

80. The creation of "DOGE teams" embedded within executive agencies, reporting not to agency heads but to an unappointed and unconfirmed individual—Defendant Musk—effectively creates a shadow chain of command that undermines statutory delegation, and allows for countless ethics, privacy, and other regulatory statutes to be wholesale ignored with absolutely no accountability. This far exceeds any previously known or acceptable exercise of executive power.

81. The lack of any formal appointment, congressional authorization, or duties that are clearly defined in law renders Defendants' government takeover a direct affront to the Constitution's structural safeguards against tyranny.

**PRAYER FOR RELIEF**

82. WHEREFORE, Plaintiffs request that this Court:

   a. Declare Defendants Musk and DOGE, as currently operating, to be acting in violation of the United States Constitution;

   b. Declare unlawful and set aside any actions taken under the color of law by

Defendant Musk, his subordinates, Defendants DOGE, and any person working

on behalf of or at the direction of DOGE or its team or staff;

c.  Enjoin Defendant Musk and his DOGE subordinates from performing their

significant and wide-ranging duties unless and until Defendant Musk is properly

appointed pursuant to the U.S. Constitution; *and*

d.  Award such other relief as the Court deems just.


Dated: February 15, 2025

Respectfully submitted,

*/s/ Norman L. Eisen*
Norman L. Eisen, [9112170186]
Tianna J. Mays, [1112140221]
**STATE DEMOCRACY DEFENDERS FUND**
600 Pennsylvania Avenue SE, Suite 15180
Washington, DC 20003
Tel: (202) 594-9958
Norman@statedemocracydefenders.org
Tianna@statedemocracydefenders.org

Mimi Marziani**
Rebecca (Beth) Stevens**
Joaquin Gonzalez**
**MARZIANI, STEVENS & GONZALEZ PLLC**
1533 Austin Highway, Suite 102-402
San Antonio, TX 78218
Tel: (210) 343-5604
mmarziani@msgpllc.com
bstevens@msgpllc.com
jgonzalez@msgpllc.com

*Attorneys for Plaintiffs*

**Application for admission or admission pro hac vice pending.

40

AO 440 (Rev. 06/12)  Summons in a Civil Action

# UNITED STATES DISTRICT COURT

for the

District of Maryland

| | |
|---|---|
| J. DOE 1-26, | ) |
| | ) |
| | ) |
| | ) |
| *Plaintiff(s)* | ) |
| v. | ) |
| ELON MUSK, in his official capacity,  UNITED STATES DOGE SERVICE, and the DEPARTMENT OF GOVERNMENT EFFICIENCY, | ) |
| | ) |
| | ) |
| | ) |
| *Defendant(s)* | ) |

Civil Action No. 8:25-cv-00462-TDC

## SUMMONS IN A CIVIL ACTION

To: *(Defendant's name and address)* UNITED STATES DOGE SERVICE, 1650 17th St NW, Washington, DC 20006

A lawsuit has been filed against you.

Within 21 days after service of this summons on you (not counting the day you received it) — or 60 days if you are the United States or a United States agency, or an officer or employee of the United States described in Fed. R. Civ. P. 12 (a)(2) or (3) — you must serve on the plaintiff an answer to the attached complaint or a motion under Rule 12 of the Federal Rules of Civil Procedure.  The answer or motion must be served on the plaintiff or plaintiff's attorney, whose name and address are:

> Norman L. Eisen Norman@statedemocracydefenders.org
> Tianna Mays, Tianna@statedemocracydefenders.org
> STATE DEMOCRACY DEFENDERS FUND
> 600 PENNSYLVANIA AVENUE SE #15180
> Washington, D.C. 20003

If you fail to respond, judgment by default will be entered against you for the relief demanded in the complaint. You also must file your answer or motion with the court.

*CLERK OF COURT*

Date: _____

_____
*Signature of Clerk or Deputy Clerk*

AO 440 (Rev. 06/12)  Summons in a Civil Action (Page 2)

Civil Action No. 8:25-cv-00462-TDC

## PROOF OF SERVICE
### *(This section should not be filed with the court unless required by Fed. R. Civ. P. 4 (l))*

This summons for *(name of individual and title, if any)* _____

was received by me on *(date)* _____ .

❏ I personally served the summons on the individual at *(place)* _____

_____ on *(date)* _____ ; or

❏ I left the summons at the individual's residence or usual place of abode with *(name)* _____

_____ , a person of suitable age and discretion who resides there,

on *(date)* _____ , and mailed a copy to the individual's last known address; or

❏ I served the summons on *(name of individual)* _____ , who is

designated by law to accept service of process on behalf of *(name of organization)* _____

_____ on *(date)* _____ ; or

❏ I returned the summons unexecuted because _____ ; or

❏ Other *(specify):*



My fees are $ _____ for travel and $ _____ for services, for a total of $ 0.00 .

I declare under penalty of perjury that this information is true.

Date: _____

_____
*Server's signature*

_____
*Printed name and title*

_____
*Server's address*

Additional information regarding attempted service, etc:

AO 440 (Rev. 06/12) Summons in a Civil Action

# UNITED STATES DISTRICT COURT

for the

District of Maryland

| | |
|---|---|
| J. DOE 1-26, | ) |
| | ) |
| | ) |
| | ) |
| *Plaintiff(s)* | ) |
| v. | ) |
| ELON MUSK, in his official capacity,  UNITED STATES DOGE SERVICE, and the DEPARTMENT OF GOVERNMENT EFFICIENCY, | ) |
| | ) |
| | ) |
| | ) |
| *Defendant(s)* | ) |

Civil Action No. 8:25-cv-00462-TDC

## SUMMONS IN A CIVIL ACTION

To: *(Defendant's name and address)* DEPARTMENT OF GOVERNMENT EFFICIENCY, 1650 17th St NW, Washington, DC 20006

A lawsuit has been filed against you.

Within 21 days after service of this summons on you (not counting the day you received it) — or 60 days if you are the United States or a United States agency, or an officer or employee of the United States described in Fed. R. Civ. P. 12 (a)(2) or (3) — you must serve on the plaintiff an answer to the attached complaint or a motion under Rule 12 of the Federal Rules of Civil Procedure.  The answer or motion must be served on the plaintiff or plaintiff's attorney, whose name and address are:

Norman L. Eisen Norman@statedemocracydefenders.org
Tianna Mays, Tianna@statedemocracydefenders.org
STATE DEMOCRACY DEFENDERS FUND
600 PENNSYLVANIA AVENUE SE #15180
Washington, D.C. 20003

If you fail to respond, judgment by default will be entered against you for the relief demanded in the complaint. You also must file your answer or motion with the court.

*CLERK OF COURT*

Date: _____

_____
*Signature of Clerk or Deputy Clerk*

AO 440 (Rev. 06/12)  Summons in a Civil Action (Page 2)

Civil Action No. 8:25-cv-00462-TDC

## PROOF OF SERVICE
### *(This section should not be filed with the court unless required by Fed. R. Civ. P. 4 (l))*

This summons for *(name of individual and title, if any)* _____

was received by me on *(date)* _____ .

❑ I personally served the summons on the individual at *(place)* _____

_____ on *(date)* _____ ; or

❑ I left the summons at the individual's residence or usual place of abode with *(name)* _____

_____ , a person of suitable age and discretion who resides there,

on *(date)* _____ , and mailed a copy to the individual's last known address; or

❑ I served the summons on *(name of individual)* _____ , who is

designated by law to accept service of process on behalf of *(name of organization)* _____

_____ on *(date)* _____ ; or

❑ I returned the summons unexecuted because _____ ; or

❑ Other *(specify):*



My fees are $ _____ for travel and $ _____ for services, for a total of $ 0.00 .

I declare under penalty of perjury that this information is true.

Date: _____

_____
*Server's signature*

_____
*Printed name and title*

_____
*Server's address*

Additional information regarding attempted service, etc:

ADD.116

AO 440 (Rev. 06/12)  Summons in a Civil Action

# UNITED STATES DISTRICT COURT

for the

| | | |
|---|---|---|
| J. Doe 1-26 | ) | |
| | ) | |
| | ) | |
| | ) | |
| *Plaintiff(s)* | ) | |
| v. | ) | Civil Action No. 8:25-cv-00462-TDC |
| ELON MUSK, in his official capacity,  UNITED STATES DOGE SERVICE, and the DEPARTMENT OF GOVERNMENT EFFICIENCY, | ) | |
| | ) | |
| | ) | |
| *Defendant(s)* | ) | |

## SUMMONS IN A CIVIL ACTION

To: *(Defendant's name and address)*  ELON MUSK, in his official capacity,  UNITED STATES DOGE SERVICES, 1600 Pennsylvania Avenue NW, Washington, DC 20500

A lawsuit has been filed against you.

Within 21 days after service of this summons on you (not counting the day you received it) — or 60 days if you are the United States or a United States agency, or an officer or employee of the United States described in Fed. R. Civ. P. 12 (a)(2) or (3) — you must serve on the plaintiff an answer to the attached complaint or a motion under Rule 12 of the Federal Rules of Civil Procedure.  The answer or motion must be served on the plaintiff or plaintiff's attorney, whose name and address are:

Norman L. Eisen Norman@statedemocracydefenders.org
Tianna Mays, Tianna@statedemocracydefenders.org
STATE DEMOCRACY DEFENDERS FUND
600 PENNSYLVANIA AVENUE SE #15180
Washington, D.C. 20003

If you fail to respond, judgment by default will be entered against you for the relief demanded in the complaint. You also must file your answer or motion with the court.

*CLERK OF COURT*

Date:  02/13/2025

_____
*Signature of Clerk or Deputy Clerk*

AO 440 (Rev. 06/12)  Summons in a Civil Action (Page 2)

Civil Action No. 8:25-cv-00462-TDC

## PROOF OF SERVICE
### *(This section should not be filed with the court unless required by Fed. R. Civ. P. 4 (l))*

This summons for *(name of individual and title, if any)* _____

was received by me on *(date)* _____ .

