No. 25-1273

In the United States Court of Appeals for the Fourth Circuit

———————

J. DOES 1-26,
*Plaintiffs-Appellees*,
*v.*
ELON MUSK, IN HIS OFFICIAL CAPACITY, UNITED STATES DOGE SERVICE AND THE DEPARTMENT OF GOVERNMENT EFFICIENCY,
*Defendants-Appellants.*

———————

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

———————

**BRIEF OF PLAINTIFFS-APPELLEES J. DOES 1-26 IN OPPOSITION TO AN ADMINISTRATIVE STAY OR STAY PENDING APPEAL**

———————

Mimi Marziani*
Rebecca (Beth) Stevens*
Joaquin Gonzalez*
MARZIANI, STEVENS & GONZALEZ PLLC
1533 Austin Highway
Suite 102-402
San Antonio, TX 78218
(212) 343-5604
mmarziani@msgpllc.com
bstevens@msgpllc.com
jgonzalez@msgpllc.com

Norman L. Eisen*
Tianna J. Mays*
Pooja Chaudhuri
STATE DEMOCRACY DEFENDERS FUND
600 Pennsylvania Avenue SE
Suite 15180
Washington, D.C. 20003
(202) 594-9958
norman@statedemocracydefenders.org
tianna@statedemocracydefenders.org
pooja@statedemocracydefenders.org

*admissions application forthcoming*

*Counsel for Plaintiffs-Appellees*

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ...............................................................................1

BACKGROUND ...................................................................................................2

    I.  Factual Background...................................................................................2

    II.  Procedural History....................................................................................7

ARGUMENT .........................................................................................................9

    I.  Defendants-Appellants Have Not Shown Likelihood of Success
        on the Merits............................................................................................10

        A.  The District Court Correctly Held that Musk Acted as an
             "Officer" in Violation of the Appointments Clause.............................10

        B.  The District Court Correctly Held that the Decision to
             Dismantle USAID Likely Violated the Separation of Powers.............16

        C.  The Court Should Defer to the District Court's Determination
             as to the Necessary Scope of the Injunction........................................20

    II.  Irreparable Harm and the Balance of Equities Also Do Not Favor
        a Stay.......................................................................................................22

CONCLUSION .....................................................................................................23

## PRELIMINARY STATEMENT

Since shortly after President Trump's inauguration, Elon Musk, an unelected and unappointed person, has exercised sweeping operational control over multiple federal agencies, gutting some and dismantling others. The United States Agency for International Development ("USAID") is one such agency that Musk made it his mission to personally "feed[] … into the wood chipper," despite it having been created and funded by Congress. He and others associated with his enterprise, the Department of Government Efficiency ("DOGE"), have been carrying out that mission: closing USAID headquarters, firing USAID employees and contractors, seizing USAID technology, and dismantling the agency in disregard of separation of powers principles. Despite wielding more power in practice than any other member of the Executive Branch beyond the President himself, Musk has never been appointed in accordance with the Appointments Clause of the Constitution, a provision designed by the Framers to preserve the political accountability of the Executive Branch.

Plaintiffs-Appellees, current and recently terminated USAID employees and contractors who were harmed by Musk's abrupt decision to dismantle the agency, brought this civil action against Musk and DOGE to enjoin his unconstitutional attacks on USAID. After thoroughly reviewing an extensive factual record, the District Court issued a carefully reasoned opinion granting "narrow emergency

relief" to Plaintiffs-Appellees based on its factual conclusion that Musk himself had decided to dismantle USAID, and that his decision violated both the Appointments Clause and the separation of powers. The District Court also recently confirmed the scope of the preliminary injunction after Defendants-Appellants requested relief from it.

Defendants-Appellants filed an emergency motion requesting the extraordinary remedy of an administrative stay and stay pending appeal. The Court should deny their motion and should not second guess the injunction's scope, which the District Court concluded was necessary to prevent its circumvention.

## BACKGROUND

This matter comes to the Court following discovery and extensive fact finding by the District Court as detailed below.