❏ I personally served the summons on the individual at *(place)* _____

_____ on *(date)* _____ ; or

❏ I left the summons at the individual's residence or usual place of abode with *(name)* _____

_____ , a person of suitable age and discretion who resides there,

on *(date)* _____ , and mailed a copy to the individual's last known address; or

❏ I served the summons on *(name of individual)* _____ , who is

designated by law to accept service of process on behalf of *(name of organization)* _____

_____ on *(date)* _____ ; or

❏ I returned the summons unexecuted because _____ ; or

❏ Other *(specify):*


My fees are $ _____ for travel and $ _____ for services, for a total of $ 0.00 .

I declare under penalty of perjury that this information is true.

Date: _____

_____
*Server's signature*

_____
*Printed name and title*

_____
*Server's address*

Additional information regarding attempted service, etc:

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| J. DOE 1, et al., | |
| *Plaintiffs*, | Case No. 8:25-cv-00462-TDC |
| v. | |
| ELON MUSK, *et al.*, | |
| *Defendants*. | |

## DEFENDANTS' MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION

# TABLE OF CONTENTS

INTRODUCTION ................................................................................................. 1

BACKGROUND .................................................................................................. 2

    A.    The Executive Branch's Authority and Discretion to Set Foreign Aid ................. 2

    B.    USAID ............................................................................................. 5

    C.    The United States DOGE Service ........................................................... 6

STANDARD OF REVIEW ................................................................................. 8

ARGUMENT ...................................................................................................... 8

I.    PLAINTIFFS ARE NOT LIKELY TO PREVAIL ON THE MERITS ........................... 9

    A.    Plaintiffs Fail to Demonstrate Standing for the Relief They Seek ...................... 9

        1.    Plaintiffs' speculative fears about possible misuse of USAID data do not create cognizable injury-in-fact ..................................... 9

        2.    Plaintiffs' other claimed injuries are neither caused by the Defendants nor redressable by the relief they seek ......................... 10

    B.    Plaintiffs Are Not Likely To Prevail On Their Constitutional Claims ................ 13

        1.    Plaintiffs' Appointments Clause Claim (Count I) Lacks Merit ................ 13

        2.    Plaintiffs' Separation of Powers Claim (Count II) Lacks Merit .............. 22

II.    PLAINTIFFS FAIL TO DEMONSTRATE THAT IRREPARABLE HARM WOULD RESULT IN THE ABSENCE OF A PRELIMINARY INJUNCTION .......... 24

    A.    Fear and Emotional Distress ................................................................. 24

    B.    Access to Sensitive Information ............................................................. 26

    C.    Reputational and Constitutional Injuries ................................................. 27

III.    THE BALANCE OF EQUITIES, INCLUDING THE PUBLIC INTEREST, DOES NOT FAVOR A PRELIMINARY INJUNCTION ................................................ 28

IV.    ANY INJUNCTIVE RELIEF SHOULD BE LIMITED TO THE PLAINTIFFS ........... 29

CONCLUSION ................................................................................................... 30

## TABLE OF AUTHORITIES

**CASES**

*AFL-CIO v. Dep't of Labor*,
No. 1:25-cv-339, 2025 WL 542825 (D.D.C. Feb. 14, 2025) .................................................. 10

*Alavarez v. Becerra*,
No. 21-2317, 2023 WL 2908819 (4th Cir. Apr. 12, 2023) ..................................................... 12

*Alpine Sec. Corp. v. FINRA*,
121 F.4th 1314 (D.C. Cir. 2024) ......................................................................... 28

*Am. Foreign Serv. Ass'n v. Trump*,
No. 1:25-cv-352, 2025 WL 573762 (D.D.C. Feb. 21, 2025) ........................... 20, 21, 22, 25, 28

*Am. Ins. Ass'n v. Garamendi*,
539 U.S. 396 (2003) ........................................................................... 23, 24

*Andrade v. Regnery*,
824 F.2d 1253 (D.C. Cir. 1987) ......................................................................... 18, 19

*Ass'n of Am. Physicians & Surgeons, Inc. v. Clinton*,
997 F.2d 898 (D.C. Cir. 1993) ......................................................................... 15, 16

*Auffmordt v. Hedden*,
137 U.S. 310 (1890) ........................................................................... 21

*Bennett v. Spear*,
520 U.S. 154 (1997) ........................................................................... 11, 12

*Braidwood Mgmt., Inc. v. Becerra*,
104 F.4th 930 (5th Cir. 2024), *cert. granted*, 604 U.S. --- (Jan. 10, 2025) ....................... 14, 17

*Church v. Biden*,
573 F. Supp. 3d 118 (D.D.C. 2021) ......................................................................... 28

*City of N.Y. v. U.S. Dep't of Def.*,
913 F.3d 423 (4th Cir. 2019) ........................................................................... 23

*Clapper v. Amnesty Int'l USA*,
568 U.S. 398 (2013) ........................................................................... 9, 10

*Dall. Safari Club v. Bernhardt*,
453 F. Supp. 3d 391 (D.D.C. 2020) ......................................................................... 24

*Dalton v. Specter*,
511 U.S. 462 (1994) ........................................................................... 22, 23

*Defy Ventures, Inc. v. U.S. Small Bus. Admin.*,
    469 F. Supp. 3d 459 (D. Md. 2020) .................................................... 25

*Department of Commerce v. New York*,
    588 U.S. 752 (2019) ........................................................................ 15

*Di Biase v. SPX Corp.*,
    872 F.3d 224 (4th Cir. 2017) ........................................................... 24

*Direx Israel, Ltd. v. Breakthrough Med. Corp.*,
    952 F.2d 802 (4th Cir. 1991) ........................................................... 26

*Disability Rts. S.C. v. McMaster*,
    24 F.4th 893 (4th Cir. 2022) ........................................................... 11

*Doe v. Va. Dep't of State Police*,
    713 F.3d 745 (4th Cir. 2013) ..................................................... 10, 11

*Ekagra Partners, LLC v. United States*,
    170 Fed. Cl. 1 (2024) ..................................................................... 26

*FDA v. All. for Hippocratic Med.*,
    602 U.S. 367 (2024) .......................................................................... 9

*Frank Krasner Enters., Ltd. v. Montgomery Cnty.*,
    401 F.3d 230 (4th Cir. 2005) ........................................................... 11

*Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*,
    561 U.S. 477 (2010) ........................................................................ 13

*Freytag v. Comm'r*,
    501 U.S. 868 (1991) ................................................................... 13, 14

*Hess v. Hughes*,
    500 F. Supp. 1054 (D. Md. 1980) .................................................... 30

*Holder v. Humanitarian L. Project*,
    561 U.S. 1 (2010) ........................................................................... 29

*Holy Land Found. for Relief & Dev. v. Ashcroft*,
    219 F. Supp. 2d 57 (D.D.C. 2002), *aff'd*, 333 F.3d 156 (D.C. Cir. 2003) ............................... 29

*Hunstein v. Preferred Collection & Mgmt. Servs., Inc.*,
    48 F.4th 1236 (11th Cir. 2022) ........................................................ 10

*I.C. v. Zynga, Inc.*,
    600 F. Supp. 3d 1034 (N.D. Cal. 2022) ............................................ 10

*Kim v. FINRA,*
   698 F. Supp. 3d 147 (D.D.C. 2023),
   *appeal dismissed,* 2025 WL 313965 (D.C. Cir. Jan. 25, 2025)........................................ 28, 29

*League of Women Voters of N.C. v. North Carolina,*
   769 F.3d 224 (4th Cir. 2014)................................................................................................ 8

*Lewis v. Casey,*
   518 U.S. 343 (1996) ............................................................................................................. 30

*Lucia v. SEC,*
   585 U.S. 237 (2018) ............................................................................................... 17, 21, 22

*Madsen v. Women's Health Ctr., Inc.,*
   512 U.S. 753 (1994) ............................................................................................................. 30

*MicroStrategy Inc. v. Motorola, Inc.,*
   245 F.3d 335 (4th Cir. 2001)................................................................................................ 8

*Morrison v. Olson,*
   487 U.S. 654 (1988) ............................................................................................................. 22

*Murthy v. Missouri,*
   603 U.S. 43 (2024) .............................................................................................. 11, 12, 30

*Nken v. Holder,*
   556 U.S. 418 (2009) ............................................................................................................. 28

*Sampson v. Murray,*
   415 U.S. 61 (1974) ............................................................................................................... 25

*Scotts Co. v. United Indus. Corp.,*
   315 F.3d 264 (4th Cir. 2002)............................................................................................. 24

*Simmons v. Poe,*
   47 F.3d 1370 (4th Cir. 1995)............................................................................................. 27

*Teva Pharms. USA, Inc. v. Azar,*
   369 F. Supp. 3d 183 (D.D.C. 2019) ................................................................................ 12

*Together Emps. v. Mass Gen. Brigham Inc.,*
   32 F.4th 82 (1st Cir. 2022)........................................................................................... 24, 25

*TransUnion LLC v. Ramirez,*
   594 U.S. 413 (2021) ........................................................................................................ 9, 10

*United States v. Arthrex, Inc.,*
   594 U.S. 1 (2021) ........................................................................................................... 14, 17

*United States v. Curtiss-Wright Exp. Corp.*,
    299 U.S. 304 (1936) ........................................................................... 24, 28, 29

*United States v. Donziger*,
    38 F.4th 290 (2d Cir. 2022) .............................................................................. 21

*United States v. Germaine*,
    99 U.S. 508 (1878) ............................................................................................ 21

*United States v. Hartwell*,
    73 U.S. (6 Wall.) 385 (1867) ........................................................................... 21

*United States v. Maurice*,
    26 F. Cas. 1211 (C.C.D. Va. 1823) ................................................................. 21

*Univ. of Cal. Student Ass'n v. Carter*,
    No. 25-cv-354-RDM, 2025 WL 542586 (D.D.C. Feb. 17, 2025) .................... 26

*Winter v. Nat. Res. Def. Council, Inc.*,
    555 U.S. 7 (2008) ................................................................................... 8, 25, 28

*Youngstown Sheet & Tube Co. v. Sawyer*,
    343 U.S. 579 (1952) ..................................................................................... 23, 24

*Zivotofsky ex rel. Zivotofsky v. Kerry*,
    576 U.S. 1 (2015) ............................................................................................... 23

## STATUTES

5 U.S.C. § 104 ............................................................................................................ 3

5 U.S.C. § 704 .......................................................................................................... 23