### I. Factual Background

On November 12, 2024, President-elect Trump announced his intent to create a new Department of Government Efficiency led by "the Great Elon Musk." Opinion ("Op.") at 2, No. 25 Civ. 462 (D. Md.), ECF 73. Upon his inauguration, President Trump established the United States DOGE Service ("USDS") within the Executive Office of the President to "implement the President's DOGE Agenda," including to "maximize governmental efficiency and productivity." *Id.* (cleaned up).

President Trump has identified Elon Musk as DOGE's leader, answering

directly to the President. Op.3-4. Musk has attended Executive Branch cabinet meetings, spoken at press conferences from the Oval Office, and has an office in the White House compound. *See id.*; Joint Record ("J.R.") 60, 25 Civ. 462 (D. Md.), ECF 37. Despite contending he has no affiliation with DOGE, the District Court found that the record establishes Musk has "firm control" over DOGE. Op.35. For example, as the District Court observed, President Trump publicly stated: "I signed an order creating [DOGE] and put a man named Elon Musk in charge." *Id.*; *see also id.* (quoting White House Press Secretary). Further, Musk's online posts confirm his "ability to cause DOGE to act." Op.4. In one instance, hours after Musk posted "CFPB RIP" on X, the Consumer Financial Protection Bureau's ("CFPB") website shut down in part and its X account was deleted. Op.5; J.R.217 (describing Jeremy Lewin and other DOGE members' CFPB takeover).

Led by Musk, DOGE has commenced the unprecedented endeavor of taking a chainsaw to federal agencies established by Congress. Without seeking legislation, or often even providing notice to Congress and agency leadership, Musk and his loyal DOGE staffers have gone to federal departments and agencies—including the Departments of Veterans Affairs, Transportation, and Health and Human Services— and intimidated, bullied, and harassed career civil servants. *See* Op.6, 11, 85; *see also* J.R.97, 109, 115, 906 (news reports of employees' experience). DOGE has commandeered agency computer systems, accessed sensitive information facilities,

and taken the lead in terminating contracts and firing employees. *See* Op.6, 9, 21. When agency employees have refused to accede in these unlawful actions, Musk has threatened to involve the U.S. Marshals Service. *See* Op.9.

The DOGE target at the center of this case is USAID. Since 1961, USAID has served the non-partisan purpose of administering civilian relief aid and development assistance to foreign nations. Initially established by executive order, based on authority Congress vested in President Kennedy pursuant to the Foreign Assistance Act of 1961, *see* 26 Fed. Reg. 10,469 (Nov. 7, 1961), the mission of USAID has long been to supply "humanitarian aid as a form of diplomacy," reinforcing "the belief that American security was linked to the economic progress and stability of other nations," USAID and PL-480, 1961-1969, OFFICE OF THE HISTORIAN, https://history.state.gov/milestones/1961-1968/pl-480; *accord* Testimony of Andrew S. Natsios, Former Administrator, USAID, House Committee on Foreign Affairs (Feb. 13, 2025), https://perma.cc/A74K-HL5C ("USAID is an extraordinary instrument of U.S. national soft power."). Relevant here, in 1998, Congress statutorily re-established USAID, employing language that is standard for creating agencies. *See* Foreign Affairs Reform and Restructuring Act of 1998, H.R. 1757-32 § 413(a) (1998) ("[T]here is within the Executive branch of Government the United States Agency for International Development"). USAID is led by an Administrator nominated by the President and confirmed by the Senate. *See*

22 U.S.C. §§ 2384, 6563(b). USAID personnel are stationed both abroad and at home, *see* Op.8, 14, and Congress has continuously funded USAID through specific appropriations, Op.44-46.

DOGE's efforts to dismantle USAID began on Monday, January 27, 2025. *See* Op.8. That morning, DOGE personnel arrived at USAID's headquarters to commence the process of dismantling the agency. *See id.* First on the agenda was removing senior leadership, and by the end of the day, over 50 senior USAID officials were placed on administrative leave. *See id.* With senior leadership sidelined, DOGE began dismantling the agency in earnest. By later in the week, the USAID seal on the building had been removed, the USAID website had been shut down, and dozens more employees were placed on leave. *See* Op.9. Remaining employees questioned the legality of DOGE's actions, *see id.*, leading in one instance to a "verbally heated" dispute between DOGE and USAID security over access to the agency's sensitive compartmented information facility ("SCIF"). J.R.186-87, 572. Musk threatened to contact the U.S. Marshals to obtain access, and DOGE eventually entered the SCIF by using their control over USAID's computer systems "to grant themselves access to restricted areas requiring security clearance." J.R.228; *see also* Op.9; J.R.184 (describing Jeremy Lewin's prior attempt to gain access to a secure area).