5 U.S.C. § 3161 .......................................................................................................... 6

18 U.S.C. § 202 ........................................................................................................ 21

22 U.S.C. § 2151b ...................................................................................................... 3

22 U.S.C. § 2291 ........................................................................................................ 3

22 U.S.C. § 2346 ..................................................................................................... 3, 4

22 U.S.C. § 2347 ........................................................................................................ 3

22 U.S.C. § 2348 ........................................................................................................ 3

22 U.S.C. § 2349aa .................................................................................................... 3

22 U.S.C. § 2382 ................................................................................................. 3

22 U.S.C. § 2601 ................................................................................................. 3

22 U.S.C. § 6563 ................................................................................................. 3

22 U.S.C. § 6592 ................................................................................................. 4

Migration and Refugee Assistance Act of 1962,
    Pub. L. No. 87-510, 76 Stat. 121 ................................................................ 3

Support for East European Democracy Act of 1989,
    Pub. L. No. 101-179, 103 Stat. 1298 .......................................................... 3

Foreign Affairs Reform and Restructuring Act of 1998,
    Pub. L. No. 105-277, 112 Stat. 2681 (1998) ............................................... 3

**U.S. CONSTITUTION**

U.S. Const. art. I, § 6 ......................................................................................... 16

U.S. Const. art. II, § 2 ....................................................................................... 13

**RULES**

Fed. R. Civ. P. 65 .............................................................................................. 30

**REGULATIONS**

*Administration of Foreign Assistance & Related Functions*,
    Exec. Order No. 10,973, 26 Fed. Reg. 10,469 (Nov. 3, 1961) .................... 3

*Establishing & Implementing the President's "Department of Government Efficiency*,"
    Exec. Order No. 14,158, 90 Fed. Reg. 8441 (Jan. 20, 2025) ........... 6, 7, 20, 26

*Reevaluating & Realigning United States Foreign Aid*,
    Exec. Order 14,169, 90 Fed. Reg. 8619 (Jan. 20, 2025) ....................... 4, 29

*Implementing the President's "Department of Government Efficiency" Workforce Optimization Initiative*,
    Exec. Order 14,210, 90 Fed. Reg. 9669 (Feb. 11, 2025) ............................ 7

**OTHER AUTHORITIES**

*Administration of the Ronald Reagan Centennial Commission*,
    34 Op. O.L.C. 174 (2010) ........................................................................... 17

*Appointments to the Commission on the Bicentennial of the Constitution*,
    8 Op. O.L.C. 200 (1984) ........................................................................ 16, 17

*Designation of Acting Director of the Office of Management & Budget*,
   27 Op. O.L.C. 121 (2003) ........................................................................... 14

Margaret MacMillan, *Paris 1919* (2001) .................................................... 16

Memorandum, Guidance on Probationary Periods, Administrative Leave & Details
   (Jan. 20, 2025), https://perma.cc/4QGN-XZLP ..................................... 4, 5

*Special Government Employee Serving as Paid Consultant to Saudi Company*,
   40 Op. O.L.C. 1 (2016) .............................................................................. 22

## INTRODUCTION

Plaintiffs, twenty-six current and former U.S. Agency for International Development ("USAID") employees and contractors, seek the extraordinary remedy of a preliminary injunction to unwind a host of actions at that agency (who is not named as a defendant) on the ground that those acts are somehow attributable to Elon Musk exercising powers in violation of the Appointments Clause. Plaintiffs' motion rests on misunderstandings of both law and fact.

Foremost, Plaintiffs conflate influence with legal authority. As detailed below, and as Plaintiffs do not contest, Mr. Musk is a Senior Advisor to the President. Critically, in that role he has no actual or formal authority to make government decisions himself; rather he can only advise the President and communicate the President's directives. That is dispositive. Of course, Mr. Musk may carry sway or influence within the Executive Branch, even significant influence. But the same is true for the Chief of Staff, White House Counsel, or a number of other senior aides. And nobody has ever suggested that those persons are "officers" of the United States. Such is the case here: Because Mr. Musk does not occupy an office that is itself entrusted with any actual sovereign power, he is not an "officer" at all and cannot be working in violation of the Appointments Clause. By a similar token, as a non-career Special Government Employee ("SGE"), Mr. Musk's position is personal to him and lacks the duration characteristic of an "office" under the Appointments Clause.

All of this is reflected in the reality of what has actually happened at USAID. While the Plaintiffs base their claims largely on high-level "information and belief," the evidence is undisputed that the actions alleged in Plaintiffs' motion were directed by USAID senior officials wielding their own independent power—not Mr. Musk or the USDS. And nowhere do Plaintiffs claim that those USAID officials lacked the authority to take those actions. Thus, one way or another, their Appointments Clause claim fails. And for many of the same reasons, Plaintiffs'

derivative separation-of-powers claim fails.

But the Court should not even reach the merits of Plaintiffs' claims, as they lack Article III standing and have failed to allege redressable injury traceable to Defendants—let alone irreparable harm. Plaintiffs' claimed fears about the potential use of data accessed by certain individuals are far too speculative to constitute a cognizable Article III injury, as other courts have recognized. And the other injuries they claim are not even caused by Defendants. Rather, the undisputed evidence reflects that USAID leadership—not Defendants—are responsible for the actions Plaintiffs contest. Accordingly, Plaintiffs cannot establish *any* injuries caused by Defendants that could be redressed here.

In addition, the balance of the equities plainly favors Defendants. Plaintiffs' preliminary injunction seeks to strike at the heart of the President's Article II foreign affairs powers. President Trump has made the judgment that the United States foreign aid industry and bureaucracy are not aligned with America's interests and, accordingly, that the activities of USAID need to be assessed; an assessment that Plaintiffs seek to enjoin. Balanced against this undoubtedly weighty interest is Plaintiffs' claim that Defendants have acted unconstitutionally—a claim which lacks merit.

At bottom, Plaintiffs have failed to establish any of the four prerequisites for obtaining a preliminary injunction, and their motion should be denied.

## BACKGROUND

### A.    The Executive Branch's Authority and Discretion to Set Foreign Aid

Under the statutory regime governing foreign assistance, and consistent with his responsibilities regarding the conduct of U.S. foreign affairs, the President has broad discretion to set the terms and conditions on which the United States provides such assistance. Many of the

authorities provided under the Foreign Assistance Act of 1961 ("FAA"), and similar statutes, explicitly allow for the provision of assistance "on such terms and conditions as [the President] may determine." *See*, *e.g.*, section 104(c)(1) of the FAA (22 U.S.C. § 2151b(c)(1)) (health assistance); section 481(a)(4) of the FAA (22 U.S.C. § 2291(a)(4)) (counternarcotics and anti-crime assistance); section 531 of the FAA (22 U.S.C. § 2346) (assistance to promote economic or political stability); section 541(a) of the FAA (22 U.S.C. § 2347) (International Military Education and Training assistance); section 551 of the FAA (22 U.S.C. § 2348) (Peacekeeping Operations); section 571 of the FAA (22 U.S.C. § 2349aa) (anti-terrorism assistance); *see also* section 2(c)(1) of the Migration and Refugee Assistance Act of 1962, Pub. L. No. 87-510, 76 Stat. 121 (22 U.S.C. § 2601(c)(1)); section 201 of the Support for East European Democracy Act of 1989, Pub. L. No. 101-179, 103 Stat. 1298 (amending the FAA by inserting, *inter alia*, § 498b(i)).

The FAA delegates some of this authority. For example, Section 622(c) of the FAA provides that the Secretary of State, under the direction of the President, "shall be responsible for the continuous supervision and general direction of economic assistance, military assistance, and military education and training programs . . . to the end that such programs are effectively integrated both at home and abroad and the foreign policy of the United States is best served thereby." 22 U.S.C. § 2382(c).

In 1961, President Kennedy issued Executive Order 10973, directing the Secretary of State to "establish an agency in the Department of State to be known as the Agency for International Development." *Administration of Foreign Assistance & Related Functions*, Exec. Order No. 10,973 § 102, 26 Fed. Reg. 10,469 (Nov. 3, 1961). Section 1413 of the Foreign Affairs Reform and Restructuring Act of 1998, Pub. L. No. 105-277, 112 Stat. 2681 (1998), ("FARRA") recognized USAID as an "independent establishment." *See* 22 U.S.C. § 6563; 5 U.S.C. § 104.

Under FARRA, the USAID Administrator is "under the direct authority and foreign policy guidance of the Secretary of State." 22 U.S.C. § 6592. And several types of foreign assistance are jointly administered by the Department of State and USAID. *See*, *e.g.*, *id.* § 6563; *id.* § 2346(b) (economic support funds).

Consistent with this authority, President Trump promptly acted to ensure that the United States' provision of foreign aid is aligned with American interests. Upon taking office on January 20, 2025, President Trump instituted a ninety-day pause in foreign development assistance to allow his administration to assess programmatic efficiencies, and to ensure that all foreign aid aligns with U.S. foreign policy. *See Reevaluating & Realigning United States Foreign Aid,* Exec. Order 14,169, 90 Fed. Reg. 8619 (Jan. 20, 2025). Secretary of State Marco Rubio implemented this Executive Order on January 24, 2025, by directing a "pause[]" on "all new obligations of funding, pending a review, for foreign assistance programs funded by or through the [State] Department and USAID." *See* Decl. of Peter Marocco ¶ 3 ("Marocco Decl."), Ex. 26 at J.R. 403–05, 418. Secretary Rubio also approved waivers, including for foreign military financing for Israel and Egypt, emergency food expenses, administrative expenses, legitimate expenses incurred before the pause went into effect, and a waiver on the pause for life-saving humanitarian assistance during the review. Ex. 26 ¶ 10 at J.R. 408.