Amidst these activities, Musk publicly boasted about his dismantling of

USAID. On the evening of February 2, Musk posted on X that USAID was "evil," a "criminal organization," and that it was "[t]ime for it to die." Op.19. After midnight, Musk hosted a live broadcast on X, in which he discussed DOGE's work at USAID to "shut it down." *Id.* At 1:54 a.m., after the live broadcast ended, Musk posted on X: "We spent the weekend feeding USAID to the wood chipper. Could have gone to some great parties. Did that instead." Op.11. DOGE permanently shuttered USAID's physical headquarters, and, until after litigation commenced, employees placed on leave were refused access to the building to retrieve their personal belongings. *See* Op.12, 24, 37, 64.

By the end of the next week, "almost 90 percent" of "USAID's 4,765 direct hire employees" were "on or slated for placement on administrative leave." Op.12, 38. USAID employees subsequently received notice stating that "all USAID direct hire personnel with the exception of designated personnel responsible for mission-critical functions, core leadership and/or specially designated programs, will be placed on administrative leave globally." Op.13. The notice also advised there would be "a Reduction-in-Force that will affect approximately 2,000 USAID personnel with duty stations in the United States." *Id.*

In addition to mass staff eliminations, DOGE terminated significant USAID contracts and grants. DOGE "has taken credit, based on its own accounting, for terminating 2,191 contracts worth $26.1 billion and 2,366 grants worth $41.8 billion,

for a total of nearly $68 billion." Op.39. Suffice it to say, "USAID has been effectively eliminated." Op.40. The agency cannot readily "perform its core functions and even certain basic functions of a governmental agency," including various statutory obligations. Op.39-40.

## II.    Procedural History

Plaintiffs-Appellees, current and recently terminated employees and contractors of USAID, brought this action to enjoin Musk and DOGE from taking unconstitutional action. The Complaint asserted two claims—a violation of the Appointments Clause and a violation of separation of powers principles—and by subsequent motion Plaintiffs-Appellees sought preliminary injunctive relief, supported by documentary evidence and declarations. Op.1-2, 24; J.R., 25 Civ. 462 (D. Md.), ECF 37. Through declarations, Plaintiffs-Appellees demonstrated the irreparable harm they would suffer absent preliminary injunctive relief. For instance, the USAID shutdown inflicted irreparable harm to J. Doe 22, "a USAID employee stationed in a high-risk area in Central America who was placed on administrative leave on February 23, 2025, and because of DOGE's shutdown of the USAID payment system" faced "ongoing physical security risk" because he could not pay for electricity powering security cameras, radios, and cell phones connected with the regional security office. Op.15, 55. As another example, J. Doe 12 suffered irreparable reputational harm because Musk's derogatory statements about "USAID

workers [] being 'corrupt' and 'stealing from the American people'" had made their way back to his family. Op.58.

Before ruling on the motion for preliminary injunction, the District Court convened a hearing. *See* Minute Entry, 25 Civ. 462 (D. Md.), ECF 47. Following the hearing, the District Court invited Defendants-Appellants to submit documentary evidence and affidavits explaining the decision to shut down USAID. *See* Order, 25 Civ. 462 (D. Md.), ECF 66. Defendants-Appellants submitted nine heavily redacted documents, *see* Defs.' Exs., 25 Civ. 462 (D. Md.), ECF 70.

With the benefit of this record, the District Court granted "some but not all of the relief requested" in Plaintiffs-Appellees' motion for preliminary injunction. Op.64, 68. Specifically, the District Court found that:

> Defendants' actions taken to shut down USAID on an accelerated basis, including its apparent decision to permanently close USAID headquarters without the approval of a duly appointed USAID Officer, likely violated the United States Constitution in multiple ways, and that these actions harmed not only Plaintiffs, but also the public interest, because they deprived the public's elected representatives in Congress of their constitutional authority to decide whether, when, and how to close down an agency created by Congress.