Not only is the Administration reviewing foreign aid for programmatic inefficiencies, it is taking steps to eliminate inefficiencies within the federal workforce. On January 20, the Office of Personnel Management issued a guidance memorandum as to probationary periods and administrative leave. Memorandum, Guidance on Probationary Periods, Administrative Leave & Details (Jan. 20, 2025), https://perma.cc/4QGN-XZLP, Ex. 25 at J.R. 399–401. That guidance reinforced that agencies had the authority to place employees on paid administrative leave "when

it is in their best interest to do so," including when (1) "the absence is directly related to the agency's mission," (2) "the absence is officially sponsored or sanctioned by the agency," (3) "the absence will clearly enhance the professional development or skills of the employee in the employee's current position," or (4) "the absence is in the interest of the agency or of the Government as a whole." *Id.* at 400. The guidance further explained that administrative leave may "be an appropriate action where the agency component in which the employee works is being eliminated or restructured, or where the agency weighs changes to the individual's role at the agency as part of a workforce realignment." *Id.*

### B.    USAID

On January 30, President Trump designated Secretary Rubio as Acting Administrator of USAID. Ex. 26 ¶ 8 at J.R. 406. Secretary Rubio, consistent with the President's views, concluded that USAID's foreign assistance processes reflected signs of severe inefficiency, and a substantial number of USAID-funded programs neither substantially benefit the American people nor reflect administration priorities. *Id.* ¶ 7 at J.R. 405–06. Thus, Secretary Rubio sent a letter to Congress on February 3, stating that Peter Marocco was delegated the duties of Deputy Administrator of USAID and would "begin the process of engaging in a review and potential reorganization of USAID's activities to maximize efficiency and align operations with the national interest." *Id.* ¶ 8 at J.R. 406–07.

USAID leadership ultimately determined that placing a substantial number of USAID personnel on paid leave was the only effective way "to pause operations, faithfully implement the pause, and conduct a full and unimpeded audit of USAID's operations and programs, consistent with the President's and Secretary's directives." *Id.* ¶ 12 at J.R. 409. The decisions to place certain USAID employees on leave and to terminate personal service contractors ("PSCs") were taken by

Secretary Rubio or Mr. Marocco, or by USAID employees at their direction. *Id.* ¶ 23 at J.R. 412. By February 7, 2025, approximately 2,140 employees had been placed on administrative leave. *Id.* ¶ 12 at J.R. 409. USAID leadership also approved the termination of nearly 800 PSCs working in the United States or high- or upper-middle-income countries, as defined by the World Bank. *Id.* ¶ 15 at J.R. 410.

When employees are placed on paid administrative leave, they may lose access to certain USAID systems, including their USAID email. *Id.* ¶ 14 at J.R. 410. This is done to ensure the security of internal systems and to allow the "pause" on agency operations to truly go into effect. *Id.* USAID is unaware of any employee in a dangerous location such as Syria whose access to USAID's digital systems was shut off. *Id.* In addition, USAID has either preserved or restored access to the overwhelming majority of overseas PSCs; to the best of its knowledge, this includes all PSCs working in dangerous locations or frontline aid delivery countries. *Id.* ¶ 15 at J.R. 410. USAID will diligently work to restore access to any employee or PSC whose access was terminated in error. *Id.*

### C.    The United States DOGE Service

On January 20, President Trump signed Executive Order 14,158, which directs changes to the United States Digital Service to implement the President's agenda of "improv[ing] the quality and efficiency of government-wide software, network infrastructure, and information technology ('IT') systems." *Establishing & Implementing the President's "Department of Government Efficiency,"* Exec. Order No. 14,158, § 4, 90 Fed. Reg. 8,441 (Jan. 20, 2025) ("USDS E.O."). The USDS E.O. also redesignated the United States Digital Service as the Department of Governmental Efficiency Service ("USDS"). *Id.* § 3(a). And under 5 U.S.C. § 3161, it established a "U.S. DOGE Service Temporary Organization" within the Executive Office of the President, to terminate on

July 4, 2026. *Id.* § 3(b). It also required agency heads to establish DOGE Teams within their agencies, which may include Special Government Employees ("SGEs"). *Id.* § 3(c).

The USDS E.O. directs USDS to collaborate with Executive agencies to modernize the government's technology and software infrastructure to increase efficiency and productivity and ensure data integrity. *Id.* § 4. To do so, the USDS E.O. directs USDS to work with relevant agency heads, and vice versa, to ensure that USDS has access to "unclassified agency records, software systems, and IT systems" to the "extent consistent with law." *Id.* § 4(b). At all times, the USDS E.O. instructs, USDS must "adhere to rigorous data protection standards." *Id.*

USAID established a "DOGE Team," *see* Ex. 26 ¶ 26 at J.R. 412–13 (citing USDS E.O., § 3(c)), comprising members detailed to USAID from other federal agencies, not USDS. *Id.* USAID DOGE Team members are treated as USAID employees, and report to USAID leadership, including Secretary Rubio and Acting Deputy Administrator Marocco. *Id.*

Elon Musk is an employee of the White House Office as a non-career SGE. *See* Decl. of Joshua Fisher ¶ 3 ("Fisher Decl."), Ex. 27 at J.R. 424. Mr. Musk is not an employee of the USDS or U.S. DOGE Service Temporary Organization and does not serve as the USDS Administrator, *id.* ¶ 6 at J.R. 425, but as a Senior Advisor to President Trump, *id.* ¶ 4 at J.R. 424. As a Senior Advisor, Mr. Musk has no greater authority than other senior White House advisors, *id.* ¶ 5 at J.R. 424–25, and like them, has no actual or formal authority to make government decisions himself; he can only advise the President and communicate the President's directives, *id.*

Consistent with section 3 of the USDS E.O., Acting Deputy Administrator Marocco sometimes consults or coordinates with USDS officials. Ex. 26 ¶ 25 at J.R. 412; *see Implementing the President's "Department of Government Efficiency" Workforce Optimization* Initiative, Exec. Order 14,210, 90 Fed. Reg. 9669, 9670 (Feb. 11, 2025). But he reports to Secretary Rubio and

President Trump, not Elon Musk or USDS.  Ex. 26 ¶ 25 at J.R. 412.  In addition, consistent with the USDS E.O., he consults with the DOGE Team on certain matters, including personnel.  *Id.* ¶ 27 at J.R. 413.  But along with Secretary Rubio, he retains ultimate authority over these decisions, and the DOGE Team "cannot legally direct [him] to do anything regarding personnel, funding, or the like."  *Id.*

Neither Mr. Musk nor USDS has any formal authority over Acting Deputy Administrator Marocco.  *See id.* ¶ 24 at J.R. 412.  Neither has the legal authority to direct him or anyone at USAID "regarding access to USAID data or systems; to alter or restore email communications; to manage personnel or take personnel actions; to take any action with respect to grants, contracts, and other agreements; or to take any other similar governmental actions."  *Id.*

## STANDARD OF REVIEW

"A preliminary injunction is an extraordinary remedy never awarded as of right," *Winter v. Nat'l Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008), and is "to be granted only sparingly and in limited circumstances," *MicroStrategy Inc. v. Motorola, Inc.*, 245 F.3d 335, 339 (4th Cir. 2001) (citation omitted).  To demonstrate entitlement to this "extraordinary remed[y]," the movant must make a "clear showing" that "(1) they are likely to succeed on the merits; (2) they will likely suffer irreparable harm absent an injunction; (3) the balance of hardships weighs in their favor; and (4) the injunction is in the public interest."  *League of Women Voters of N.C. v. North Carolina*, 769 F.3d 224, 236 (4th Cir. 2014) (*Winter*, 555 U.S. at 20).

## ARGUMENT

Plaintiffs have failed to meet their burden to obtain preliminary injunctive relief because (1) they have shown no likelihood of success on the merits of their claims because the Court lacks jurisdiction to hear them, and they are unlikely to succeed on the merits; (2) they have shown no

irreparable harm, as any alleged injuries are remediable following judgment; and (3) the balance

of the equities and public interest favor Defendants because the public has an interest in ensuring

that the Executive is allowed to take decisive action in the realm of foreign affairs.  For these

reasons, the Court should deny Plaintiffs' preliminary injunction motion.

## I.      PLAINTIFFS ARE NOT LIKELY TO PREVAIL ON THE MERITS

### A.      Plaintiffs Fail to Demonstrate Standing for the Relief They Seek

Plaintiffs lack Article III standing to obtain the relief they seek.  Their speculative fears

that individuals alleged to be affiliated with USDS or Mr. Musk will misuse their authorized access

to data housed in USAID's information systems present no cognizable injury, and the remaining

contract decisions and employment actions made by USAID officials—who again, are not

defendants in this suit against whom the Court could issue any order—are neither fairly traceable

to Defendants' conduct nor redressable by the relief they seek.

### 1.      Plaintiffs' speculative fears about possible misuse of USAID data do not create cognizable injury-in-fact

Plaintiffs must show that they have suffered an injury-in-fact—"actual or imminent, not

speculative" harm, "meaning that the injury must have already occurred or be likely to occur soon."

*FDA v. All. for Hippocratic Med.*, 602 U.S. 367, 381 (2024).  If the injury has not materialized, it

must be "certainly impending," "[a]llegations of *possible* future injury are not sufficient." *Clapper*

*v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013).  It also must be "concrete—that is, real, and not

abstract."  *TransUnion LLC v. Ramirez*, 594 U.S. 413, 424 (2021) (citations omitted).

Plaintiffs argue that certain individuals have access to "private, sensitive information"

housed within USAID's information technology systems and that this creates an injury in fact.  PI

Mem. at 21–23.  As another Court has recognized, however, "DOGE Team members are federal

government employees . . . who have a need for the" data they have been granted access "in the

performance of their duties." *AFL-CIO v. Dep't of Labor*, No. 1:25-cv-339, 2025 WL 542825, at

*2 (D.D.C. Feb. 14, 2025); *see also* Ex. 26 ¶ 24 at J.R. 412. And Plaintiffs have not explained

how that access is unauthorized or otherwise unlawful. Plaintiffs instead assert, without more, that

this *authorized* access to USAID data increases the risk that their personal data housed on those

systems will be misused *in the future*. *See* PI Mem. at 20–23. That is insufficient.

To be sure, "disclosure of private information" may cause cognizable harms. *TransUnion*,

594 U.S. at 425. But to show standing, Plaintiffs still must establish "physical, monetary, or

cognizable intangible harm traditionally recognized as providing a basis for a lawsuit in American

courts" from that disclosure. *Id.* at 427. Here, Plaintiffs' failure to show disclosure of any private

information held by USAID IT systems defeats standing because "the common law private torts

of disclosure of private facts" requires "publicity." *See I.C. v. Zynga, Inc.*, 600 F. Supp. 3d. 1034,

1048 (N.D. Cal. 2022); *see also TransUnion*, 594 U.S. at 434 n.6; *Hunstein v. Preferred Collection

& Mgmt. Servs., Inc.*, 48 F.4th 1236, 1240, 1245–50 (11th Cir. 2022) (en banc).