Op.68.

In ruling on the motion, the District Court carefully distinguished those unlawful DOGE actions with some evidence of possible ratification by USAID officials from those with none. *See* Op.26-28, 65, 67. The District Court specifically observed that "Musk and DOGE Team Members" are "the only individuals known

to be associated with the decisions to initiate a shutdown of USAID by permanently closing USAID headquarters and taking down its website." Op.28. Shortly after the District Court ruled, Defendants-Appellants moved for clarification or modification of the ruling. *See* Mot., 25 Civ. 462 (D. Md.), ECF 77. In this motion, Defendants-Appellants sought to exclude from the preliminary injunction Jeremy Lewin, an individual Defendants-Appellants stated was appointed March 18, 2025 by Secretary of State Marco Rubio to serve as USAID Chief Operating Officer. Defendants-Appellants submitted a declaration from Lewin asserting: "I am not, and have never been, an employee of Elon Musk or [DOGE]." Decl. of Jeremy Lewin ¶ 9, 25 Civ. 462 (D. Md.), ECF 77-2; *but see* J.R.217, 184; *The People Carrying Out Musk's Plans at DOGE*, NY TIMES (updated Mar. 14, 2025), https://www.nytimes.com/interactive/2025/02/27/us/politics/doge-staff-list.html. The District Court confirmed that its order applied to Lewin because he "served as a DOGE Team Lead." Order, 25 Civ. 462 (D. Md.), ECF 79. Defendants-Appellants appealed and requested a stay pending appeal.

## ARGUMENT

The familiar four-part standard set forth in *Nken v. Holder*, 556 U.S. 418 (2009), supplies the test for evaluating the government's motion to stay: "(1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay;

(3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies." *Sierra Club v. United States Army Corps of Eng'rs*, 981 F.3d 251, 256 (4th Cir. 2020) (cleaned up). In evaluating these factors on a motion to stay, any factual findings made by the district court "are entitled to deference." *Patten Grading & Paving, Inc. v. Skanska USA Bldg., Inc.*, 380 F.3d 200, 203-04 (4th Cir. 2004); *see also Index Newspapers LLC v. United States Marshals Serv.*, 977 F.3d 817, 824 (9th Cir. 2020). Defendants-Appellants have not met their burden.

## I.    Defendants-Appellants Have Not Shown Likelihood of Success on the Merits.

Defendants-Appellants have not shown a likelihood of succeed on the merits. As the District Court correctly held, Defendants-Appellants "likely violated both the Appointments Clause and Separation of Powers." Op.62.

### A. The District Court Correctly Held that Musk Acted as an "Officer" in Violation of the Appointments Clause.

The Appointments Clause prescribes the "exclusive means" of appointing "'Officers [of the United States].'" *Lucia v. SEC,* 585 U.S. 237, 241 (2018). The Clause provides "a significant structural safeguard that preserves political accountability through direction and supervision of subordinates." *United States v. Arthrex, Inc.*, 594 U.S. 1, 17-18 (2021) (cleaned up). Two characteristics divide such Officers, who must be appointed in conformity with the Appointments Clause, from

mere employees, who need not be. To be an "Officer," an official must: (1) "exercise significant authority pursuant to the laws of the United States," and (2) "occupy a continuing position established by law." *Lucia*, 585 U.S. at 245 (cleaned up). Here, based on the extensive factual record, the District Court correctly held that Musk was likely an Officer who was not appointed in conformity with the Appointments Clause.

The District Court extensively assessed the factual record to determine the authority that Musk exercised with respect to USAID. It concluded that Musk and DOGE Team Members were "the only individuals known to be associated with the decisions to initiate a shutdown of USAID by permanently closing USAID headquarters and taking down its website." Op.28. That decision "to permanently close an agency's headquarters as part of the shutdown of the agency," the District Court held, "is a matter of great significance." Op.29. And by turning over USAID headquarters to another agency, Musk and the DOGE Team Members ensured that the decision "was plainly final." Op.30. Thus, Musk "exercised significant discretion when carrying out important functions" and had "the last word" in doing so, satisfying the first prong of the test. *Carr v. Saul*, 593 U.S. 83, 86 (2021) (cleaned up).