Plaintiffs' speculative fear that Defendants might misuse data is not a cognizable injury

either. As the Supreme Court has made clear, fear of future harm does not suffice for Article III

standing where that harm is not certainly impending. *Clapper*, 568 U.S. at 416.

### 2. Plaintiffs' other claimed injuries are neither caused by the Defendants nor redressable by the relief they seek

Plaintiffs also cannot show standing because their other alleged harms—the effects of

USAID contract, personnel, and grant decisions—are traceable only to the independent decisions

of governmental actors not before the Court and not redressable through the relief Plaintiffs seek

against Defendants here. "Traceability is established if it is likely that the injury was caused by

the conduct complained of and not by the independent action of some third party not before the

court." *Doe v. Va. Dep't of State Police*, 713 F.3d 745, 755 (4th Cir. 2013) (citation omitted).

And redressability requires that it is "likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Id.* (citation omitted). Both "become problematic when third persons not party to the litigation must act in order for an injury to arise or be cured." *Id.* Nor is the Government a monolith for these purposes. *See Murthy v. Missouri*, 603 U.S. 43, 69 (2024). Instead, traceability is not present where injuries are traceable to independent third-party government actors. *See Disability Rts. S.C. v. McMaster*, 24 F.4th 893, 901 (4th Cir. 2022).

Here, Plaintiffs' claimed injuries were caused by independent actions authorized by USAID and its leadership wielding their own power. Although Plaintiffs cite supposed actions across the whole of government, they are "current and former employees or contractors of" USAID and claim injury only from actions related to that agency. Compl. ¶ 3 (ECF No. 14); *see id.* ¶ 66; PI Mem. at 18–28. Yet every action cited was authorized by State or USAID officials, not by any Defendant here. Ex. 26 ¶¶ 22–23 at J.R. 412. Those independent acts of Secretary Rubio or Mr. Marocco—that is, authorizing and ordering the actions at issue—preclude standing. *See Frank Krasner Enters., Ltd. v. Montgomery Cnty.*, 401 F.3d 230, 235–36 (4th Cir. 2005).

To be sure, a plaintiff might show standing to challenge an intermediary actor if that actor's conduct creates a "determinative or coercive effect upon the action of someone else" who made the final decision but is not before the court. *Bennett v. Spear*, 520 U.S. 154, 169 (1997). *Bennett* held that a Biological Opinion issued by the Fish and Wildlife Service was likely to injure the plaintiffs, even though the actual decision-making agency—the Bureau of Reclamation—was "technically free to disregard the Biological Opinion and [to] proceed with [the] proposed action" albeit "at its own peril." *Id.* at 170. Fundamental to causation and redressability was the fact that the Biological Opinion "alter[ed] the legal regime to which the agency action is subject," and disregarding that opinion would have exposed the Bureau to "substantial civil and criminal

penalties." *Id.* at 169–70; *see Teva Pharms. USA, Inc. v. Azar*, 369 F. Supp. 3d 183, 200 (D.D.C. 2019). But Plaintiffs do not even attempt to show such a dynamic here. *See Alavarez v. Becerra*, No. 21-2317, 2023 WL 2908819, at *3 (4th Cir. Apr. 12, 2023) (unpublished opinion). Nor would they appear able to do so: Again, neither Mr. Musk nor USDS has any formal legal authority to direct actions at USAID; and so long as those USAID actions are the product of independent decisionmakers making their own decisions, then Plaintiffs cannot satisfy causation.

Similarly, the relief Plaintiffs seek against Mr. Musk and USDS would not redress any claimed injury. To make that finding, the Court need only look to the requested relief, which asks it to have Defendants direct USAID to reverse data access decisions; prevent destruction of property at USAID offices; prevent USAID from acting on any USAID "contracts, grants, cooperative agreements, loans, or other federal foreign assistance award"; and rescind other unspecified USAID actions. *See* PI Mem. at 29–30. Yet Defendants lack authority to "legally direct" USAID to do any of those acts. Ex. 26 ¶ 27 at J.R. 413. Should this Court order Defendants to "direct" something at USAID, Plaintiffs have offered "no reason" why USAID leadership would "be obliged to honor" those directives that hold no force. *Murthy*, 603 U.S. at 73 (citation omitted).

Finally, Plaintiffs' assertion of reputational injury from public statements about USAID operations and federal employees more generally satisfies neither causation nor redressability. *See* PI Mem. at 26–27; Compl. ¶ 66(d). Plaintiffs fail to link those harms to their claim that any Defendant is improperly exercising executive power. Nor do they explain how an order enjoining Mr. Musk or other USDS personnel from allegedly exercising such power would remedy any reputational harm. Indeed, Plaintiffs fail to establish that their requested relief with respect to Mr. Musk—a public figure whose large audience predates his government service—would have any effect on the reach or impact of his public statements.

**B.     Plaintiffs Are Not Likely To Prevail On Their Constitutional Claims**

**1.     Plaintiffs' Appointments Clause Claim (Count I) Lacks Merit**

The Appointments Clause of the Constitution prescribes the method for appointing officers of the United States.  U.S. Const. art. II, § 2, cl. 2.  Principal officers must be appointed by the President with Senate confirmation, while inferior officers may be appointed by the President alone, the courts of law, or the heads of Executive departments.  *Id.*  Individuals are officers, and thus must receive a constitutional appointment, when they occupy a continuing position that is vested with the authority to "exercis[e] significant authority pursuant to the laws of the United States."  *Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*, 561 U.S. 477, 506 (2010) (citation omitted).  Federal employees who do not meet these criteria "need not be selected in compliance with the strict requirements of Article II."  *Freytag v. Comm'r*, 501 U.S. 868, 880 (1991).

Plaintiffs' contention that Elon Musk is exercising powers reserved for principal officers is incorrect.  As the declaration of the Director of the Office of Administration Joshua Fisher explains, Mr. Musk is employed by the White House Office as a Special Government Employee who serves as a "Senior Advisor to the President."  Ex. 27 ¶¶ 3–5 at J.R. 424–25.  He wields *influence*, not *authority*—much like a Chief of Staff, White House Counsel, or any other such advisor.  And like any of those figures, he is simply not an "officer" at all.

At bottom, the Appointments Clause governs formal, not colloquial, power; and where someone does not occupy an office equipped with actual authority, he cannot be an "officer" of the United States.  An advisor does not become an officer, simply because the officer listens to his advice.  Once that premise is removed, Plaintiffs' constitutional claim collapses—as confirmed by the actual facts regarding USAID, which is the central focus of Plaintiffs' motion.

**a.**  An officer must exercise "significant authority pursuant to the laws of the United States."  *Freytag*, 501 U.S. at 881 (citation omitted).  But as the Fisher Declaration explains, Mr.

Musk is employed by the White House Office as an SGE who serves as a "Senior Advisor to the President." Ex. 27 ¶¶ 3–5 at J.R. 424–25. In that role, Mr. Musk "has no actual or formal authority to make government decisions himself" and "can only advise the President and communicate the President's directives." *Id.*; *see id.* ¶ 6 at J.R. 425 (explaining that Mr. Musk is not the USDS Administrator or an employee of USDS or the U.S. DOGE Service Temporary Organization).

For Appointments Clause purposes, that ends the inquiry. The Appointments Clause is concerned with the formal powers vested in an office, not an individual's perceived informal influence. *See*, *e.g.*, *Freytag*, 501 U.S. at 881 (looking to statute for office's "duties," and noting that court-appointed special masters are not officers in part because their "duties and functions are not delineated in a statute"). That a President's senior staff will often be able to influence policy, or that their views will command respect even from cabinet secretaries, has never been thought to transform them into principal officers requiring Senate confirmation. That holds as true when an advisor's portfolio covers "DOGE" as it does with respect to immigration, homeland security, or the economy.

Mr. Musk's purely advisory role to the President falls far short of what is required for the "significant authority" prong of officer status. Mr. Musk does not, for example, possess statutory or regulatory authority to issue "final decision[s]" that "bind[] the Executive Branch." *United States v. Arthrex, Inc.*, 594 U.S. 1, 23 (2021); *see also*, *e.g.*, *Braidwood Mgmt., Inc. v. Becerra*, 104 F.4th 930, 955 (5th Cir. 2024) (finding members of the U.S. Preventive Services Task Force to be principal officers when their recommendations carry "legally binding" effect by statute), *cert. granted*, 604 U.S. --- (Jan. 10, 2025). Nor can he "make policy" for the Executive Branch by virtue of any statutory or regulatory authority. *Designation of Acting Director of the Office of Management & Budget*, 27 Op. O.L.C. 121, 123 (2003). Indeed, Plaintiffs cite no statutory or

regulatory authority—none—granting binding legal effect to any recommendations made by Mr. Musk without the further approval and action of executive officers.

That is fatal. Indeed, across contexts, federal courts consistently have held that those acting in a purely advisory role do not exercise "significant authority" and do not qualify as officers.

Foremost, courts have long recognized that the President is entitled to his choice of senior advisors—who can help him execute his agenda—without having to seek approval from Congress. "Article II not only gives the President the ability to consult with his advisers confidentially, but also, as a corollary, it gives him the flexibility to organize his advisers and seek advice from them as he wishes." *Ass'n of Am. Physicians & Surgeons, Inc. v. Clinton*, 997 F.2d 898, 909 (D.C. Cir. 1993). The President can of course direct duly appointed officers of the United States (including Senate-confirmed Department Heads) to take all manner of actions permitted under their relevant statutory authorities. "Agency policymaking is not a rarified technocratic process, unaffected by political considerations or the presence of Presidential power." *Department of Commerce v. New York*, 588 U.S. 752, 781 (2019). And in doing so, the President may choose to rely on a close advisor to identify actions for these officers to take. The President's choice to rely on such advice before making an ultimate decision does not transform an advisor into an officer of the United States who exercises "significant authority" in his own right. And, likewise, the President may act through his advisors and other non-officers when communicating his decisions.