Next, the District Court determined that the position of USDS Administrator qualified as a "continuing office established by law," satisfying the second prong of

the test. *Id.* The District Court explained that the Executive Order reflected that the position was "not personal to any particular individual." Op.32-33. Moreover, although "the DOGE Executive Order sets an 18-month term," the USDS Administrator position is not "transient or fleeting" because "the executive orders contemplate robust, ongoing duties for DOGE during that time period." Op.33. And the work contemplated by the DOGE Executive Order is substantial, "not merely 'incidental' to the regular operations of government." Op.34. Finally, the District Court held, as a factual matter, that "the record demonstrates that, at least during the time period relevant to this Motion, Musk was, at a minimum, likely the official performing the duties and functions of the USDS Administrator," and thus "has a 'continuing position' for purposes of the Appointments Clause." Op.36.

Defendants-Appellants ask this Court to stay the preliminary injunction—allowing Musk and DOGE Team Members to continue exercising control over USAID—because Musk is, according to Defendants-Appellants, nothing more than an influential presidential adviser not subject to the Appointments Clause. Mot.14-15, 17-18. They contend that Musk, who uses the title "Senior Advisor to the President," neither exercises significant authority nor holds a continuing position. *Id.* In their view the lack of a formal statutory or regulatory delegation of authority to Musk "should have been dispositive." *Id.* at 15. These contentions are wrong for at least two reasons.

*First*, Defendants-Appellants' argument contradicts the careful factual findings below that Musk wields far more actual authority than a typical presidential adviser (presumably with the express or tacit approval of the President). While it is true that presidential advisers typically are not "Officers" and therefore need not be appointed in conformity with the Appointments Clause, that is because they do not in fact exercise operational authority over agencies even if they may wield influence. *Cf. Lofstad v. Raimondo*, 117 F.4th 493, 499 (3d Cir. 2024) (concluding that members of Regional Fishery Management Councils were more than mere advisers because their powers "to block some actions by the Secretary of Commerce" "go well beyond advice").

Musk, by contrast, does much more in practice than advise the President or wield influence. Instead, as the District Court determined, the factual record at this preliminary stage supports the conclusion that Musk personally made the decision to dismantle USAID and directed the actions to carry out that decision. The Court cited record evidence supporting this conclusion noting that "Musk specifically stated about USAID on X that it was 'Time for it die,' … that 'we're in the process of … shutting down USAID,' … and that he had 'spent the weekend feeding USAID to the wood chipper,'…" Op.28. And it was a "DOGE Team Member" who announced to employees that USAID headquarters would be closed. *Id.* The record also revealed that Musk exercised similar decision-making authority over *other*

agencies, *see* Op.6, further confirming the nature of his power over USAID, *see* Op.28-29. In contrast, the District Court noted, Defendants-Appellants submitted no evidence indicating that any USAID official was involved in the decision to begin the dismantling of the agency by closing its headquarters and shutting down its website—even though USAID officials submitted declarations claiming responsibility over other challenged actions and had ample opportunity to submit further evidence. *See* Op.26-27.

These factual findings are entitled to considerable deference, *see Patten*, 380 F.3d at 203-04; *Index Newspapers*, 977 F.3d at 824, and Defendants-Appellants offer no reason to disturb them. Instead, they inaccurately claim that the District Court improperly shifted the burden of proof to the government. *See* Mot.16-17. But as described above, the District Court did no such thing. The court looked to evidence Plaintiffs-Appellees submitted (and which Defendants-Appellants offered no evidence to contradict), conducted a careful evaluation of the extensive record before it, and made factual findings based on that record.