This tracks longstanding historical practice. Since at least the time of President Andrew Jackson, "Presidents have created advisory groups composed of private citizens . . . to meet periodically and advise them (hence the phrase 'kitchen cabinets')." *Ass'n of Am. Physicians*, 997 F.2d at 908. President Lyndon Johnson, for instance, "often sought advice" from both private citizens and sitting Supreme Court Justice Abe Fortas "on matters concerning the Vietnam War."

*Id.* at 908 n.8. Similarly, Edward House served as a close advisor to President Woodrow Wilson for many years, serving as the President's right hand both before and after the First World War and—as Wilson himself stated—being "the only person in the world with whom I can discuss everything." Margaret MacMillan, *Paris 1919*, at 17–18 (2001).

Likewise, when President Bill Clinton established a task force on health care reform, the D.C. Circuit had little trouble concluding that the First Lady "[wa]s not a government official" despite her role on the task force—she was instead one of the President's "closest advisers." *Ass'n of Am. Physicians*, 997 F.2d at 910. Judge Buckley elaborated on that conclusion, explaining that the First Lady did not serve as a constitutional officer under Article II. *Id.* at 920 (Buckley, J., concurring in the judgment). Although the Presidents' spouses have provided "undoubted value" in advising the Presidents, "it cannot be said that they have occupied an office with duties," and in this case the First Lady's actions "carrie[d] none of the indicia of a federal officer." *Id.* Thus, under "any fair interpretation of the term, Mrs. Clinton [wa]s not an officer of the United States," despite her influential role as an advisor. *Id.*

More broadly, drawing on the same principles, it has long been understood that those who occupy advisory roles do not wield "authority" in a manner that could make them an officer. For instance, when Congress created the Commission on the Bicentennial of the Constitution, it allowed the President to appoint several officers to that Commission, but Congress "specifically designate[d]" two of its members to serve on the Commission as well. *Appointments to the Commission on the Bicentennial of the Constitution*, 8 Op. O.L.C. 200, 200 (1984) ("*Bicentennial Appointments*"). That structure raised constitutional concerns, as members of Congress may not "be appointed to any civil Office under the Authority of the United States." U.S. Const. art. I, § 6, cl. 2. The Reagan Administration's Department of Justice explained that the practical solution to

this concern would be to establish "an executive committee" composed of the Commission's properly appointed executive officers who could approve "binding regulations, sign[] legal instruments," and otherwise "discharg[e] the purely executive functions of the Commission." *Bicentennial Appointments*, 8 Op. O.L.C. at 207.  The congressional members of the Committee would be limited to "advisory functions" that would allow them to participate in designing "programs that would be technically approved and executed by non-congressional members." *Id.* By limiting the congressional members to a purely advisory role, they would not thereby become "'officers' of the United States." *Id.*

The Obama Administration re-affirmed this constitutional understanding in 2010, explaining that congressional members on a similar commission could serve an advisory role to properly appointed officers, who would then "technically approve[] and execute[]" the Commission's functions.  *Administration of the Ronald Reagan Centennial Commission*, 34 Op. O.L.C. 174, 175 (2010).  Here, the Fisher Declaration confirms that Mr. Musk serves in a similar capacity: The President and other executive officers may "choose to consult with and receive advice from" Mr. Musk, but the President and constitutionally appointed officers "alone would be responsible for exercising significant executive authority." *Id.* at 180.

In short, the Appointments Clause turns exclusively on hard—not soft—power.  But here, Mr. Musk has "no actual or formal authority to make government decisions himself." Ex. 27 ¶ 5 at J.R. 424–25.  Instead, he "can only advise the President and communicate the President's directives." *Id.*  Mr. Musk thus lacks any of the comparable authority wielded by constitutional officers, *cf. Lucia v. SEC*, 585 U.S. 237, 248 (2018); *Arthrex*, 594 U.S. at 23; *Braidwood*, 104 F.4th at 955, and merely serves in an advisory role as is permitted by non-officers such as Members of Congress and close advisors to the President.  Because Mr. Musk does not exercise authority—

let alone "significant authority"—he is not a constitutional officer and Plaintiffs' Appointments Clause claim fails.

**b.**  Plaintiffs' primary response is that Mr. Musk has "directed" certain actions at various agencies, and that he must be an officer, because those individuals allegedly listened to him, and wielded their power accordingly.  *See* PI Mem. at 10–11, 13.  But that is flawed at every turn.

Again, Mr. Musk does not have—and Plaintiffs have cited no source showing—any independent legal authority to command anyone to do anything.  Accordingly, *even if* Mr. Musk advised, recommended, or indeed "directed" certain actions across multiple agencies, that still would not give rise to an Appointments Clause problem.  That is because the actual legal authority for such actions is not vested in Mr. Musk, but instead in the actual decisionmakers making those decisions.  The *sine qua non* of an Appointments Clause challenge is a governmental action taken by a governmental actor without proper authority.  But here, Plaintiffs have not identified a single example fitting this mold.  All of the actions that they generally complain about—*e.g.*, firings, grant terminations, dispositions of government property—involve discrete legal actions effectuated by identifiable legal instruments and approved by agency officials.  Put simply, what is needed for an Appointments Clause challenge is an argument that the signature at the bottom of one of those instruments is from someone who *lacked the authority* to make that decision.  Plaintiffs offer none.

Indeed, one of Plaintiffs' own cited cases underscores their claim's core defects.  In *Andrade v. Regnery*, the D.C. Circuit rejected an Appointments Clause challenge asserted in an employment removal action.  824 F.2d 1253, 1256–57 (D.C. Cir. 1987).  The plaintiffs argued that an official not validly appointed as an officer of the United States "had complete responsibility for crafting and executing" their terminations.  *Id.* at 1257.  The court explained that, even if true, that

fact was irrelevant: "it does not offend the Appointments Clause so long as the duly appointed official has final authority over the implementation of the governmental action." *Id.* That principle applies here: Even assuming that Mr. Musk or USDS employees "conceive[d of] and even carr[ied] out policies" to which Plaintiffs object, there is no Appointments Clause violation because duly appointed agency heads ultimately "take official responsibility" for those actions. *Id.* Mr. Musk does not have formal decision-making authority, and thus political accountability for those actions lies with the individuals authorized to undertake them.

Once more, an Appointments Clause challenge involves a discrete legal wrong: Someone using the powers of an office, without proper appointment. Plaintiffs do not identify a single example of that. Of course, they insist that a number of governmental actions were done *for the wrong reasons—i.e.*, at the pressure of Elon Musk, or some amorphous "DOGE" entity. But even if that were true, such actions do not violate the Appointments Clause. Plaintiffs' claim is essentially that USAID decisionmakers were influenced by external pressures, not that those decisionmakers lacked the power to take the challenged actions in the first place. That claim states no constitutional defect.

**c.** The Plaintiffs' claim thus rests on a fundamental misunderstanding of the Appointments Clause, which is more than enough to reject it. But it also rests on a fundamental misunderstanding of the facts on the ground in connection with USAID.

Plaintiffs' motion focuses specifically on USAID. *See* PI Mem. at 3. Marocco has been performing the duties and functions of the Acting Deputy Director of USAID since January 30, 2025. Ex. 26 ¶ 2 at J.R. 403. The Marocco Declaration reviews various USAID actions that allegedly have injured Plaintiffs, including the revoking or granting of access to USAID property and systems and decisions whether to terminate or retain employees, and it explains that each was

taken by or at the direction of Secretary Rubio (serving as Acting USAID Administrator) or Marocco himself. *Id.* ¶¶ 10–23 at J.R. 408–12. Mr. Marocco explains that neither Mr. Musk nor USDS has any formal authority over him and neither has the legal authority to direct him or anyone at USAID regarding access to USAID data or systems; to manage personnel or take personnel actions; to take any action with respect to grants, contracts, and other agreements; or to take any other similar governmental action. *Id.* ¶ 24 at J.R. 412.

Mr. Marocco further explains that the DOGE Team within USAID are not employed by USDS. *Id.* ¶ 26 at J.R. 412–13; *see* USDS E.O. § 3(c) (making each "Agency Head" responsible for "establish[ing] within their respective Agencies a DOGE Team" and directing that each Agency Head "shall select the DOGE Team members" in consultation with the USDS Administrator). Rather, members of the DOGE Team within USAID have each been detailed to USAID from other federal agencies (not USDS) and are subject to the supervision and control of USAID's politically accountable leadership in the performance of their USAID duties. Ex. 26 ¶ 26 at J.R. 412–13. The complained-of actions within USAID have been taken by USAID's leadership in the exercise of that agency's organic authorities. *Id.* ¶ 23 at J.R. 412; *see also* USDS E.O. § 5(a) (specifying nothing in the USDS E.O. shall "impair or otherwise affect" the "authority granted by law to an executive department or agency, or the head thereof"). DOGE Team Leads within agencies, including USAID, "coordinate their work" with USDS and "advise their respective Agency Heads on implementing the President's DOGE Agenda." *Id.* § 3(c).

In short, the ultimate authority for actions within USAID rests with USAID leadership; and the actions that Plaintiffs complain about here were the product of those leaders exercising their own authority. Plaintiffs may object to those actions, or insist they violate some other legal limit. But whatever the merit of those objections (*contra Am. Foreign Serv. Ass'n v. Trump*, No. 1:25-

cv-352, 2025 WL 573762 (D.D.C. Feb. 21, 2025)), those are not problems sounding in the Appointments Clause.

**d.** Plaintiffs' claim also fails for an independent reason: They have not shown that Mr. Musk occupies any continuing office. *See Lucia*, 585 U.S. at 245 ("[A]n individual must occupy a 'continuing' position established by law to qualify as an officer."). The Supreme Court has explained that the term "office" "embraces the ideas of tenure, duration, emolument, and duties." *United States v. Hartwell*, 73 U.S. (6 Wall.) 385, 393 (1867); *accord United States v. Germaine*, 99 U.S. 508, 511–12 (1878); *Auffmordt v. Hedden*, 137 U.S. 310, 326–27 (1890). Those factors show that Mr. Musk's position as a "Senior Advisor to the President" is not a continuing office.