*Second*, by focusing on Musk's "Special Advisor" title and the lack of formal statutory or regulatory authority for Musk to decide the fate of USAID, Defendants-Appellants focus on the wrong facts. The test for whether an official is an "Officer" who must be appointed in accordance with the Appointments Clause is whether the official "exercises" significant authority. *See Lucia*, 585 U.S. at 248 (concluding

SEC administrative judges are "officers" because they "exercise … significant discretion when carrying out … important functions") (cleaned up); *see also Arthrex*, 594 U.S. at 13 (noting that administrative patent judges are "Officers" because they "exercise significant authority"). Although in many cases the scope of an official's authority can be assessed through examination of a statute or regulation specifying their powers, that will not always be the case. An ordinary observer can plainly see— as the District Court did—that Musk is exercising operational control over departments and agencies even though Defendants-Appellants claim there is no formal legal instrument granting him such authority. And whatever his formal title, the District Court correctly determined *as a factual matter* that Musk is plainly occupying the position of USDS Administrator, a continuing position established by the DOGE executive order.

The Administration cannot evade the accountability enforced through the Appointments Clause by obfuscating Musk's actual authority. As the District Court explained in rejecting this argument below: "To deny Plaintiffs' Appointments Clause claim solely on the basis that, on paper, Musk has no formal legal authority relating to the decisions at issue, even if he is actually exercising significant authority on governmental matters, would open the door to an end-run around the Appointments Clause." Op.31; *cf. Officers of the United States Within the Meaning of the Appointments Clause*, 31 Op. O.L.C. 73, 117 (2007) ("Congress could not

evade the Appointments Clause by, for example, the artifice of authorizing a contract for the supervision of the Justice Department, on the ground that no 'office' of Attorney General would be created by law.").

The District Court correctly concluded that Musk, while occupying the "continuing position" of USDS Administrator and leader of DOGE, is exercising "significant authority" by deciding to dismantle USAID and other agencies, regardless of whether his title or any legal instrument formally gives him authority to so. To conclude otherwise would turn the Appointments Clause into a mere nuisance easily manipulated by the very branch whose accountability it was designed to ensure. *Arthrex*, 594 U.S. 17-18. This Court should therefore reject Defendants-Appellants request for a stay.

### B. The District Court Correctly Held that the Decision to Dismantle USAID Likely Violated the Separation of Powers.

The Supreme Court "consistently has given voice to, and has reaffirmed, the central judgment of the Framers of the Constitution that, within our political scheme, the separation of governmental powers into three coordinate Branches is essential to the preservation of liberty." *Mistretta v. United States*, 488 U.S. 361, 380 (1989). When assessing whether the Executive Branch has overstepped its role in this structure, violating the Separation of Powers, courts look to the tri-partite framework set out in Justice Jackson's concurrence in *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579 (1952). Under that framework, if Congress has expressly authorized

the President to act, "his authority is at its maximum;" if Congress is silent, the President must rely on his independent powers (which exist in a "zone of twilight" of concurrent authority); and if Congress has expressly or impliedly prohibited the President from acting, his power is at its "lowest ebb" and he must rely only on "his own constitutional powers minus any constitutional powers of Congress over the matter." *Id.* at 635-37 (Jackson, J., concurring). For an action in this third *Youngstown* category to be sustained, the "President's asserted power must be both 'exclusive' and 'conclusive' on the issue." *Zivotofsky v. Kerry*, 576 U.S. 1, 10 (2015) (quoting *Youngstown*, 343 U.S. at 637-38 (Jackson, J., concurring)).

Applying the *Youngstown* framework, the District Court concluded correctly that "the third *Youngstown* category applies" because "Congress has consistently reserved for itself the power to create and abolish federal agencies, specifically established USAID as an agency by statute, and has not previously permitted actions taken toward a reorganization or elimination of the agency without first providing a detailed justification to Congress." Op.45-46. Because of Congress's express action, the authority of the President is at its "lowest ebb" here. *Id.* The District Court further concluded that "even considering the identified Article II authority"—*i.e.*, the asserted powers over foreign policy and to take care that the laws are faithfully executed—"the power to act to eliminate federal agencies resides exclusively with Congress." Op.50.

In asking this Court to stay the preliminary injunction, Defendants-Appellants once more sidestep the careful factual findings that underlie the preliminary injunction. For starters, Defendants-Appellants assert, without elaboration, that it is "doubtful" that Plaintiffs-Appellees' injuries could be traced to Defendants-Appellants because of the involvement of USAID officials in some of the challenged actions. Mot.19. But the District Court addressed traceability at length, making detailed factual findings, *see* Op.19-22, and concluding that "USAID officials were not actually independent actors and that even if they were, they in fact would predictably sign off on the actions directed or taken by Defendants." Op.21. These factual findings, again, are entitled to significant deference, *see Patten*, 380 F.3d at 203-04; *Index Newspapers*, 977 F.3d at 824, no matter how "doubtful" Defendants-Appellants find them to be.