To be a continuing office, the position must not be "personal to a particular individual." *United States v. Donziger*, 38 F.4th 290, 297 (2d Cir. 2022). Here, there is no indication that Mr. Musk's role as a "Senior Advisor to the President" will outlast his tenure. *See United States v. Maurice*, 26 F. Cas. 1211, 1214 (C.C.D. Va. 1823) (Marshall, Circuit Justice) (explaining that an office has "duties [that] continue, though the person be changed"). Indeed, Presidents have long selected advisors based on their "identity"—and thus "who cannot simply be replaced" by others— precisely because the President depends on those advisors' personalized advice and judgment. *Donziger*, 38 F.4th at 297. That makes Mr. Musk's advisory role *personal*, not *permanent*. *Cf. Germaine*, 99 U.S. at 512 (holding that a civil surgeon was not an officer in part because he served at his superior's pleasure "to procure information needed to aid in the performance of his own official duties," and the superior could "appoint one or a dozen persons to do the same thing").

Moreover, Mr. Musk is a non-career SGE, Ex. 27 ¶ 3 at J.R. 424, a status that lacks the duration characteristic of an office. As defined by statute, SGEs are necessarily time-limited in their service. *See* 18 U.S.C. § 202. That stands in contrast to the administrative law judges in

*Lucia*, for example, who "receive[d] a career appointment." 585 U.S. at 248 (citation omitted). While some nonpermanent positions can qualify as offices, *see Morrison v. Olson*, 487 U.S. 654, 671 n.12 (1988), the limited duration of Mr. Musk's SGE status indicates that his position is not an office. *Cf. Special Government Employee Serving as Paid Consultant to Saudi Company*, 40 Op. O.L.C. 1, 8–9 (2016) (SGE "d[id] not appear to hold the essential features of a federal office— in particular, 'tenure,' 'duration,' and 'continuous duties'"). Plaintiffs have failed to establish that Mr. Musk's position falls within the bounds of an office under the Appointments Clause.

## 2.  Plaintiffs' Separation of Powers Claim (Count II) Lacks Merit

Plaintiffs argue that Defendants' supposed "collective actions" violated the principle of the separation of powers. PI Mem. at 14–17. Much of that claim is inseparable from Plaintiffs' Appointments Clause claim and thus fails for the same reasons. *See supra* Section I.B.1.

Plaintiffs' argument that USAID actions pausing foreign aid, placing employees on administrative leave, or terminating personal service contractors violate separations of powers principles relies entirely on an alleged conflict with statutes. *See* PI Mem. at 15–17 (citing Foreign Service Reform and Restructuring Act of 1998 and Further Consolidated Appropriations Act of 2024). But Plaintiffs cannot turn an otherwise straightforward claim that the Executive Branch has exceeded its statutory authority into a constitutional issue merely by asserting that an alleged failure to adhere to a statute encroaches on Congress's Article I powers. *See Am. Foreign Serv. Ass'n*, 2025 WL 573762, at *11 (denying preliminary injunction in "challenge [to] a sweeping scheme to dismantle an entire agency" where "their only ripe theories of harm fundamentally rely on their members' employment relationship with USAID"). As the Supreme Court explained in *Dalton v. Specter*, permitting a plaintiff to assert a separation-of-powers claim in such a case would "eviscerate[e]" the well-established "distinction between claims that an official exceeded his statutory authority, on the one hand, and claims that he acted in violation of the Constitution." 511

U.S. 462, 474 (1994). The Court in *Dalton* thus squarely rejected the proposition that "whenever the President acts in excess of his statutory authority, he also violates the constitutional separation-of-powers doctrine." *Id.* at 471.

Nor can Plaintiffs evade the threshold requirements of what amounts to an Administrative Procedure Act ("APA") claim that a government actor has exceeded statutory authority by recasting it as a constitutional challenge. Plaintiffs do not invoke the APA, because it authorizes a challenge only to "final agency action," 5 U.S.C. § 704, not "a 'broad programmatic attack'" on the way the Executive Branch conducts its operations. *City of N.Y. v. U.S. Dep't of Def.*, 913 F.3d 423, 431 (4th Cir. 2019) (citation omitted). That limitation is itself "vital to the APA's conception of the separation of powers" because courts "are woefully ill-suited" to "adjudicate generalized grievances asking [them] to improve an agency's performance or operations" or "to engage in day-to-day oversight of the executive's administrative practices." *Id.* Yet that is precisely what Plaintiffs' separation-of-powers claim contemplates. *See* Compl. ¶¶ 80–82.

More, USAID is not even a party to this case against whom a remedy can run. But in any case, USAID's pause on foreign aid and the other actions complained of fit well within the President's Article II authority. Contrary to Plaintiffs' arguments, *see* PI Mem. at 17, Article II and existing law grants the President authority to review foreign aid and government operations to ensure that the United States' provision of foreign aid is consistent with its policy values and conducted efficiently. *See supra* pp. 2–5. While the Executive is "not free from the ordinary controls and checks of Congress merely because foreign affairs are at issue," *Zivotofsky ex rel. Zivotofsky v. Kerry*, 576 U.S. 1, 21 (2015), the "historical gloss on the 'executive Power' vested in Article II of the Constitution has recognized the President's 'vast share of responsibility for the conduct of our foreign relations,'" *Am. Ins. Ass'n v. Garamendi*, 539 U.S. 396, 414 (2003) (quoting

*Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 610–11 (1952) (Frankfurter, J., concurring)).  Thus, "in foreign affairs the President has a degree of independent authority to act." *Id.*; *see also United States v. Curtiss-Wright Exp. Corp.*, 299 U.S. 304, 320 (1936) (The President's power in the field of international relations "does not require as a basis for its exercise an act of Congress."); *Youngstown*, 343 U.S. at 635–36, n.2 (the President can "act in external affairs without congressional authority").  The upshot is that Article II affords the President tremendous discretion over foreign affairs, including with respect to the actions at issue here.

## II.   PLAINTIFFS FAIL TO DEMONSTRATE THAT IRREPARABLE HARM WOULD RESULT IN THE ABSENCE OF A PRELIMINARY INJUNCTION

Even if Plaintiffs could show likelihood of success, their motion should be denied because they cannot show irreparable harm absent preliminary relief.  A party moving for a preliminary injunction must show not "just a 'possibility' of irreparable harm[,]" *Di Biase v. SPX Corp.*, 872 F.3d 224, 230 (4th Cir. 2017), but harm that is likely and "neither remote nor speculative, but actual and imminent." *Scotts Co. v. United Indus. Corp.*, 315 F.3d 264, 283 (4th Cir. 2002).

### A.   Fear and Emotional Distress

Plaintiffs first assert that Defendants' actions have "left numerous Plaintiffs to fear for their physical safety" and "inflicted upon all Plaintiffs severe emotional distress . . ." PI Mem. at 18. Plaintiffs' declarations describe their anxiety surrounding their employment status and physical safety.  But Plaintiffs' "claimed emotional injuries, as presented, do not rise to the level of irreparable harm." *See Dall. Safari Club v. Bernhardt*, 453 F. Supp. 3d 391, 399 (D.D.C. 2020). First, their emotional-injury claims stem substantially from their employment status. Ex. 6 at J.R. 243 ("I am distressed that I may lose my job without access to my salary, healthcare, and housing.").  But "the fact that an employee may be psychologically troubled by an adverse job action does not usually constitute irreparable injury warranting injunctive relief." *Together Emps.*

*v. Mass Gen. Brigham Inc.*, 32 F.4th 82, 86 (1st Cir. 2022) (citation omitted).  That is because "[t]he possibility that adequate compensation or other corrective relief will be available at a later date, in the ordinary course of litigation, weighs heavily against a claim of irreparable harm." *Sampson v. Murray*, 415 U.S. 61, 90 (1974).  Some Plaintiffs allude to emotional distress due to "Defendants' egregious conduct in shutting USAID workers out of their offices with no notice or opportunity to collect personal belongings . . ."  PI Mem. at 20.  They contend that "[t]here is no way to compensate J. Doe 1 . . . for their personal belongings that have non-monetary sentimental value." *Id*.  But even if this is more than just recast employment-related harms, Plaintiffs make no showing that such harms are genuinely irreparable, or that they are both "certain and great."  *Defy Ventures, Inc. v. U.S. Small Bus. Admin.*, 469 F. Supp. 3d 459, 480 (D. Md. 2020).

Second, certain Plaintiffs' subjective fears about their physical safety fare no better. Although J. Does 6 and 12 claim that they are locked out of USAID systems, PI Mem. at 19, neither articulates any specific threat to their physical safety.  *See generally* Ex. 4 at J.R. 233–34, Ex. 7 at J.R. 245–49.  Indeed, J. Doe 12's declaration indicates that they still have access to USAID's emergency notification system through a personal account.  Ex. 7 at J.R. 246.  And USAID has stated that it will work to restore access to any employee or PSC whose access was terminated in error.  Ex. 26 ¶ 15 at J.R. 410; *see Am. Foreign Serv. Ass'n*, 2025 WL 573762, at *5–6.  Plaintiffs also assert that "Defendants' public disparagement of USAID has predictably incited third-party animus against its workers[,]"  PI Mem. at 19, further alleging that "Defendants are now actually *publishing the personal information of terminated USAID PSCs, including links to their addresses*, on a DOGE-specific page." *Id.* (citing Ex. 20 at J.R. 381).  But no Plaintiff claims that their own personal information has been published.  And these fears of third-party animus are plainly too speculative to give rise to irreparable harm because Plaintiffs provide no

evidence of any credible safety risk. *See Winter*, 555 U.S. at 22; *Direx Israel, Ltd. v. Breakthrough Med. Corp.*, 952 F.2d 802, 816 (4th Cir. 1991). Moreover, the website that Plaintiffs cite, *see* Ex. 20 at J.R. 381, appears to publish publicly available information from the Federal Procurement Data System ("FPDS") website. *See Ekagra Partners, LLC v. United States*, 170 Fed. Cl. 1, 42 (2024) ("FPDS is a comprehensive, web-based tool for agencies to report contract actions and remains the authoritative source for procurement data.").