Turning to the merits, Defendants-Appellants' primary response is an untenable argument about the President's foreign policy powers. *See* Mot.20. The Supreme Court has rejected arguments about any such talismanic "foreign policy" power of the President: "The Executive is not free from the ordinary controls and checks of Congress merely because foreign affairs are at issue." *Zivotofsky,* 576 U.S. at 21; *id.* ("It is not for the President alone to determine the whole content of the Nation's foreign policy."). The authority to dismantle an agency established by Congress—whether it aids the President in development and implementation of

foreign policy or another function—is a power that Congress wields, not the President. Indeed, as the District Court held, "the primary actions at issue—the closure of USAID headquarters, the placement on leave or termination of 90 percent of its workforce, and the termination of large numbers of contracts, including those with personal services contractors—relate largely to the structure of and resources made available to a federal agency, not to the direct conduct of foreign policy or engagement with foreign governments." Op.48. The District Court correctly held that "Defendants' actions taken to abolish or dismantle USAID are 'incompatible with the express or implied will of Congress.'" Op.45 (quoting *Youngstown*, 343 U.S. at 637 (Jackson, J., concurring)).

Defendants-Appellants also argue that it is improper to look at the "sum of agency actions," suggesting that the appropriate remedy is for aggrieved parties to challenge individual agency actions one-by-one under the Administrative Procedures Act. Mot.20-21. The dismantling of an agency, of course, is necessarily executed through a series of smaller actions, but that does not insulate the overarching decision from constitutional challenge. *See* Op.13 ("USAID has been effectively eliminated."); *see also Local 2677, American Federation of Government Employees v. Phillips*, 358 F. Supp. 60, 72 (D.D.C. 1973) (finding Separation of Powers violation pursuant to *Youngstown* where the President sought to terminate the Office of Economic Opportunity). It is precisely when the Executive Branch so

egregiously encroaches on the power of Congress to create and abolish federal agencies that a separation of powers challenge is needed to preserve the Framers' vision of a "tripartite Federal Government," intended to "safeguard against the encroachment or aggrandizement of one branch at the expense of the other." *Mistretta*, 488 U.S. at 382 (citations omitted).

## C. The Court Should Defer to the District Court's Determination as to the Necessary Scope of the Injunction.

No doubt recognizing the weakness of their merits arguments, Defendants-Appellants also seek in the alternative a partial stay of the preliminary injunction as it applies to DOGE member, and former USAID DOGE Team Lead, Jeremy Lewin. Here too they fail to carry their burden, and their request for a partial stay should be denied.

Just four days ago, the District Court considered and denied Defendants-Appellants' request to carve out Lewin from its preliminary injunction. In declining to revisit the scope of its injunction, the court emphatically noted that it had "carefully crafted" the class of individuals bound by the injunction "to address the most likely perpetrators of constitutional violations and to prevent the circumvention of the injunction." Order, 25 Civ. 462 (D. Md.), ECF 79. This Court should not second guess the District Court's determination as to the injunction's necessary scope to avoid circumvention of the court's order and continuing constitutional violations.

First, as this Court has recognized, "remedies with bite" are appropriate for Appointments Clause violations given the importance of the clause in preserving the Constitution's "structural integrity." *Brooks v. Kijakazi*, 60 F.4th 735, 740 (4th Cir. 2023). The Supreme Court in *Lucia* recognized this point by determining that the proper remedy for an improperly appointed administrative law judge was a hearing before a different judge—not a rehearing before the same judge once properly appointed. *See* 585 U.S. at 251. Like the administrative law judge in *Lucia*, Lewin, the former USAID DOGE Team Lead, "cannot be expected to consider" the question of USAID's dismantling "as though he had not adjudicated it before," *id.* at 251, given his entanglement with Musk and DOGE.