### B.  Access to Sensitive Information

Next, Plaintiffs claim irreparable harm from Defendants' alleged access to sensitive information including their "personnel, medical, and security clearance files." PI Mem. at 22. Plaintiffs speculate that Defendants could release this sensitive information to the public to threaten or harass Plaintiffs. *Id*. at 22–23.

Those contentions fall well short of showing irreparable harm. At the outset, Plaintiffs' assertion that Defendants "have unlawfully breached USAID's systems and misappropriated Plaintiffs' information," *Id.* at 24, is wrong. The USDS E.O. authorizes USDS to receive "full and prompt" access to USAID's systems. USDS E.O. § 4(b); *see also* Ex. 26 ¶ 26 at J.R. 412–13. Moreover, the D.C. District Court recently denied a TRO in a similar case involving DOGE Team access to agency data because assertions of potential future misuse of such data were "entirely conjectural." *Univ. of Cal. Student Assoc.* ("*UCSA*") *v. Carter*, No. 25-cv-354-RDM, 2025 WL 542586, at *6 (D.D.C. Feb. 17, 2025). As the court observed, the plaintiffs provided no evidence "beyond sheer speculation, that would allow the Court to infer that [the agency] or DOGE [Team] will misuse or further disseminate this information." *Id*. So too here. Plaintiffs chiefly protest Defendants' alleged unrestricted access to USAID's systems. PI Mem. at 24. But that is not enough for irreparable harm. *See UCSA*, 2025 WL 542586, at *6 ("UCSA . . . cites no authority

for the proposition that mere 'access' to personal data by government employees who are not formally authorized to view it, without more, creates an irreparable injury.").

Critically, Plaintiffs cite no evidence to support their allegation that Defendants have purloined sensitive USAID information for nongovernmental purposes. Plaintiffs' allegations that Defendants are *likely* to misuse USAID's sensitive information—such as by releasing it to the public for the purpose of threatening or harassing Plaintiffs—are entirely speculative. Although Plaintiffs cite to various declarations to show their fear and anxiety of "doxxing" threats, PI Mem. at 22–23, they fail to provide any evidence of a *likelihood* of such a threat and further fail to draw a connection to Defendants' access to USAID's systems. *See Simmons v. Poe*, 47 F.3d 1370, 1382 (4th Cir. 1995) ("a future or conjectural threat of injury is insufficient to justify injunctive relief").

Finally, Plaintiffs cite to some cases that purport to stand for the proposition that the breach, misappropriation, or disclosure of personal data can constitute irreparable harm. PI Mem. at 24–25. Those cases are inapposite because there is no merit to the premise that Defendants unlawfully breached USAID's system. As noted, the USDS E.O. directs Defendants to be given full access to U.S. government systems and data. And, again, Plaintiffs provide no evidence to show that Defendants publicly disclosed or otherwise misused any of their information.

### C. Reputational and Constitutional Injuries

Plaintiffs assert that, "[a]s a direct result of Defendants' unconstitutional conduct, Plaintiffs face significant reputational harm." PI Mem. at 26. But they show no evidence of actual—or likely—reputational injury. No Plaintiff testifies that they have personally suffered—or will likely suffer—any reputational harm. Seemingly recognizing this hurdle, Plaintiffs insist, without legal support, that "[i]t is not necessary for Defendant Musk to single out specific Plaintiffs by name in his digital diatribes," and argue that such reputational harms "leveled against *all* USAID personnel

are sufficient to permanently stain the employment record of these Plaintiffs." *Id*. at 27.  But those reputational harms are clearly connected to "standard employment harms" and, therefore, are insufficient to demonstrate irreparable injury.  *Am. Foreign Serv. Ass'n*, 2025 WL 573762, at *5. Moreover, Plaintiffs' argument that a collective reputational injury suffices here is at odds with decisions that have held that harms to third parties do not satisfy the irreparable harm requirement. *See*, *e.g.*, *Church v. Biden*, 573 F. Supp. 3d 118, 146 (D.D.C. 2021).

Finally, Plaintiffs contend that the claimed Appointments Clause violation, standing alone, constitutes irreparable harm.  PI Mem. at 27.  But the D.C. Circuit has squarely rejected that claim. *See Alpine Sec. Corp. v. FINRA*, 121 F.4th 1314, 1334 (D.C. Cir. 2024) ("an unconstitutionally appointed officer is not, without more, an injury that necessitates preliminary injunctive relief. And Alpine has not asserted anything more." (citation omitted)).

## III.    THE BALANCE OF EQUITIES, INCLUDING THE PUBLIC INTEREST, DOES NOT FAVOR A PRELIMINARY INJUNCTION

The final two factors, balance of equities and the public interest, also favor Defendants. *See Nken v. Holder*, 556 U.S. 418, 434–435 (2009).  Plaintiffs make no serious effort to explain otherwise, but collapse their arguments into the merits, positing that the public interest cuts against the government sustaining unlawful action.  *See* PI Mem. at 28.  Defendants' actions are *not* unlawful.  Regardless, the Supreme Court has made clear that considering only likelihood of success is insufficient to justify emergency injunctive relief.  *See*, *e.g.*, *Winter*, 555 U.S. at 23–24. Rather, it is Plaintiffs' proposed injunction that would harm the public interest.  *See Kim v. FINRA*, 698 F. Supp. 3d 147, 172 (D.D.C. 2023) ("[A] court can deny preliminary injunctive relief solely on the balance of equities and public interest factors even in cases, like this, involving constitutional claims."), *appeal dismissed*, 2025 WL 313965 (D.C. Cir. 2025).  The public has an interest in permitting the President to take decisive action when it comes to foreign affairs.  *Curtiss-*

*Wright*, 299 U.S. at 319–20.  Here, the President has determined that the "foreign aid industry and

bureaucracy are not aligned with American interests and in many cases antithetical to American

values," and that such work "serve[s] to destabilize world peace by promoting ideas in foreign

countries that are directly inverse to harmonious and stable relations internal to and among

countries."  *See* Exec. Order 14,169, § 1, 90 Fed. Reg. 8619.  Preliminary relief would displace

and frustrate the President's decision about how to best address that threat to foreign affairs, and

the Court must give deference to the Executive Branch's "evaluation of the facts" and the

"sensitive and weighty interests of national security and foreign affairs," *Holder v. Humanitarian*

*L. Project*, 561 U.S. 1, 33–34 (2010), including "the timing of those . . . decisions."  *Holy Land*

*Found. for Relief & Dev. v. Ashcroft*, 219 F. Supp. 2d 57, 74 n.28 (D.D.C. 2002), *aff'd*, 333 F.3d

156 (D.C. Cir. 2003).  Preliminary relief would also raise serious separation-of-powers concerns

by impeding the President's ability to rely on non-officer advisors.  Because the public has an

interest in the executive branch effectuating foreign affairs, and in the President being able to rely

on advisors, this final factor tips in favor of Defendants.  *See Kim*, 698 F. Supp. 3d at 172.

## IV.    ANY INJUNCTIVE RELIEF SHOULD BE LIMITED TO THE PLAINTIFFS

Even if Plaintiffs could satisfy the preliminary injunction factors, the nationwide relief they

seek would be inappropriate.  Plaintiffs are certain unidentified USAID employees, PSCs, and

other contractors, yet they seek a nationwide preliminary injunction that would apply to all USAID

employees and PSCs—including those not represented in this case.  *See*, *e.g.*, Pls' Proposed Order

¶ 2 (directing Defendants to "reinstate access to email, payment, security notification, and other

systems for *all* USAID employees and PSCs within 24 hours") (emphasis added).

Both constitutional and equitable principles require that injunctive relief be limited to

redressing Plaintiffs' own cognizable injuries.  Article III demands that "'plaintiffs must

demonstrate standing for each claim that they press,' against each defendant, 'and for each form of relief that they seek." *Murthy*, 603 U.S. at 61 (citation omitted). "The remedy" sought must "be limited to the inadequacy that produced the injury in fact that the plaintiff has established." *Lewis v. Casey*, 518 U.S. 343, 357 (1996). "The actual-injury requirement would hardly serve [its] purpose . . . . of preventing courts from undertaking tasks assigned to the political branches[,] if once a plaintiff demonstrated harm from one particular inadequacy in government administration, the court were authorized to remedy all inadequacies in that administration." *Id.* And equitable principles independently require that an injunction "be no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs." *Madsen v. Women's Health Ctr., Inc.*, 512 U.S. 753, 765 (1994) (citation omitted). Accordingly, any injunctive relief in this case should be limited to addressing only the claims of the Plaintiffs and go no further.

Were the Court inclined to grant Plaintiffs' requested relief, Defendants request that (1) pursuant to Fed. R. Civ. P. 65(a)(2), the Court consolidate the preliminary injunction motion with a final determination on the merits, *see Hess v. Hughes*, 500 F. Supp. 1054, 1056 (D. Md. 1980); (2) any injunctive relief be stayed pending the disposition of any appeal that is authorized, or at minimum be administratively stayed for a period of seven days to allow the Defendants to seek an emergency, expedited stay from the court of appeals, if an appeal is so authorized; and (3) any injunctive relief accompany a bond under Fed. R. Civ. P. 65(c). Requiring Plaintiffs to post security for any taxpayer funds wrongfully distributed during the pendency of any preliminary relief is appropriate here given that such relief would potentially mandate that the Executive spend money that may not be recouped once distributed.

**CONCLUSION**

Plaintiffs' motion for a preliminary injunction should be denied.

Dated: February 24, 2025       Respectfully submitted,

                                 YAAKOV M. ROTH
                                 Acting Assistant Attorney General

                                 DIANE KELLEHER
                                 Director, Federal Programs Branch

                                 CHRISTOPHER R. HALL
                                 Assistant Branch Director, Federal Programs Branch

                                 JOSHUA E. GARDNER (FL Bar No. 302820)
                                 *By Special Appearance*
                                 Special Counsel

                                 */s/Jacob S. Siler*
                                 JACOB S. SILER (DC Bar No. 1003383)
                                 *By Special Appearance*
                                 Trial Attorney
                                 U.S. Department of Justice
                                 Civil Division, Federal Programs Branch
                                 1100 L Street NW
                                 Washington, DC 20005
                                 Phone: (202) 353-4556
                                 Email: jacob.s.siler@usdoj.gov

                                 *Attorneys for Defendants*