Second, the District Court concluded that "it is likely that Plaintiffs will succeed on their Separation of Powers claim," Op.53, and so enjoined Defendants-Appellants from continuing such violations. Lewin, as a DOGE member, is clearly a party to the case (and hence Defendants-Appellants felt it necessary to move the District Court "for clarification or modification" of the injunction). Thus, he has been enjoined from continuing to violate the separation of powers. The fact that "other government officials" may, "as well," have violated the separation of powers does not diminish the District Court's ability to enjoin the parties in front of it from continuing their own constitutional violations. Op.37; *cf. AIDS Vaccine Advoc. Coal. v. U.S. Dep't of State*, No. 25 Civ. 400 (D.D.C. 2025), ECF 60 (enjoining non-DOGE

officials from likely separation of powers violations regarding USAID's dismantling).

To the extent the Court believes there are factual or legal questions pertinent to whether the preliminary injunction should apply to Lewin, those questions can and should be taken up in due course by the District Court. The Court should not grant the extraordinary remedy of a stay, especially when USAID undoubtedly can continue to perform its necessary functions through reliance on properly appointed Officers not within the scope of the injunction.

## II. Irreparable Harm and the Balance of Equities Also Do Not Favor a Stay.

The relevant question is whether the party seeking a stay—here, the government—has shown that it would suffer irreparable harm in the absence of a stay. *See W. Virginia v. EPA*, 90 F.4th 323, 331 (4th Cir. 2024); *Sierra Club*, 981 F.3d at 264. Defendants-Appellants have not made that showing. To the extent they address irreparable harm, they rely primarily on the application of the injunction to Lewin. But they have not shown why other properly appointed officials at USAID—or elsewhere in the Executive Branch—cannot carry out the functions that Secretary Rubio assigned to Lewin the day the District Court issued its injunction. At any rate, far from irreparably harming the government, it is eminently reasonable for the whole-cloth dismantling of an agency to await the conclusion of this significant constitutional challenge. For similar reasons, the equities strongly favor

denial of a stay, especially given the "serious concerns about security and safety" faced by Plaintiffs-Appellees who are personnel overseas on administrative leave. Op.62.

## CONCLUSION

For the foregoing reasons, the Court should deny Defendants-Appellants' motion for a stay.

Dated: March 24, 2025

Respectfully submitted,

/s/Pooja Chaudhuri

| | |
|---|---|
| Mimi Marziani* | Pooja Chaudhuri |
| Rebecca (Beth) Stevens* | Norman L. Eisen* |
| Joaquin Gonzalez* | Tianna J. Mays* |
| MARZIANI, STEVENS & GONZALEZ PLLC | STATE DEMOCRACY DEFENDERS FUND |
| 1533 Austin Highway | 600 Pennsylvania Avenue SE |
| Suite 102-402 | Suite 15180 |
| San Antonio, TX 78218 | Washington, D.C. 20003 |
| (212) 343-5604 | (212) 594-9958 |
| mmarziani@msgpllc.com | pooja@statedemocracydefenders.org |
| bstevens@msgpllc.com | norman@statedemocracydefenders.org |
| jgonzalez@msgpllc.com | tianna@statedemocracydefenders.org |

*admissions application forthcoming

Counsel for Plaintiffs-Appellees

**CERTIFICATE OF COMPLIANCE**

I hereby certify that this response complies with the type-volume requirements of Federal Rule of Appellate Procedure 27(d)(2)(A) because it contains 5,084 words. This response was prepared in 14-point Times New Roman font, a proportionally spaced typeface, using Microsoft Word.

Dated: March 24, 2025
/s/Pooja Chaudhuri
Pooja Chaudhuri
*Counsel for Plaintiffs-Appellees*

## CERTIFICATE OF SERVICE

I hereby certify that on March 24, 2025, I electronically filed the foregoing brief with the Clerk of the Court for the U.S. Court of Appeals for the Fourth Circuit by using the appellate CM/ECF system. Participants in the case are registered CM/ECF users, and service will be accomplished by the appellate CM/ECF system.

Dated: March 24, 2025

*/s/Pooja Chaudhuri*
Pooja Chaudhuri
*Counsel for Plaintiffs-Appellees*